IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FILED
UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

OCT 20 2009

MATTHEW J. DYKMAN
CLERK

UNITED STATES OF AMERICA,

Plaintiff,

vs.

CR No. 07-0614 RB

REBECCA CHRISTIE (a/k/a REBECCA WULF),

Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER DENYING MOTIONS TO SUPPRESS

**THIS MATTER** is before the Court on Defendant Christie's First Motion to Suppress (Doc. 153), filed June 16, 2009, and Defendant Christie's Second Motion to Suppress (Doc. 173), filed August 10, 2009. The Court held an evidentiary hearing on Defendant's Motions September 10, 2009.

## FINDINGS OF FACT

1. In January 2006, Sgt. Derek Wulf and his wife Rebecca Christie (a/k/a Rebecca Wulf) were living in military housing on Holloman Air Force Base at 2032-A Langley with their three-year-old daughter Brandi Wulf. Sgt. Wulf was assigned to temporary duty in Langley Virginia and departed Holloman Air Force Base on January 17, 2006, leaving Rebecca to care for Brandi.

2. On January 26, 2006, Brandi was transported by emergency medical personnel to the Gerald Champion Hospital in Alamogordo where she was pronounced dead that afternoon. That day, the Air Force Office of Special Investigations (AFOSI) began an investigation into the circumstances surrounding Brandi's death. The AFOSI then contacted the FBI who also

became involved in the investigation.

3. While still at the hospital following Brandi's death, Rebecca was briefly interviewed by investigators and signed a Consent to Search and Seizure Form pertaining to the Wulfs' residence and automobile located at 2032-A Langley. Investigators conducted a search of the house the very same day, January 26, 2006. Investigators seized several items from the house at this time, however, they did not seize Rebecca's computer.

4. Upon learning of his daughter's death, Sgt. Wulf flew home on January 27, 2006 and was picked up by investigators at the airport and escorted to the Office of Special Investigations where he was interviewed by Special Agent Oakes. Sgt. Wulf had been away nine days. Rebecca was also interviewed on January 27, 2006.

5. After the death of their daughter, the Wulfs moved out of their previous residence and into a new house at 2066-A Lea Court on Holloman Air Force Base. The consent to Search and Seizure Form that was signed by Rebecca on January 26, 2006 applied only to the couple's residence at 2032-A Langley, and not to this new residence.

6. Sometime after the couple moved into their new residence at 2066-A Lea Court, they decided to split up and physically divided their property in anticipation of their pending divorce and Sgt. Wulf's reassignment to Montgomery, Alabama. The division of property by the couple occurred in early to mid-April before the seizure of Ms. Christie's computer on May 4, 2006. Sgt. Wulf's possessions were moved into a separate room and marked "first out" so that they could be shipped to Alabama. According to Ms. Christie, she received the computer that Sgt. Wulf's father had purchased.

7. In April Ms. Christie and Sgt. Wulf moved into temporary housing in anticipation of Sgt.

Wulf's reassignment. At this point, they were not sleeping in the same bedroom. Ms. Christie was sleeping near her computer in a "side area" of the temporary housing to which Sgt. Wulf was allowed access. At their previous residences, Ms. Christie's computer was kept in the living room.

8. On May 4, 2006, Sgt. Wulf was interviewed by S.A. Oakes for a second time. Sgt. Wulf was advised of his Miranda rights, stated that he understood those rights, and signed an advice of rights form.

9. Sgt. Wulf then told S.A. Oakes that he thought that Rebecca's excessive computer usage caused Brandi's death.

10. Ms. Christie would often stay up late at night and spend four to six hours playing World of Warcraft.

11. During his May 4, 2006 interview with S.A. Oakes, Sgt. Wulf indicated that Rebecca's computer was purchased for him by his father.

12. Rebecca contends that the computer was a Christmas gift to both of them, that Sgt. Wulf bought his own computer about a year later, that she was the exclusive user of the computer, that she kept it password protected, and that she changed the password when she became concerned that Sgt. Wulf had discovered her password and gained access to the computer.

13. During the May 4, 2006 interview, Sgt. Wulf indicated to S.A. Oakes that he and Ms. Christie had filed for divorce approximately three weeks prior to the interview.

14. During the May 4, 2006 interview, S.A. Oakes asked if Derek would like to know how much time Rebecca was spending on the computer. Derek indicated that he would, and S.A. Oakes offered to have the FBI search the computer and provide him with that information. S.A.

Oakes also asked if Rebecca would be willing to come in for an interview.

15. Following his interview with S.A. Oakes, Sgt. Wulf went home to retrieve the computer and ask Rebecca if she would like to speak to S.A. Oakes. Sgt. Wulf came back about 20 minutes later with the computer and Rebecca and handed the computer over to S.A. Oakes.

16. When Ms. Christie saw that S.A. Oakes had the computer, she asked why he had taken her computer. S.A. Oakes told Ms. Christie that the computer was Derek's, that Sgt. Wulf had consented to give it to him, and that he was going to look at it to determine how much time she had been spending on the computer.

17. Ms. Christie expressed concern about the computer and the fact that she needed the computer for her school work. She had recently started a criminal justice program at ITT Tech in March 2006, had taken out loans to pay for the schooling, and she was concerned that she might get kicked out of school without the computer. S.A. Oakes told her that the computer belonged to Sgt. Wulf and refused to give the computer back to Rebecca or allow her access to it.

18. Rebecca went to the First Sergeant to see if she could get some information from the computer that she needed for her schoolwork. S.A. Oakes told the First Sergeant that it was not possible.

19. After his interviews that day with Ms. Christie and Sgt. Wulf, S.A. Oakes visited Sgt. Wulf at the couple's temporary housing where Sgt. Wulf signed a Consent to Search Form for the computer, and S.A. Oakes gave him a receipt for the computer.

20. The computer was then taken to Albuquerque and stored in an evidence room until a search warrant was obtained on October 6, 2006.

21. During the five-month period between when the computer was seized and when the computer was searched by the FBI, S.A. Oakes was participating in multiple undercover operations.

22. The first search warrant granted investigators permission to search for electronic data indicating Ms. Christie's "frequency of use" of the computer. The search of the computer was performed between October 13–17, 2006. Prior to the search, a mirror image of the computer's hard drive was created which was downloaded and placed on a network. Copies of the hard drive were also provided to the defense.

23. On October 16, 2007, Rebecca filed a Motion to Preclude Additional Search and for Return of Computer. On May 26, 2009, this Court granted in part and denied in part Rebecca Christie's Motion to Preclude Search and for Return of Computer, allowing the United States to conduct a second search, provided a second search warrant was obtained.

24. On May 18, 2009, the United States announced its intent to seek a second search warrant, and a second search warrant was granted on May 20, 2009. The second warrant granted investigators permission to search for the following:

> All records and information relating to the murder, neglect, and abuse of Brandi Wulf from June 19, 2002 (date of birth) to May 4, 2006, (date computer seized), including:
> 1. All photographs of Brandi Wulf.
> 2. All correspondence and/or documents relating to Brandi Wulf.
> 3. All records and inforamtion, including any diaries or calendars, showing the day-to-day activities of Rebecca Christie and/or Brandi Wulf.
> 4. All addresses and/or contact information of friends, families, or acquaintances who may have had regular contact with Rebecca Christie and/or Brandi Wulf.

The second search warrant instructed that the search be performed on or before May 30, 2009

and that the search not exceed ten days.

25. On May 22, 2009, the computer forensic investigators at the FBI placed the computer on the server so that S.A. Oakes could look at it and check what parts were relevant to the warrant. By August 11, 2009, S.A. Oakes finished searching the computer and checkmarking the items that he wanted. The computer forensic people at the FBI then generated a disk for him with the requested items.

## CONCLUSIONS OF LAW

### *Gov't bears the burden of establishing by a preponderance of the evidence that it had valid consent to seize property?*

1. "[A] search or seizure carried out on a suspect's premises without a warrant is *per* se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions . . . ." *Coolidge v. New Hampshire*, 403 U.S. 443, 474 (1971). One such exception is where a person who has a sufficient relationship to and control over the property to be searched gives consent. *See Illinois v. Rodriguez*, 497 U.S. 177 (1990). Under this exception "[t]he government bears the burden of proving by a preponderance of the evidence that the consenter had mutual use of the property searched by virtue of [his] joint access to it, or control for most purposes over it." *United States v. McAlpine*, 919 F.2d 1461, 1463 (10th Cir. 1990) (citing *Rodriguez*, 497 U.S. at 181.).

### *Ms. Christie did not give valid consent for the seizure or subsequent search of her computer.*

2. The Consent to Search and Seizure Form that Ms. Christie signed with regard to the couple's 2032-A Langley residence on Holloman Air Force Base did not give authorities consent to search or seize property from the couple's temporary residence on Holloman Air Force Base,

which is where the computer was picked up by Sgt. Wulf and then turned over to S.A. Oakes. Furthermore, "an individual's mere acquiescence to a claim of unlawful authority is not, by itself, enough to show voluntary consent." *Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1233 (10th Cir. 2001). Since Ms. Christie did not turn over the computer herself and did not affirmatively consent to the seizure of the computer, there was no valid consent on her part. Consequently, in order for the Government's seizure of the computer to be valid, the Government must show by a preponderance of the evidence that Sgt. Wulf had the authority to consent to the seizure of the computer.

***Sgt. Wulf had authority to turn the computer over to S.A. Oakes.***

3. Computers are analogous to "suitcases, footlockers, or other personal items that 'command[] a high degree of privacy.'" *United States v. Andrus*, 483 F.3d 711, 718 (10th Cir. 2007) (quoting *United States v. Salinas-Cano*, 959 F.2d 861, 864 (10th Cir. 1992)). In assessing the degree of privacy that should be afforded an object, the trial court must also look at "the precautions taken by the owner to manifest his subjective expectation of privacy, for example locking the container," or in this case, using a password to restrict access to the computer. *Salinas-Cano*, 959 F.2d at 864; *see also United States v. Andrus*, 483 F.3d 711 (10th Cir. 2007). Where the *seizure* of such an object is at issue, however, the trial court must also look at where the object was located and the expectation of privacy that the person had in that area. *See United States v. Rith*, 164 F.3d 1323, 1329 (10th Cir. 1999); *Salinas-Cano*, 959 F.2d at 863–65.

4. The Tenth Circuit and the United States Supreme Court have drawn a distinction between the mere seizure of a closed container and a search of the contents of that closed container.

*See United States v. Burgess*, 576 F.3d 1078, 1089 (10th Cir. 2009); *United States v. Carey*, 172 F.3d 1268, 1275 (10th Cir. 1999); *Texas v. Brown*, 460 U.S. 730, 749 (1983); *Arkansas v. Sanders*, 442 U.S. 753 (1979); *United States v. Chadwick*, 433 U.S. 1 (1977). "[I]f there is probable cause to believe [an object] contains [evidence of a crime], the owner's possessory interest in the container must yield to society's interest in making sure that the [evidence] does not vanish during the time it would take to obtain a warrant. . . . Once the container is in custody, there is no risk that evidence will be destroyed." *Brown*, 460 U.S. at 749–50 (plurality) (Js. Stevens, Brennan, and Marshall concurring). S.A. Oakes obtained a warrant before performing any search on Ms. Christie's computer. Thus, the issue in this case is not whether S.A. Oakes' search of the computer's files was valid, but rather whether he had the requisite consent or authority to seize the computer believing it contained evidence of a crime.

5. The requirements for a valid seizure of a computer are less than for a search of the computer's contents because the person's expectation of privacy in the object is different than her expectation of privacy in its contents. *Brown*, 460 U.S. at 749 ("[T]he constitutionality of a container search is not automatically determined by the constitutionality of the prior seizure. . . . Separate inquiries are necessary, taking into account the separate interests at stake.") There is clearly a higher expectation of privacy in the files that are stored inside a computer, just as there is a higher expectation of privacy in the contents of a file cabinet or briefcase. Authorities may seize a briefcase when there is probable cause to believe that the briefcase contains contraband or evidence of a crime because there is a real danger that the evidence will be destroyed by the time the officer obtains a search warrant.

*Id.* The same rationale applies to a computer. If S.A. Oakes had not immediately seized the computer, there was a substantial risk that the evidence contained in the computer would have been lost or destroyed.

6. Sgt. Wulf had actual authority to consent to the seizure of Ms. Christie's computer because it was taken from a common area in the couple's temporary housing at Holloman to which Sgt. Wulf had access and was not restricted from entering by Ms. Christie. Since Ms. Christie did not have the area where the computer was seized under her exclusive control, Sgt. Wulf had actual authority to consent to the search of the couple's home and the area where the computer was located. In order to show that a co-resident has actual authority to consent to a search, "[t]he government must [] come forward with persuasive evidence of both shared use and joint access *or* control of container in order to support third party consent." *Salinas-Cano*, 959 F.2d at 864 (emphasis added). This test is disjunctive, meaning that the Government need only show "mutual use of the property by virtue of joint access" *or* "control." *Rith*, 164 F.3d at 1329. Whether a third party has control over property is "dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control. . . . Relationships which give rise to a presumption of control of property include . . . husband-wife relationships." *Id.* at 1330.

7. In the case at hand, however, there is the added issue that Ms. Christie and Sgt. Wulf had already filed for divorce when the seizure of the computer took place. *See id.* ("a simple co-tenant relationship does not create a presumption of control and actual access would have to be shown"). Additionally, the husband-wife relationship only creates a "presumption of control . . . over the property" which "may be rebutted by facts showing an agreement or

understanding between the defendant and third party that the latter must have permission to enter the defendant's room." *Id.* at 1331. In this case, however, "[t]here is no evidence to rebut this presumption: no lock . . . ; no agreement . . . ; no payment of rent." *Id.* Even if not considered husband and wife, Ms. Christie and Sgt. Wulf were at least co-residents, and Sgt. Wulf had access to the space where the computer was kept and mutual use of the property in that area of the house. A co-resident may grant officers valid consent to search a common area and seize any items in the home over which they hold common authority, even though this authority may not extend to the interior of the objects. *See United States v. Buckner*, 473 F.3d 551, 554–55 (4th Cir. 2007). Consequently, Sgt. Wulf had actual authority to consent to the seizure of Ms. Christie's computer.

8. This Court finds no distinction between the situation in this case, where Sgt. Wulf retrieved the computer from his home and handed it over to S.A. Oakes, and the situation where S.A. Oakes comes to search Sgt. Wulf's home and Sgt. Wulf consents to him seizing the computer from his home. Ms. Christie and Sgt. Wulf shared the home, and therefore, Ms. Christie had a reduced expectation of privacy in the area where the computer was located. Sgt. Wulf had authority to allow S.A. Oakes to enter his home and seize the computer, just as he had the authority to seize the computer himself and turn it over to S.A. Oakes.

9. Even assuming that Sgt. Wulf did not have actual authority to consent to a search of the area where Ms. Christie's computer was located, such facts were not made known to S.A. Oakes, and therefore, at a minimum Sgt. Wulf had apparent authority to turn the computer over to authorities. Apparent authority exists if "the facts available to the officer at the moment . . . 'warrant a [person] of reasonable caution in the belief' that the consenting party

had authority." *Rodriguez*, 497 U.S. at 188 (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)). We have to look at "the facts available to the officer at the moment." *Rodriguez*, 497 U.S. at 188; *but see United States v. Kimoana*, 383 F.3d 1215, 1222 (10th Cir. 2004) ("[W]here an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent."). Thus, the crucial inquiry is whether during his interview with Sgt. Wulf on May 4, 2006, S.A. Oakes reasonably believed that Sgt. Wulf had the requisite control over the premises to consent to the search. In this case, the totality of the circumstances provided S.A. Oakes with sufficient basis to form an objectively reasonable belief that Sgt. Wulf had apparent authority to consent to the seizure of the computer. *See Buckner*, 473 F.3d at 555.

10. This Court's finding in its May 26, 2009 Memorandum and Order granting in part and denying in part Ms. Christie's Motion to Preclude Additional Search and for Return of Computer that "Mr. Wulf lacked third party apparent authority to consent to even the original search of the computer" is not inconsistent with the Court's findings of fact and conclusions of law herein. The authority required to consent to the seizure of an object and the authority needed to consent to the search of that object's interior are distinct. Ms. Christie had a higher expectation of privacy in the computer's files than in the computer itself. If the computer was password protected and used exclusively by Ms. Christie, as Defendant argues, then the Government needed a warrant to search the files on the computer, and Sgt. Wulf did not have the authority to consent to a search of the computer's files. In this case, the Government acted prudently and obtained a search warrant before searching the computer's files.

11

### *The five-month seizure of Ms. Christie's computer was reasonable.*

11.  Defendant argues that the five-month delay between the seizure of the computer on May 4, 2006 and the issuance of a search warrant on October 6, 2006 was constitutionally unreasonable. Defendant is correct that "a seizure based on probable cause is unconstitutional if police act with unreasonable delay in securing a warrant." *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998) (finding that a delay of eleven days was reasonable); *see also United States v. Jacobsen*, 466 U.S. 109, 124 (1984) ("a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures'"); *United States v. Respress*, 9 F.3d 483 (6th Cir. 1993) ("[E]ven with the existence of probable cause to effect a seizure, the duration of the seizure pending the issuance of a search warrant must still be reasonable."). However, the above cases can be distinguished from the case at hand because the seizure of the defendants' property in those cases was based upon probable cause; whereas, the seizure of Ms. Christie's computer was based on consent. *See, e.g., United States v. Reid*, 19 F.Supp. 2d 534, 539 (E.D. Va. 1998).

12.  Ms. Christie never protested the continuing seizure of her computer by the Government and did not file a Motion for Return of Computer until October 16, 2007, after the initial search warrant had been obtained and the search performed. Once the search was performed and evidence of possible criminal activity discovered, law enforcement officials were justified in keeping the computer for evidentiary purposes, and Ms. Christie was no longer entitled to have it returned to her. Had she filed a Motion for Return of the Computer prior to the

execution of the original search warrant, asserting the facts that she now asserts, then the Government's authority to seize the computer based on Sgt. Wulf's consent alone would have evaporated, and the Government would have had to get a search warrant or return the computer. Had Ms. Christie protested the continuing seizure—sent a letter, called S.A. Oakes after the interview, filed a motion, anything—then it would be difficult for the Government to argue that they had continuing consent to hold on to the computer.

13. Another factor that courts consider "in assessing the effect of the length of the detention" is "whether the police diligently pursue their investigation." *United States v. Place*, 462 U.S. 696, 709 (1983). Where "no effort [is] made to obtain a warrant within a reasonable time because law enforcement officers simply believed that there was no rush," courts have been more willing to find that a prolonged seizure was unreasonable. *United States v. Mitchell*, 565 F.3d 1347, 1351 (11th Cir. 2009). In the case at hand, S.A. Oakes was participating in multiple undercover operations.

***The second search warrant was valid.***

14. Defendant contests the second search warrant for the computer issued on May 20, 2009 on three grounds: (1) the warrant did not establish probable cause; (2) the warrant was overbroad and did not specify with sufficient particularity what items could be seized; and (3) there was unreasonable delay in obtaining the second warrant. These are generally questions for the issuing magistrate to answer. *See United States v. Biglow*, 562 F.3d 1272, 1281 (10th Cir. 2009); *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998). The magistrate's decision should be given substantial deference, and it is not this Court's position to second-guess the issuing magistrate's judgment. *See United States v. Nolan*, 199 F.3d

13

1180, 1181 (10th Cir. 1999); *Illinois v. Gates*, 462 U.S. 213, 236 (1983); *United States v. Cantu*, 405 F.3d 1173, 1176–77 (10th Cir. 2005); *Massachusetts v. Upton*, 466 U.S. 727, 733 (1984).

15. The Court finds that the second search warrant was supported by probable cause. Provided the magistrate had a "substantial basis" for his determination of probable cause, his decision will be upheld. *Gates*, 462 U.S. at 238–39. In making its determination, the Court must look at the totality of the circumstances. *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir. 2001). In this case, the affidavit of Special Agent Oakes provided a substantial factual basis from which the issuing magistrate could have reasonably concluded that there was probable cause to believe the items listed in the search warrant would be found on Defendant's computer. Therefore, the warrant was supported by probable cause.

16. The second search warrant was not overbroad. While it is true that the "development of the personal computer and its ability to store and intermingle a huge array of one's personal papers" has dramatically increased "law enforcement's ability to conduct a wide-ranging search," *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009), this does not mean that any search of a personal computer should be per se unconstitutional because there are other personal files stored on the computer. The search warrant issued by the magistrate "affirmatively limit[ed] the search to evidence of specific federal crimes or specific types of material." *United States v. Riccardi*, 405 F.3d 852, 862 (10th Cir. 2005). The federal officers were limited in their search to records relating to the treatment and circumstances surrounding the death of Brandi Wulf. The warrant did not authorize a general search of Defendant's computer for evidence of any crime. Thus, the search warrant was not

overbroad.

17. There was not unreasonable delay in obtaining the second search warrant. After the initial search of Ms. Christie's computer, FBI agents made a copy of the hard drive for Ms. Christie, and they indicated their intent to use the computer and hard drive as evidence at trial. Thus, Defendant's argument that the Government's delay in requesting a second search warrant infringed upon her constitutional rights must fail. Once the computer analysts found evidence of the alleged crimes on the hard drive during the initial search, the Government was permitted to seize the property for use in its prosecution, and Defendant did not have a right to have the property returned to her until after trial. *See, e.g.*, *Warden v. Hayden*, 387 U.S. 294, 306–07 (1967); *Lavin v. United States*, 299 F.3d 123, 128 (2d. Cir. 2002) ("The defendant's right to the return of lawfully seized property is subject to the Government's legitimate continuing interest in that property."); *United States v. LaFatch*, 565 F.2d 81, 83 (6th Cir. 1977).

**WHEREFORE,**

**IT IS HEREBY ORDERED** that Defendant Christie's First and Second Motions to Suppress are **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**