**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CR No. 07-0614 RB** |
| | ) | |
| **REBECCA CHRISTIE,** | ) | |
| **(a/k/a REBECCA WULF),** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Rebecca Christie's motions for reconsideration, judgment of acquittal, and a new trial. (Docs. 341 & 359.)  Having considered the submissions of counsel, the relevant law, and being otherwise fully advised, Defendant's motion for reconsideration is granted in part and denied in part, Defendant's motion for judgment of acquittal is denied, and Defendant's motion for a new trial is denied.

Having reconsidered the issue of multiplicity in light of the government's ultimate theory of the case, the evidence presented at trial, and the jury's verdict, the Court will vacate two of Ms. Christie's three homicide convictions to prevent a violation of Defendant's constitutional right to be free from multiple punishments for the same offense.  With regard to Defendant's motion for judgment of acquittal, the Court concludes there was sufficient evidence for a rational trier of fact to find the essential elements of the crimes charged in counts 1, 2, 3, and 5 of the Second Superseding Indictment beyond a reasonable doubt, and therefore, denies Defendant's motion for judgment of acquittal under Federal Rule of Criminal Procedure 29.  Finally, the Court finds that the trial was fundamentally fair and denies Defendant's motion for a new trial under Federal Rule of Criminal Procedure 33, as this would not be in the interest of justice.

## I.       INTRODUCTION AND PROCEDURAL BACKGROUND

Ms. Christie was tried before this Court from October 26, 2009 through November 11, 2009 on the following counts:

> Count 1: Second-degree murder in violation of 18 U.S.C. § 1111 occurring on or about January 17, 2006 through January 26, 2006.
> Count 2: Negligent child abuse not resulting in death in violation of N.M. STAT. ANN. § 30-6-1 occurring on or about January 2005 through January 26, 2006.
> Count 3: Negligent child abuse resulting in death in violation of N.M. STAT. ANN. § 30-6-1 occurring on or about January 17, 2006 through January 26, 2006.
> Count 4: Intentional child abuse not resulting in death in violation of N.M. STAT. ANN. § 30-6-1 occurring on or about January 2005 through January 26, 2006.
> Count 5: Intentional child abuse resulting in death in violation of N.M. STAT. ANN. § 30-6-1 occurring on or about January 17, 2006 through January 26, 2006.

(Doc. 181.)  At the end of trial, the jury found Defendant guilty on counts 1, 2, 3, and 5 of the Second Superseding Indictment and not guilty on count 4. (Doc. 316.)

At trial, the government argued that Defendant abused her daughter, Brandi Wulf, during two separate periods: (1) the year running from January 2005 through January 2006, and (2) the nine days before her death beginning on or about January 17, 2006 and continuing through January 26, 2006.   To prove abuse during the year-long period, the government presented evidence that Defendant abused Brandi by failing to provide adequate nourishment and failing to take her to the doctor.   To prove abuse during the nine-day period preceding Brandi's death, the government presented evidence that Defendant withheld or failed to provide Brandi with adequate hydration and nourishment.   Defendant was the sole caretaker of Brandi during these nine days, as her husband, Derek Wulf, had left Holloman Air Force Base on January 16, 2006 for a thirty-day temporary duty assignment in Langley, Virginia.   According to the government, Brandi entered this nine-day period weakened by chronic malnutrition.   With her father gone on temporary deployment, she lost her primary source of care, and Defendant's abuse and neglect

intensified.  At this point, Brandi was in a black hole, her health rapidly deteriorated from poor to critical, and she finally succumbed to the combined effects of dehydration and malnutrition.

At the end of the government's case-in-chief, Defendant moved, orally, for a judgment of acquittal on all counts pursuant to Federal Rule of Criminal Procedure 29. (Tr. 1090.)  The Court reserved ruling on this motion until the close of Defendant's case. (Tr. 1116.)  At that time, the Court denied Defendant's motion. (Tr. 2012–18.)  Defendant now requests a judgment of acquittal on all counts pursuant to Federal Rule of Criminal Procedure 29(c).  Additionally, Defendant requests that the Court reconsider its pre-trial rulings with regard to the Assimilative Crimes Act and Multiplicity and vacate Defendant's convictions on counts 3 and 5.  Finally, Defendant requests that the Court grant a new trial pursuant to Federal Rule of Criminal Procedure 33.

## II.       SUMMARY OF TRIAL TESTIMONY AND EVIDENCE

Given Defendant's Rule 29 Motion for Judgment of Acquittal and assertion that the evidence presented at trial was insufficient for any rational trier of fact to find Defendant guilty on counts 1, 2, 3, and 5 of the Second Superseding Indictment, the Court here offers a fairly exhaustive summary of the trial evidence presented in the light most favorable to the government.  Nonetheless, due to the length of the trial and the voluminous testimony presented over eleven days, this summary cannot begin to address every witness' testimony or exhibit offered.  For a complete record, please refer to the official trial transcript. (Docs. 327–37.)

### A.       Testimony of Security Officer, First Responders, and Hospital Staff

The government presented testimony from base security officer Brandon Webb, and Air Force medics Amanda Smith, Christopher Ross, and Michael McFadden, who were the first people on scene after Defendant called 911 on January 26, 2006.  Additionally, the government

3

called Nurse Jamie Potter, who worked at the Gerald Champion Regional Medical Center in Alamogordo, New Mexico, and was present when Brandi arrived at the hospital on January 26, 2006.  These witnesses testified regarding Brandi's condition at that time and their efforts to save her life.

### 1. Security Officer Brandon Webb

At approximately 2:23 p.m. on January 26, 2006, Assistant Flight Chief Brandon Webb of the Holloman Air Force Base Security services received a call regarding a non-responsive child on base. (Tr. 101–02.)    A few minutes later, Officer Webb arrived at Defendant's residence on Langley Court. (Tr. 103.)  Officer Webb was the first on scene that day and testified that Brandi was blue around the lips, her eyes were open and glassy, and her skin was cool and clammy. (Tr. 104.)  When he checked Brandi's vital signs, she was non-responsive and did not have a pulse or respiration. (Tr. 105.)  At 2:27 p.m., a few minutes after Officer Webb arrived, an Ambulance Response Element from Holloman Air Force Base arrived to provide medical assistance. (Tr. 68–73, 105, 109, 135.)

### 2. Medic Amanda Smith

Amanda Smith, a medical technician who arrived as part of the Ambulance Response Element, testified that when she encountered Brandi, she was bluish-gray in color, her eyes were sunken, and there was brown around each eye; additionally, her lips were dry and scaly, she could see every rib and bone in her body, each tooth had black around it, her mouth was very dry, and Brandi did not blink or move the entire time she was working on her. (Tr. 74–75.) When describing Brandi's condition, Ms. Smith stated, "I have never seen a child like this.  And I was deployed in Afghanistan for four months and, even still, in a third world country, the kids—I have never seen a child as bad as she was." (Tr. 74–75.)   In describing Defendant,

4

Ms. Smith stated that she looked disheveled, her hair was matted, and it appeared that she had just woken up. (Tr. 75.)

### 3. *Medic Christopher Ross*

Christopher Ross, the lead medic for the Ambulance Response Element, testified that Brandi was totally unresponsive when they arrived on scene; she was cyanotic, bluish-gray in color, as if she hadn't been breathing for a little while, cold to the touch, her teeth were dried out and had a dark ring around each tooth near the gumline, her eyes were sunken, her pupils were unresponsive to light, her mucous membranes were dry, her lips were cracked, her stomach was sunken, and she had no respiration and no pulse. (Tr. 135–37, 149–51.)  When asked about Brandi's oral intake, Ms. Christie did not respond. (Tr. 141–42, 164–65.)  When asked how Brandi got like this, Ms. Christie indicated that she "found her like she was." (Tr. 142.)

### 4. *Medic Michael McFadden*

Michael McFadden, an emergency medical technician who arrived with the Ambulance Response Element, testified that he saw some movement in Brandi's abdomen, which indicated she was still breathing when they arrived. (Tr. 175.)  In describing Brandi's condition, he indicated that her eyes were sunken in, her pupils were not reactive, she was not blinking, her lips were cracked and dry, her skin was cool and clammy, and her ribs were prominent. (Tr. 175–77.)  His initial medical diagnosis after observing Brandi's symptoms, and based on his experience with hundreds of dehydration cases, was that Brandi was grossly dehydrated. (Tr. 170, 175.)  Mr. McFadden stated that he couldn't believe it was a real child. (Tr. 176.)

Unable to stabilize Brandi, and recognizing the seriousness of the situation, the response team loaded Brandi into the ambulance for transport to Gerald Champion Regional Medical Center in Alamogordo. (Tr. 78, 180–81.)  In the ambulance, the medics started an intraosseous

(IO) needle in her leg to attempt to rehydrate Brandi. (Tr. 145, 180.)  The paramedics decided to attempt an IO needle because they were unable to get an IV into Brandi's veins. (Tr. 341–43.) An IO is inserted into the tibia and pumps fluid directly into the bone marrow. (Tr. 342.)

> ### 5.   Nurse Jamie Potter

Jamie Potter was working as a nurse at the Gerald Champion Regional Medical Center when the ambulance carrying Brandi arrived. (Tr. 339.)  Ms. Potter testified that when Brandi arrived at the hospital, she did not have a pulse. (Tr. 344.)  Her initial assessment was that Brandi was severely dehydrated because her eyes were sunken, glazed over, and so dry she could not shut her eyelids.  (Tr. 345–46.)  Additionally, Ms. Potter observed that Brandi was discolored in places and her hands were balled into fists, indicating that she had been without a pulse and not breathing for some time. (Tr. 347.)  Ms. Potter and others worked on Brandi at the hospital for about one hour. (Tr. 351.)  At approximately 4:00 p.m., however, Dr. Gallegos, the emergency room doctor, declared Brandi deceased. (Tr. 351–52.)

> ## B.   Testimony Regarding Defendant's Care of Brandi and Conditions in Home

The government presented the testimony of several witnesses regarding Defendant's care of Brandi and the conditions within Defendant's home.  It was the government's theory that Defendant abused Brandi during 2005 and 2006 by failing to provide adequate hydration and nourishment, and by failing to take her to the doctor.  To prove this theory, the government presented several witnesses who testified to Defendant's general neglect of Brandi, as well as her neglect of Brandi in the nine days before her death while Derek was on temporary deployment.

> ### 1.   OSI Special Agent Steven San Miguel

Special Agent Steven San Miguel works with the Air Force Office of Special Investigations and is currently serving as the criminal division branch chief at Hill Air Force

Base in Utah. (Tr. 193.) In January 2006, he was a criminal investigator at Holloman Air Force Base and assisted in processing the crime scene on January 26, 2006—meaning that he secured Defendant's residence, photographed it, took notes and observations, and then collected physical evidence. (Tr. 194–201.)  Agt. San Miguel testified that the home was a mess and smelled of cat urine. (Tr. 199.)  There were several stains in the carpet. (Tr. 214.)  They did not find any diapers with diarrhea or feces in them, indicating that Brandi did not have the explosive, continuous diarrhea that her mother described. (Tr. 216, 225–26, 232.)  They did not find any PediaSure bottles—empty or full—in the house, indicating that Brandi was not receiving PediaSure as prescribed by Dr. Noël. (Tr. 224.)  The investigators did not find any Pedialyte either. (Tr. 240.) The investigators looked in all the cabinets inside the house and the garbage cans outside the house. (Tr. 239.)  The investigators found a screwdriver among the blankets in Brandi's room where she had been sleeping. (Tr. 225; Gov't Ex. 110.)  The investigators took numerous photos of the inside of Defendant's residence that were introduced at trial to show the state of disorder inside the house and the lack of food and water for Brandi. (Gov't Exs. 50–94, 96, 98, 100–10, 113–22, 125–30, 131, 133–38, 140–41, 144, 146, 149, 152, 155–56.)

### 2. *OSI Special Agent Charles Hanners*

In January 2006, Special Agent Charles Hanners worked for the Air Force Office of Special Investigations and was assigned to Holloman Air Force Base; he was the lead case agent assigned to investigate Brandi's case. (Tr. 424–25.)  Agt. Hanners spoke with Defendant on January 26, 2006 at approximately 5:30 p.m., shortly after Brandi died.  Defendant told him that she initially tried to put Brandi down at 9:00 p.m. the night before, but that she did not go to sleep until about midnight. (Tr. 429.)  Defendant indicated that she went to bed between 2:00 and 3:00 a.m. that morning, and that she did not wake up until 11:00 a.m. or noon the following

day. (Tr. 434.)  Defendant stated that it was not unusual for Brandi to wake up late, and that she did not find it strange she was not awake at this hour. (Tr. 434.)  Defendant finally went up to check on Brandi sometime after 2:00 p.m.  She changed her diaper and brought her downstairs, and it was then that she noticed she was unresponsive. (Tr. 434.)

Defendant indicated to Agt. Hanners that Brandi had some problems digesting dairy products, that she was delayed in her development, and that they had met with a Dr. Noël concerning Brandi's digestive problems. (Tr. 435.)  They talked briefly about Brandi's diet, and Defendant indicated that Brandi ate Ramen Noodles, hot dogs, and PediaSure. (Tr. 435.)  Defendant also mentioned that she did not like to go out of the house because it caused her anxiety; and therefore, she avoided doing so. (Tr. 435–36.)

### 3. *FBI Special Agent Chad Oakes*

FBI Special Agent Chad Oakes worked for the FBI satellite office in Las Cruces, New Mexico and was assigned to this case on January 26, 2006. (Tr. 676.)  The Air Force Office of Special Investigations contacted the Las Cruces FBI office to assist because Defendant was a civilian married to an active duty military person living on a federal military base, and the FBI has jurisdiction in these circumstances. (Tr. 677.)  Agt. Oakes drove over to the Holloman Air Force Base in Alamogordo, New Mexico on January 27, 2006. (Tr. 677–78.)  Rebecca's husband, Derek Wulf, had been on temporary deployment for nine days in Langley, Virginia, but was scheduled to arrive at Holloman later that day. (Tr. 678.)  The investigators planned to interview both Defendant and Derek simultaneously. (Tr. 678.)  Agt. Oakes interviewed Derek that day, while FBI Special Agent Rasheed Williams interviewed Defendant. (Tr. 460, 678.)

On May 4, 2006, Agt. Oakes conducted a second interview with both Defendant and her husband at Holoman Air Force Base. (Tr. 682, 684.)  During this interview, Defendant described

8

Brandi as being a very sick child throughout her entire life, except for maybe one or two days, vomiting twenty-four hours a day, and having diarrhea five to ten times a day. (Tr. 688–90.) Defendant indicated that they had seen Dr. Noël with regard to Brandi's medical problems, but that nothing ever came of it—the Doctor did not call back, and they never called the doctor's office or returned for a follow-up appointment. (Tr. 690.)   Defendant indicated that Derek handled the medical appointments. (Tr. 690.)

When asked about Brandi's routine, Defendant stated that Brandi would sleep between eight and ten hours a day, that she would often fall asleep downstairs—sometime between 10:00 p.m. and midnight—and that when she fell asleep, Defendant would carry her upstairs, put her in her bedroom, and close the door. (Tr. 691–92.)  Brandi was unable to open the door by herself. (Tr. 691.)  Additionally, Defendant would not leave any water or beverages in the room with Brandi. (Tr. 692.)  Defendant would wake up around noon, do her morning routine, and then go let Brandi out of her room shortly thereafter, sometime between noon and 2:00 p.m. (Tr. 692–93.)  Defendant would take care of Brandi until Derek arrived home between 4:30 and 5:00 p.m. (Tr. 693.)  Defendant indicated that it was very stressful taking care of Brandi, and that after four or five hours of taking care of her, she needed a break. (Tr. 693.)  When asked about the morning of January 26, 2010, Defendant indicated that she got up around 12:00 p.m., fixed herself a meal, did her morning routine, and then went upstairs to check on Brandi around 2:00 p.m., at which point she found Brandi limp and unconscious and called 911. (Tr. 692–93.)

Agt. Oakes interviewed Defendant a second time on December 11, 2006. (Tr. 701, 893.) A CD recording of this interview was played for the jury. (Tr. 893; Gov't Ex. 205.)  A transcript of the recording was also admitted into evidence and provided to the jury. (Gov't Ex. 202.) During this interview, Defendant indicated that even after Dr. Noël prescribed PediaSure, Brandi

was still throwing up and having diarrhea five or six times an hour. (*Id*. at 5.)  Defendant stated

that she did not call Dr. Noël back to follow-up on Brandi's medical condition because she "was

not one to call people." (*Id*. at 9.)  Defendant testified that Brandi was constantly hungry and

thirsty, and if she left cat food on the floor, Brandi would try to eat it. (*Id*. at 14–18.)  Defendant

indicated that Brandi was unable to open the door to her bedroom because she did not know how

to, and because she could barely reach the handle. (*Id*. at 22.)  Defendant stated that she never

left water in Brandi's bedroom at night. (*Id*. at 22.)  When asked about the lack of PediaSure in

the house, Defendant indicated that they had been giving Brandi PediaSure as prescribed by

Dr. Noël; however, at the time Brandi died, they had just run out, and she was planning on going

to the store that day to get more. (*Id*. at 41–42.)

### 4. *FBI Special Agent Rasheed Williams*

FBI Special Agent Rasheed Williams became involved in this case when Agt. Oakes

asked him to assist in conducting an interview at Holloman Air Force on January 27, 2006.

(Tr. 448–49.)  Agt. Oakes intended to conduct simultaneous interviews of Brandi's parents, and

therefore, he needed the assistance of another agent. (Tr. 449.)  Agt. Williams interviewed

Defendant for approximately two hours on January 27, 2006, the day after Brandi's death.

(Tr. 460.)  Defendant indicated that Brandi had digestive problems and that she had seen

Dr. Noël in El Paso, who recommended PediaSure. (Tr. 453–54.)  In describing her daily

routine, Defendant stated that she would typically get up around 12:00 p.m.; however, before

waking Brandi, she would do her morning routine. (Tr. 454.)  At night, Defendant indicated that

she would stay up until 1:00 to 3:00 a.m.  (Tr. 455.)  Defendant indicated that her husband,

Derek, was primarily in charge of preparing the meals, doing the shopping, and taking Brandi to

doctors appointments. (Tr. 455.)  Defendant told Agt. Williams that she did not like to go

outdoors or be around crowds because she would get panic attacks; accordingly, Derek was in charge of anything that related with going outside the home. (Tr. 455.)

When asked about the events of January 25 and 26, 2006, Defendant told Agt. Willimas that the evening of January 25, Brandi was bloated and cranky. (Tr. 456–57.)  However, she did not indicate that Brandi had any diarrhea or vomiting that evening. (Tr. 458–59.)  Defendant did not recall what Brandi had to eat that evening or whether she had even eaten a meal. (Tr. 456.) Defendant stated that she had made some macaroni and cheese for herself, and that Brandi may have had some of that if she left it sitting out and Brandi had access to it. (Tr. 456–57.)  She also indicated that she had given Brandi some PediaSure earlier that day, but was not sure if she had had a PediaSure that evening. (Tr. 457.)

Defendant told Agt. Williams that she put Brandi to bed between 10:00 p.m. and midnight on January 25 and that Defendant did not wake up until around noon the next day. (Tr. 458–59.) This was typical for Defendant, and she would normally get up and do her morning routine and then check on Brandi a few hours later if she did not hear her wake up. (Tr. 459.)  On that day, Defendant stated that she did not check on Brandi until about 2:00 p.m.; Defendant noticed that Brandi did not have a diaper, which was normal, but when she picked her up, she was limp, not very responsive, and very weak, which concerned her. (Tr. 459.)  That is when Defendant decided to call 911. (Tr. 459.)  Defendant indicated that it had been about a year since Brandi had last seen a doctor. (Tr. 461–62.)

### 5.    *Ms. Lisa Ross*

Lisa Ross was Derek Wulf's ex-wife and the mother of their daughter, Acadia Wulf. (Tr. 751.)  While Defendant and her husband, Derek, were living at Holloman Air Force Base, Acadia would visit them in New Mexico for a couple months during the summer. (Tr. 755–56.)

11

Ms. Ross testified that when Acadia would go visit Derek and Defendant, she would tell her daughter to make sure she brushed her teeth, that she got a bath every night, and that she got enough food. (Tr. 761.) Ms. Ross was concerned about these things based on her observations of Defendant and the way she kept her house when Derek was stationed at Eglin Air Force Base in Florida. (Tr. 761–62.) During Christmas 2005, a month before Brandi's death, Ms. Ross saw Brandi, Derek, and Defendant when they were in Florida visiting Defendant's parents; Ms. Ross testified that Brandi did not look healthy at Christmas 2005. (Tr. 764.) When Ms. Ross was in Alamogordo for Brandi's funeral, she went out for lunch at Red Lobster with Derek, Defendant's parents, Acadia Wulf, and Mia, Defendant's first daughter; however, Defendant did not join them. (Tr. 765–66.) When they returned to Defendant's and Derek's residence after lunch, Defendant was on the computer playing an online, fighting-adventure game. (Tr. 766.)

6.    *Ms. Acadia Wulf*

Acadia Wulf is the daughter of Derek Wulf and Lisa Ross from Derek's previous marriage. (Tr. 784–85.) During the summers of 2003–2005, Acadia would visit Defendant and Derek in New Mexico for a couple months each summer. (Tr. 756.) At trial, Acadia testified that sometimes they would not get any food until lunch, that Brandi often looked hungry, that she would steel food from Acadia, that she did not see Brandi eat a lot of food, and that Brandi spent most of her time in her room. (Tr. 791–93.) Additionally, Acadia indicated that they would spend most of their time in the house, and that when they were in the house, Defendant would be playing on the computer. (Tr. 794.)

7.    *Ms. Gina May*

Gina May lived next door to Defendant and her husband from July 2005 until after Brandi's death in January 2006. (Tr. 661–62.) When she met Defendant, Defendant was on the

computer with her headset and microphone engrossed in a role-playing game. (Tr. 664–665.) Defendant said, "Hi," but then went back to playing her video game. (Tr. 665.)  Ms. May rarely saw Defendant outside of the house with Brandi. (Tr. 666.)

### C.     Government's Expert Medical Testimony

At trial, the government argued that Brandi died of extreme dehydration and malnutrition that resulted from Defendant withholding or failing to provide adequate hydration and nutrition to her daughter over a period of nine days, and then placing her in a bedroom from which she could not escape with no fluids or food for a period of fourteen to sixteen hours.  Additionally, the government argued that Brandi was abused during the year before her death by Defendant, who failed to take her to the doctor and to provide adequate nutrition.  This abuse resulted in chronic malnutrition, which meant that she was in a weakened state when her father left for temporary deployment on January 17, 2006, and therefore, less able to cope with the more intense abuse and neglect that resulted when she was in her mother's sole care.  To prove this theory, the government presented testimony from several doctors with expertise in forensics, gastrointestinal diseases, pediatrics, child abuse, and military medicine.

On rebuttal, the government presented the testimony of Dr. Susan Cooper to attack Defendant's theory of the case.  Defendant had presented expert medical testimony that Brandi had a gastrointestinal disease or inborn error of metabolism that the military doctors had failed to properly diagnose.  To refute this theory, the government presented Dr. Susan Cooper, a forensic pediatrician with many years of experience in the military's medical system.

### 1.     Doctor Ross Zumwalt

Dr. Ross Zumwalt is the Chief Medical Investigator for the State of New Mexico and participated in Brandi's autopsy on January 27, 2006. (Tr. 360, 366–67.)  Dr. Zumwalt testified

that when they performed the autopsy, he observed that Brandi was very thin, poorly nourished, and obviously dehydrated. (Tr. 370.)  Brandi's eyes were sunken, her lips were dry, and her skin was very lax and wrinkled instead of smooth, indicating a lack of water in the subcutaneous tissue. (Tr. 370–71.)  Additionally, Brandi had very little subcutaneous fat, indicating that she was malnourished. (Tr. 379.)

At the end of the autopsy, Dr. Zumwalt concluded that Brandi died of severe malnutrition and dehydration. (Tr. 378.)  The final "mechanism of death" was dehydration, as Brandi became so dehydrated that she developed an electrolyte imbalance and hypotension; ultimately, she couldn't profuse her tissues well enough, resulting in a lack of blood flow and oxygenation to her vital organs, such as her brain and heart. (Tr. 380.)   In order for someone to get this dehydrated, Dr. Zumwalt testified that it would have taken several days. (Tr. 381.)  During this time period, there would have been clear signs and symptoms of dehydration: Brandi would have been less active and listless, her eyes would have appeared sunken, her skin would have been wrinkled, and she would have looked very dry. (Tr. 381.)

Dr. Zumwalt also examined Brandi's stomach and intestines.  Her stomach contained only a few drops (approximately 1 milliliter) of a dark, brownish fluid. (Tr. 382.)  The small bowel contained some digesting foods, and the colon had some formed stool. (Tr. 382.)   In Dr. Zumwalt's opinion, this indicated that Brandi was not suffering from diarrhea because there would not have been any formed stool if this was the case. (Tr. 382.)   Additionally, Dr. Zumwalt's lab performed a very thorough and complete screening to look for any infectious diseases, abnormalities, or inborn errors of metabolism; all of these tests came back negative. (Tr. 384–85.)  Accordingly, the sole cause of death in this case was determined to be dehydration and malnutrition. (Tr. 385.)

14

2.    *Doctor James Meredith Noël*

Dr. James Noël was the Chief of Pediatric Gastroenterology at Wilford Hall in the Brooke Army Medical Center in San Antonio, Texas. (Tr. 548.)  Dr. Noël testified as an expert in pediatric gastroenterology, and as Brandi's treating gastroenterologist from August 2004 through January 2005. (Tr. 551–52, 593.)  Brandi had been referred to Dr. Noël for chronic diarrhea and failure to thrive, and to rule out malabsorption as a cause of her diarrhea. (Tr. 552.) Dr. Noël first saw Brandi on August 26, 2004. (Tr. 553.)  Based on the medical history from Brandi's parents, Dr. Noël initially had many possible theories regarding Brandi's diarrhea, including cystic fibrosis, renal tubular acidosis, celiac disease, food allergies, and post-infectious diarrhea. (Tr. 553–59.)  To test these hypothesis, Dr. Noël ordered a number of biopsies, exams, and other tests to be performed. (Tr. 559–72.)

After receiving the results from these tests, Dr. Noël determined that Brandi's diarrhea was most likely the result of post-infectious diarrhea, which is fairly common in young children. (Tr. 573.)  It results when children are infected with an intestinal virus: diarrhea occurs to purge the body of the virus; however, after the virus is eliminated, the body does not immediately go back to its pre-infection state, but continues at a relatively high state of motility. (Tr. 557.)  To treat post-infectious diarrhea, Dr. Noël instructed the parents to avoid sugary drinks and to give Brandi PediaSure, which is a high-calorie, milk-based beverage that has a slowing effect on the intestinal tract. (Tr. 573–75.)

Brandi's parents missed the scheduled follow-up appointment in October 2004, but Dr. Noël talked with Defendant by telephone in November 2004, and she indicated that Brandi's diarrhea and bloating had resolved. (Tr. 576.)   Brandi had a follow-up appointment on December 9, 2004, and again Defendant indicated that the diarrhea and bloating had resolved.

15

(Tr. 581.)  Brandi's weight also improved during this time. (Tr. 607.)  Based on these results, Dr. Noël felt comfortable that post-infectious diarrhea was the correct diagnosis, but he wanted to do some additional testing to rule out other potential causes. (Tr. 581–93.)  An endoscopy was performed on January 28, 2005. (Tr. 593–94.)  Other tests had also been ordered, however, at this point, not all of the tests had been completed. (Tr. 590–91.)  Accordingly, Dr. Noël wanted to give the parents some additional time to have the tests performed; he scheduled a follow-up appointment for February 24, 2005, and hoped to be able to settle on a final diagnosis for Brandi on that date. (Tr. 594.)  The February 24, 2005 appointment, however, did not happen. (Tr. 594.) Dr. Noël was not sure why. (Tr. 594–95.)  Dr. Noël never heard back from Brandi's parents after the January 28, 2005 appointment. (Tr. 608.)

### 3.    *Doctor Nancy Kellogg*

Dr. Nancy Kellogg is a professor of pediatrics and Chief of the Child Abuse Division in the Department of Pediatrics at the University of Texas Medical School in San Antonio, Texas. (Tr. 977–78.)  It was Dr. Kellogg's expert opinion that Brandi died due to being "deprived of the fluid and nutrition needed to survive." (Tr. 983.)  An analysis of Brandi's electrolytes from a sample of fluid taken from her eye during the autopsy indicated that she had a very high concentration of sodium chloride, as well as blood, urea, and nitrogen, which was consistent with someone who was very dehydrated, as it indicated that the body had lost a lot of its free water. (Tr. 986.)  Additionally, Brandi's sunken eyes with dark circles surrounding them, her dry skin, the wrinkles on her abdomen and neck, and her prominent ribs and bones were clear symptoms of severe dehydration and/or malnutrition. (Tr. 986–89.)  In all her years of her experience, Dr. Kellogg had never come across a case in which a child was as severely dehydrated as Brandi. (Tr. 990.)

16

Dr. Kellogg testified that if fluid and nutrition had been suddenly stopped, it would have taken a period of several days for a child to become so dehydrated and malnourished. (Tr. 990.) During this period, the child would have first become very thirsty and would seek out water as a survival instinct. (Tr. 990.)  If, however, the child were unable to obtain food or water, the dehydration symptoms would become worse, and her brain functions would be affected, causing confusion, a loss of coordination and speech, weakness, lethargy, and eventually complete immobility. (Tr. 991.)  In the end, the child would lose consciousness, go into shock, and die. (Tr. 991.)  As the child progresses through these stages, it becomes harder for her to seek out water or to verbalize her needs, and in the case of a child who was as dehydrated and malnourished as Brandi, she would have probably been too weak to even move on January 25. (Tr. 991.)  Thus, to a normal person, it would have been readily apparent that the child was debilitated and in need of immediate medical attention. (Tr. 991.)

Next, Dr. Kellogg testified about the normal sleep patterns for a three-year-old child. Typically, a three to four-year-old will sleep eight to nine hours a night, and possibly take a nap during the day. (Tr. 992.)  When asked whether it would be appropriate to leave a three-year-old locked in a room for fourteen to sixteen hours straight without access to food or water, Dr. Kellogg stated, "I would tell you that that would be entirely inappropriate, and I would probably report you, if you told me that history." (Tr. 992.)  Dr. Kellogg explained that children at Brandi's age have higher metabolic needs than adults, and therefore, they need three good meals a day and shouldn't go more than nine to ten hours without a meal. (Tr. 993.) Accordingly, leaving a child locked in a room without access to fluid or nutrition for fourteen to sixteen hours would cause the child to become fluid and nutrition deprived. (Tr. 993.)

17

Dr. Kellogg also testified concerning how she believed that malnutrition contributed to Brandi's death. (Tr. 993.)  In addition to the bony prominence that was evident in the autopsy photographs, a biopsy performed on Brandi's liver showed micro and macro-vesicular steatosis, which indicated that Brandi was suffering from chronic malnutrition. (Tr. 993–94.)  In other words, the biopsy indicated that Brandi had not been receiving the essential nutrients—fats, proteins, carbohydrates—needed for good growth and health for a period of weeks or months. (Tr. 1005.)  At death, Brandi weighed a little over 23 pounds, which is the average weight of a fifteen-month-old child. (Tr. 994.)  The last recorded weight for Brandi, taken on January 28, 2005, approximately one year before her death, was 21 pounds, 8 ounces, indicating a weight gain of only 1.5 pounds for the entire year. (Tr. 995.)  According to the growth charts, however, Brandi should have gained three to five pounds over that period. (Tr. 995.)

When Brandi was born, she was near the 50th percentile for height and weight, indicating that she was a very normal, American child. (Tr. 996–97.)  After she was born, Brandi gained a lot of weight, and jumped up to about the 96th percentile, signifying that only four percent of babies her age weighed more than she did. (Tr. 997.)  After six and a half months, however, Brandi began to fall off the normal percentile, and from twenty-one to twenty-seven months, she gained little or not weight. (Tr. 998–1000.)  At twenty-nine months, she began to gain weight. (Tr. 1000.)  This was the period during which there was a "medical intervention": Brandi was seeing Dr. Noël and had been prescribed PediaSure. (Tr. 1001.)  During this time, Brandi was getting more nutrition and calories to grow. (Tr. 1002.)  Dr. Kellogg hypothesized that since Brandi responded so well to the PediaSure (which contains milk protein), it was unlikely that she had a milk allergy or an inborn error of metabolism. (Tr. 1003–04.)  In other words, because Brandi gained weight on the PediaSure, when she was getting the calories and nutrition she

18

needed, Dr. Kellogg concluded she did not have an underlying medical condition. (Tr. 1004.) Finally, Dr. Kellogg testified that the fact Brandi did not see a doctor over the last year of her life likely contributed to her death, as her doctors had indicated that Brandi needed to be followed closely due to her slow growth and medical history. (Tr. 1004–05.)

### 4. *Doctor Susan Cooper*

Dr. Susan Cooper is a developmental and forensic pediatrician with many years experience in the military medical system, who testified as a rebuttal witness for the government. Dr. Cooper testified that Brandi died of dehydration caused by a lack of fluid intake, which can only be provided by a child's caregivers. (Tr. 2129–31.) Consequently, it was Dr. Cooper's opinion that Brandi's death was not the result of a failure in the military medical establishment because, in the military medical system, it is the family's responsibility, not the clinic's or the doctor's, to make appointments for well-baby check-ups and to follow up with the doctor when instructed to do so. (Tr. 2082, 2130.)

Based on her experience as a pediatrician, Dr. Cooper testified that a normal person would be able to recognize the signs of dehydration in a child based on common sense, and that this was not something doctors need to instruct parents about. (Tr. 2091–92.) Dr. Cooper described the progression of the physical and behavioral symptoms of dehydration that would have been obvious to a normal, concerned parent. (Tr. 2084.) In terms of behavior, first, the child would become thirsty, and if the child can walk or communicate in any way, the child is going to try to drink anything she can get her hands on. (Tr. 2084.) Eventually, if the child does not receive any fluids, she will start to become tired and lethargic, then disoriented, and eventually she would become unresponsive and difficult to arouse. (Tr. 2085.) At this point, if fluid is not provided, the child will likely die. (Tr. 2085.)

In terms of physical signs, the child is going to stop voiding; in other words, the child's diapers are not going to be wet. (Tr. 2084–85.)   The urine will also begin to look very concentrated and yellow. (Tr. 2085.)  The child's skin will lose its turgor around the mouth, and her saliva will become sticky. (Tr. 2085.)  Eventually, the child's mouth and lips will become dry and split, and there won't be any more saliva visible. (Tr. 2085.)  The child's skin will also start "tenting," which means that if you pick up the skin between your thumb and forefinger, it will stay in place instead of going right back down. (Tr. 2085–86.)  The child's abdomen will also begin to sink because the child is not having any fluid in the bladder and the abdomen. (Tr. 2086.)  If the dehydration becomes more severe, the child's eyes will begin to sink. (Tr. 2086.)  Dr. Cooper testified that Brandi exhibited many of the physical signs of dehydration: Brandi's lips were dry, cracked, and split; her eyes were sunken; her abdomen was flat and sunken; and there was a loss of skin turgor or smoothness. (Tr. 2090.)

When asked what Brandi would have looked like when she was put to bed on January 25, 2006, Dr. Cooper indicated that there were two ways for Brandi to get as dehydrated as she was: either she had an excessive output of fluids—which can dehydrate in a relatively short period of time—or she was not taking in enough fluids to stay hydrated. (Tr. 2087–88.)  For Brandi to get to the state she was due to fluid loss, she would have had to have a fluid output of at least a quart of fluid, and there was no evidence, based on  Defendant's statements, Brandi's diaper from that evening, or the sheets and blankets that were found in Brandi's room, that she had anywhere near that level of fluid output. (Tr. 2094.)  Furthermore, the autopsy showed absolutely no indication of copious diarrhea or that Brandi was "stooling out." (Tr. 2095.)  Without any evidence of copious output, Brandi must have become dehydrated due to inadequate intake of fluids, which would have taken a period of several days, during which time the signs of dehydration would

have become progressively more apparent. (Tr. 2093–94.)  Accordingly, on the night of January 25, the physical and behavioral signs would have been obvious.

When asked whether some form of disease or inborn error of metabolism may have contributed to Brandi's death, Dr. Cooper responded that, in her opinion, Brandi did not have any disease or abnormality that would have caused her to become so dehydrated. (Tr. 2095–2101.)  Dr. Cooper indicated that Brandi did not have Renal Tubular Acidosis because there was no evidence of it in her bones or her kidneys, and the only symptom she had that was consistent with such a diagnosis was the delayed growth. (Tr. 2096–97.)  Additionally, Dr. Cooper indicated that she did not believe that an inborn error of metabolism contributed to Brandi's death. (Tr. 2098–99.)  And finally, Dr. Cooper stated that there were no indications in Brandi's history or her autopsy that indicated malabsorption. (Tr. 2100–01.)

Furthermore, Dr. Cooper concluded that there was no systemic error in the military medical establishment that led to an error in diagnosis or treatment:

> Brandi's last medical appointment, according to her medical records, was when she was about 31 months of age.  And you have to remember that she was three and a half years old at the time that she died.  In a patient who has had ongoing medical problems associated with poor growth, the biggest concern that I saw in her medical records was that her family was not bringing her back for care.  I did not see the kind of concerned, compliant follow-up that we would expect to see in parents who were caregivers for a child who was not only demonstrating delayed development, but also delayed gains.  So from a perspective of the degree of medical care that she had, there was nothing in the medical records that would point at malpractice, that would point in an error in diagnosis or treatment.

(Tr. 2100–01.)

Lastly, Dr. Cooper testified that a toddler should not be left alone for more than eight to nine hours at a time without any form of hydration and/or nutrition as this would put her at a higher risk to develop hypoglycemia and other complications. (Tr. 2104.)  Accordingly, in

Dr. Cooper's opinion, it was not appropriate to leave Brandi alone in a room which she could not get out of, without supervision, and without any food or water, for fourteen to sixteen hours. (Tr. 2104.)

### D.   Computer Evidence

Part of the government's theory was that Defendant failed to provide adequate nutrition, water, and care for Brandi because she was constantly on the computer, engrossed in playing or doing other activities related to the video game, World of Warcraft.  When FBI Special Agent Chad Oakes interviewed Defendant and her husband on May 4, 2010, he also seized a computer used by Ms. Christie. (Tr. 682–83.)  This computer was submitted to FBI examiners for forensic analysis. (Tr. 683.)  Through his interviews with Ms. Christie and the FBI's analysis of the computer, Special Agent Oakes discovered Ms. Christie was an avid gamer and spent considerable time playing Star Wars Galaxies and World of Warcraft; however, Defendant's primary obsession appeared to be World of Warcraft. (Tr. 874–76.)  For instance, Ms. Christie would frequently participate in four to six hour "raids," in which a group of players band together to raid villages or other sites in the game and to capture money, weapons, and other items. (Tr. 855–56, 1510–19; Gov't Exs. 206-B, 206-D, & 206-G)  This was, however, just one of many World of Warcraft activities in which Defendant engaged. (Tr. 1510–19.)

The FBI analysts provided Agent Oakes with a report of how much time Defendant spent on the computer, in addition to photos, e-mails, online chats, and other information related to Defendant's World of Warcraft activities. (Tr. 709–13.)  Based on the FBI's analysis of the online chat sessions, internet activity, and other computer data, Agt. Oakes stated that during the period analyzed, there was nearly continuous activity on Defendant's computer, starting at around noon or 2:00 p.m. each day and continuing until 3:00 a.m., or sometimes later. (Tr. 828,

866, 913–15.)  Agt. Oakes also testified that the FBI's analysis indicated that there was computer activity on January 25–26, 2006, in the days and hours prior to Brandi's death. (Tr. 913.)

While online, Defendant spent considerable time chatting with other World of Warcraft players.  Special Agent Oakes compiled Defendant's online chats, which occurred between her and six or eight different individuals, into an excel spreadsheet for analysis. (Tr. 712–13.) Pertinent parts of these conversations were then copied into a word document and presented to the jury. (Tr. 712–13, 853; Gov't Exs. 206-A, 206-B, 206-C, 206-D, 206-E, 206-F, 206-G, 206-H, 206-I, 206-J, 206-K, 206-L, 206-M, 206-N, 206-P.)  In the online conversations that occurred in the months leading up to Brandi's death, Defendant made several statements indicating that she was not happy with her present situation, and that she would like to leave Derek and Brandi behind to go back to school or to travel.  These statements generally indicated a lack of interest in having or caring for children, and a desire to be rid of Brandi and Derek and the responsibilities associated with parenthood. (Tr. 831–74.)

Defendant stated that she wanted to move on with her life and get a degree, and that she wanted "out of this hell hole." (Tr. 831; Gov't Ex. 206-A.)  Defendant talked about how she wanted to go to Europe and give Brandi to Derek and fly away for some relaxation. (Tr. 832–33; Gov't Ex. 206-B.)  Defendant discussed  how she was stuck in a bubble; that life was going on around her; that she wanted to live; that she always had to put Derek, the house, and the kids' needs before hers; that she wanted to do something for herself; and that she wanted to get out and live and start over without kids. (Tr. 833–34; Gov't Ex. 206-B.)  Defendant indicated that she would like to go live with her parents, but their house was too remote and the internet connection was poor; consequently, if she moved home, there would be no way for her to go on World of Warcraft raids for four-plus hours because it would tie up her parents' phone line.

23

(Tr. 834, 839, 855–56; Gov't Exs. 206-B, 206-D, & 206-G.)  Defendant stated that she didn't want to have any more kids, that she was worn out from being a mom, and that she wanted to live her life. (Tr. 836; Gov't Exs. 206-B & 206-C.)  Defendant wrote, "I just want to get out, get into school, live life, go out and have fun." (Tr. 837; Gov't Ex. 206-C.)  Defendant talked about how she didn't want kids, how she wanted to explore and see and learn about new things, how she wanted to run away from her house, and that thinking about these things made her smile. (Tr. 840–41; Gov't Ex. 206-E.)

On January 6, 2006, just a few weeks before Brandi's death, Defendant wrote, "I want out of this house fast." (Tr. 860; Gov't Ex. 206-I.)  On January 10, 2006, Defendant stated that she was happy Derek was leaving because she would have "30 days with no Derek starting Monday." (Tr. 861; Gov't Ex. 206-J.)  On January 16, 2006, just a few hours before Derek was scheduled to leave, Defendant wrote that "freedom will come" and she was going to "effing party." (Tr. 863.)  Derek left on January 17, 2006, and nine days later Brandi died. (Tr. 862.)  On January 25, 2006, the night before Brandi's death, Defendant was online chatting about gaming. (Tr. 872–74; Gov't Ex. 206-P.)  At 1:33 p.m. on January 26, 2006, less than an hour before Defendant found Brandi unresponsive in her bedroom, Defendant was online chatting about gaming. (Tr. 873; Gov't Ex. 206-P.)

Even after Brandi's death, Defendant continued her online gaming and computer use.  On January 26, 2006, the night after Brandi died, Defendant was back on the computer at 10:00 p.m. (Tr. 863.)  On February 3, 2006, while her family was visiting for Brandi's funeral, Defendant was on the computer several times that day, talking about an upcoming World of Warcraft raid that evening. (Tr. 864–66.)  Defendant indicated that she hoped she could participate in the raid and stated that she was glad her family would be leaving. (Tr. 866.)  Defendant continued to talk

24

about how she didn't want to have any more children, that she wanted to have her tubes tied, and that she didn't even want a one percent chance of ever having kids so that she could have fun with no worries.  (Tr. 867–70.)

### E.     Defense Witnesses

Defendant argued that Brandi's death was not the result of Defendant's actions or inactions, but rather an undiagnosed medical condition that Brandi's doctors failed to diagnose. To support this theory, Defendant and her mother, Karen O'Hara, testified concerning Brandi's frequent diarrhea and medical problems.  Additionally, Defendant presented the expert testimony of two doctors who indicated that Brandi may have suffered from an inborn error of metabolism. On cross-examination, however, the government was able to show that during 2005, Brandi's diarrhea had substantially resolved.  Indeed, at trial, Defendant testified that on January 24–25, 2006, Brandi had only a few mud-pie like stools a day, compared to the five or six diarrheal stools per hour she had described to FBI Special Agent Chad Oakes in her December 11, 2006 interview.  When confronted on cross-examination with a description of Brandi's stools and her fluid and nutritional intake in the days leading up to her death—as described by Defendant during her trial testimony—Defendant's medical experts admitted that, given these facts, Brandi likely did not suffer from malabsorption, and they would have to consider restriction of fluids or inadequate intake of fluids as a more significant factor in her death.

### 1.     Karen O'Hara

Karen O'Hara is Defendant Rebecca Christie's mother. (Tr. 1241.)   In May 2003, Ms. O'Hara was concerned about Brandi's health. (Tr. 1249.)  In June 2004, Ms. O'Hara spoke to Defendant and Derek and told them that Brandi was not healthy and that there was a problem with her diarrhea. (Tr. 1262–63.)  Defendant told her that the doctors had told them that it was

okay.  Ms. O'Hara replied, "Then you get in their face and you tell them that it's not okay. There's something wrong with her.  And you need to get it taken care of." (Tr. 1263.)  Ms. O'Hara felt that Defendant had not been aggressive enough in talking to the doctors and trying to figure out what was wrong with Brandi. (Tr. 1264.)  At Christmas 2004, Ms. O'Hara did not think that Brandi's health had improved very much, but Defendant had told her that she was talking to doctors. (Tr. 1266.)  By 2005, however, it was Ms. O'Hara's impression that Brandi's diarrhea had resolved. (Tr. 1270.) And in December 2005, when Brandi visited Ms. O'Hara and her husband in Florida, Ms. O'Hara indicated that Brandi was much healthier and happier and drinking PediaSure. (Tr. 1271–72.)

        2.    *Rebecca Christie*

Defendant testified at trial regarding her general routine and care of Brandi, as well as her care of Brandi in the nine days leading up to her death.  Defendant stated that her schedule was generally staying up until 3:00 or 4:00 a.m. (Tr. 1520.)  Brandi would normally go to bed between 10:00 p.m. and 1:00 a.m. and wake up between noon and 2:00 p.m. (Tr. 1521–22, 1570.)  Defendant would close the door to Brandi's bedroom, and Brandi could not get out of her room by herself because she was too small to open the door. (Tr. 1524.)  Defendant would  not put food or water in the room with Brandi. (Tr. 1525.)  Defendant testified that her husband, Derek, left on a temporary duty deployment to Langley, Virginia on January 16, 2006. (Tr. 1409.)  Derek was gone for nine days when Brandi died, and during this time, Defendant was the sole caretaker and person responsible for Brandi. (Tr. 1531.)  Defendant indicated that on January 24–25, 2006, the days before Brandi's death, she did not notice anything out of the ordinary as far as Brandi's behavior and activity level, and Brandi did not look dehydrated or abnormal. (Tr. 1580–81, 1586–89.)  Additionally, in the days before Brandi's death, Defendant

testified that Brandi only had a few mud pie like stools a day, but no watery or explosive diarrhea. (Tr. 1583, 1590.)

Defendant also testified at length about Brandi's health, her diarrhea, and the different doctors that they had seen.  Defendant indicated that after Dr. Noël prescribed PediaSure for Brandi in August 2004, her diarrhea improved. (Tr. 1484–86, 1568.)  Defendant stated that in 2005, Brandi did not have the extreme explosive and watery diarrhea that she had in the past and described her stools as occurring a few times a day and being a little more watery than a mud pie that children make, and maybe once a week an explosive diarrhea. (Tr. 1572.)  In late 2004 or early 2005, Defendant called Dr. Noël to indicate that Brandi's diarrhea had improved; however, she never made a follow-up appointment with Dr. Noël or went to a well visit at the clinic at Holloman, even though it was just down the street and she knew she could do so at any point. (Tr. 1530–31, 1534.)  Defendant testified that after Brandi's endoscopy appointment in February 2005, during the following year, she never took Brandi to the doctor because she did not ever feel there was a reason to take her to the doctor. (Tr. 1571.)  Also, Defendant indicated that Derek mainly took care of the medical appointments. (Tr. 1482, 1567.)

Lastly, Defendant testified about World of Warcraft. (Tr. 1510–19.)  Defendant explained that she would often go "farming" to improve her character two to three times a week, or sometimes more. (Tr. 1511.)  This would take about half an hour. (Tr. 1510.)  However, this was just one of many activities, beyond raids, that a person could participate in by being part of World of Warcraft. (Tr. 1511.)  Raids would take about three to four hours, but sometimes more in extreme cases. (Tr. 1511.)  Defendant would also play one-on-one with Socks, a World of Warcraft friend she had met online. (Tr. 1512.)  Defendant would also go pick flowers in World of Warcraft, as her character was an herbalist. (Tr. 1513.)  Defendant additionally spent time

"questing," completing certain objectives in the game in order to build her character's level. (Tr. 1519.)

### 3. *Doctor Todd Cameron Grey*

Dr. Todd Cameron Grey, the Chief Medical Examiner for the State of Utah, testified for the defense concerning the possibility that Brandi may have had an inborn error of metabolism that contributed to her death.  Dr. Grey's final conclusion with regard to Brandi's death was that it was caused by dehydration with the possibility of an inborn error of metabolism or metabolic error as contributory factors. (Tr. 1675.)  Dr. Grey admitted that Brandi's decline on her growth charts could have been due to the family moving away from Florida in December 2002, where they had a support system, to New Mexico, where they were living on their own without any family support. (Tr. 1681–86.)  Dr. Grey also acknowledged that Brandi responded positively to the PediaSure. (Tr. 1687.)

When confronted with Defendant's testimony regarding Brandi's condition in the days leading up to her death, Dr. Grey indicated that, if Brandi only had a few mud pie like diarrheas a day, as Defendant indicated, then restriction of fluids or inadequate intake would have to be considered as a more substantial contributing factor in explaining her dehydration and death. (Tr. 1693–95.)  Additionally, Dr. Grey admitted that if, as Defendant testified, Brandi had four PediaSures a day and only a few mud pie like stools a day on January 24–25, 2006, and she took a bath the day before her death, then her level of dehydration on January 26, 2006 would be inconsistent with this scenario. (Tr. 1697–99.)  Finally, Dr. Grey admitted that Brandi's father leaving nine days before her death and her mother placing her in her room for fourteen to sixteen hours with no food or water could have been a contributing factor in her death. (Tr. 1700.)

28

4.      *Doctor William M. Rogers, M.D.*

Dr. William Rogers worked as a pediatrician and a pediatric endocrinologist at Wilford Hall Medical Center in San Antonio, Texas and saw Brandi in April 2004 to evaluate her for short stature and delayed bone age. (Tr. 1806–07.)  Dr. Rogers was concerned that Brandi might have a malabsorption problem, and therefore, he referred her to Dr. Noël. (Tr. 1829, 1832.) Malabsorption is the inability of the gastrointestinal tract to absorb nutrients, which prevents a child from growing normally. (Tr. 1833.)  With malabsorption, it is common for the child to have frequent, liquid stools, and this was one of the factors that led Dr. Rogers to this preliminary diagnosis. (Tr. 1833.)  On cross-examination, however, Dr. Rogers indicated that if Brandi only had a few mud pie like diarrhea stools a day as testified to by her mother, that would be inconsistent with his diagnosis of malabsorption. (Tr. 1879–80.)   Also, when shown the results of a urinalysis, Dr. Rogers acknowledged that Brandi did not have Reno Tubular Acidosis. (Tr. 1875–77.)

Dr. Rogers also testified regarding the "well visits" that are recommended by the American Academy of Pediatrics for babies and toddlers. (Tr. 1870.)  Regardless of illness or health issues, it is recommended that a child see a pediatrician at two weeks, two months, four months, six months, twelve months, eighteen months, two years, three years, and four years. (Tr. 1870.)  The purpose of the well visits is to ensure that the child is growing properly and doesn't have any underlying health issues. (Tr. 1871.)  Dr. Rogers acknowledged that when treating a child for failure to grow or failure to thrive, one of the major concerns is the child's weight, and that he would encourage the parents to closely monitor the child's weight because it is an important measurement to determine if the child is growing. (Tr. 1872–73.)  Accordingly,

29

for a child with medical issues such as Brandi, it is especially important for her parents to keep up with her well visits. (Tr. 1874.)

### F.      Photographs & Other Physical Evidence

The Court admitted into evidence 165 exhibits from the government.  These exhibits consisted of photographs, medical records, growth charts, expert witness' CVs, diagrams, Defendant's computer, chat session logs, computer screen shots, a recorded interview of Defendant, a recording of the 911 call, a written statement by Defendant, and various items collected from Defendant's house by investigators on January 26, 2006.

### III.    MOTION FOR RECONSIDERATION

In her Motion for Judgment of Acquittal, Defendant requested the Court enter an order granting a judgment of acquittal on counts 1, 2, 3, and 5 of the Second Superseding Indictment on three grounds: (1) counts 3 and 5 do not assimilate under the Assimilative Crimes Act (ACA); (2) double jeopardy prevents multiple punishments for a single homicide with a single victim; and (3) there was insufficient evidence presented at trial on counts 1, 2, 3, and 5 for any rational trier of fact to find the essential elements of the crimes charged beyond a reasonable doubt.  In its Response (Doc. 354 at 15), the government argued that the first two grounds do not present a proper basis for a Rule 29 motion for judgment of acquittal because "[t]here is only one ground for a motion for judgment of acquittal . . . that the evidence is insufficient to sustain a conviction of one or more of the offenses charged in the indictment." *United States v. Huber*, 243 F. Supp. 2d 996, 998 (D.N.D. 2003) (quoting 2A CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 466 at 299 (3d ed. 2000)).  In her Reply, Defendant "concedes that perhaps her arguments regarding the ACA and double jeopardy were more properly brought pursuant to a motion for reconsideration," but argues that the "Court should reconsider its prior

30

rulings because it now has the benefit of the government's actual arguments at trial and Ms. Christie's additional arguments in her post-trial motion." (Doc. 359 at 5.)

The Tenth Circuit permits motions for reconsideration in criminal cases, even though the Federal Rules of Criminal Procedure do not specifically provide for such motions. *See, e.g.*, *United States v. Corey*, 999 F.2d 493, 495 (10th Cir. 1993) ("It is well established that a motion for rehearing or reconsideration of an order in a criminal case that is filed within the permissible time period for appeal renders an otherwise final order of the district court nonfinal until disposition of the motion."); *United States v. Sims*, 252 F. Supp. 2d 1255, 1260 (D.N.M. 2003). The Court will therefore consider Defendant's request for a judgment of acquittal as a motion for reconsideration where appropriate.  A trial court may grant a motion for reconsideration where there has been an intervening change in controlling law, new evidence has become available, or there is a need to correct clear error or prevent manifest injustice. *Major v. Benton*, 647 F.2d 110, 112 (10th Cir. 1981).  A motion for reconsideration is not, however, an opportunity to revisit issues already addressed or to hear arguments or consider facts that could have been presented originally. *See Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir. 1991).

### A.    Assimilative Crimes Act

In the Second Superseding Indictment (Doc. 181), Ms. Christie was charged with violations of both state and federal law.  In count 1, the government charged federal second-degree murder in violation of 18 U.S.C. § 1111; in counts 2 and 4, the government charged negligent and intentional child abuse not resulting in death in violation of section 30-6-1 of the New Mexico Statutes; and in counts 3 and 5, the government charged negligent and intentional child abuse resulting in death in violation of section 30-6-1 of the New Mexico Statutes.

Ultimately, the jury found Defendant guilty of federal second-degree murder, as well as three counts of child abuse under New Mexico law.

Defendant requests that the Court reconsider its earlier ruling concerning the assimilation of the New Mexico child abuse statute in light of the government's ultimate theory of the case. (Doc. 341 at 4.)  In its earlier ruling on this issue, the Court reasoned that the federal murder statute, as defined by 18 U.S.C. § 1111, did not cover the conduct charged in the Second Superseding Indictment because the government intended to prove guilt through omission, but federal murder required proof of an affirmative act; therefore, the Court concluded there was a gap in federal criminal law. (Doc. 251 at 6.)  At trial, however, the government presented evidence of affirmative acts of abuse that led to Brandi's death: (1) Defendant regularly placed Brandi in her room for twelve to sixteen hours with no food or water (Tr. 429–34, 456–59, 691–93, 1524; Gov't Ex. 202 at 22); and (2) Defendant intentionally withheld food or water during the nine-day period leading up to Brandi's death. (Tr. 831–36, Gov't Ex. 206.) Ultimately, the jury convicted Defendant of federal second-degree murder, indicating that at least part of the charged conduct was covered by federal law.  Defendant therefore urges the Court to reconsider its earlier ruling and enter judgments of acquittal on counts 3 and 5 of the Second Superseding Indictment because these crimes do not assimilate under the Assimilative Crimes Act (ACA) and should not have been charged on federal enclaves. (Doc. 341 at 4.)

"The ACA applies state law to a defendant's acts or omissions that are 'not made punishable by *any enactment* of Congress.' " *Lewis v. United States*, 523 U.S. 155, 159 (1998) (quoting 18 U.S.C. § 13(a)).  "The ACA's basic purpose is one of borrowing state law to fill gaps in the federal criminal law that applies on federal enclaves." *Id*. at 160.  The words "any enactment" are not to be read literally, however, as this would prevent the assimilation of

specific state laws that are aimed directly at addressing "a serious, narrowly defined evil." *Id.* at 161.  Nor are the words to be read too narrowly, such that a state law may be assimilated any time its elements do not precisely match the elements of the federal criminal statute. *Id.* at 163 (rejecting the government's proposed "precise elements" test).  The Supreme Court accordingly formulated the following test in *Lewis*:

> [A] court must first ask the question the ACA's language requires:  Is the defendant's "act or omission . . . made punishable by *any* enactment of Congress."  If the answer to this question is "no," that will normally end the matter.  The ACA presumably would assimilate the statute.  If the answer to the question is "yes," however, the court must ask the further question whether the federal statutes that apply to the "act or omission" preclude application of the state law in question, say, because its [1] application would interfere with the achievement of federal policy, [2] because the state law would effectively rewrite an offense definition that Congress carefully considered, or [3] because federal statutes reveal an intent to occupy so much of a field as would exclude use of the particular state statute at issue . . . .

*Id.* at 164–65 (internal citations omitted).

In its earlier ruling on this issue (Doc. 251), the Court concluded that Defendant's conduct was not covered by any enactment of Congress because the government intended to prove Defendant's guilt through omissions, which were not covered under the federal murder statute; however, considering the evidence ultimately adduced at trial and the jury's verdict, the Court concedes that at least part of Defendant's conduct was punishable under the federal murder statute, 18 U.S.C. § 1111.  Thus, the answer to the first part of the test is "yes." Consequently, the Court must move to the second part of the test.

Defendant argues that under *Lewis*, child abuse resulting in death must be prosecuted under the federal homicide statutes, because the federal murder statute completely preempts the field. (Doc. 341 at 5.)  The federal murder statute specifically lists murder occurring as the result of child abuse as murder in the first degree. 18 U.S.C. § 1111(a).  Under this statute, child abuse

is defined as "intentionally or knowingly causing death or serious bodily injury to a child," 18 U.S.C. § 1111(c)(3).  This is similar to the language of the New Mexico child abuse statute, which prohibits a person from "knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be . . . placed in a situation that may endanger the child's life or health." N.M. STAT. ANN. 30-6-1.  However, just because certain conduct could have been charged under a federal statute, doesn't mean that a state statute which also covers that same conduct cannot be assimilated.  Instead, "[t]he primary question . . . is one of legislative intent: Does applicable federal law indicate an intent to punish conduct such as the defendant's to the exclusion of the particular state statute at issue?" *Lewis*, 523 U.S. at 166.

In 2003, Congress amended the federal murder statute through the PROTECT Act, including "child abuse" as a means of committing first-degree felony murder. Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today (P.R.O.T.E.C.T.) Act of 2003, Pub. L. No. 108-21, 117 Stat. 650, Sec. 102 (enacted Apr. 30, 2003).  The primary focus of the Act was to combat child sexual exploitation and to increase penalties for those who abuse and victimize children. *See* S. REP. NO. 108-2 (Feb. 11, 2003); Statements by President George W. Bush Upon Signing S. 151, 2003 WL 21254444 (Apr. 30, 2003); *United States v. Gallenardo*, 579 F.3d 1076, 1085 (9th Cir. 2009).  Congress' inclusion of child abuse in the first-degree murder statute, however, did not signal an intent to entirely occupy the field of child abuse. *See United States v. Martinez*, Cr. No. SA-98-CR-158-OG, 1998 WL 1784220 (W.D. Tex. Dec. 8, 1998) ("The [PROTECT Act] amendments are not a comprehensive enactment designed to address the problem of child abuse on federal enclaves, and therefore do not manifest a Congressional intent to occupy the child abuse field to the exclusion of state law.").

34

In contrast to *Lewis*, where the government sought to assimilate a state murder statute, here, there is not the same evidence of an intent to occupy the field.  Indeed, in *Lewis*, the Supreme Court indicated in dicta its decision was not intended to prevent the assimilation of all state child protection statutes. *Lewis*, 523 U.S. at 171–72 ("without expressing any view on the merits of lower court cases that have assimilated state child abuse statutes despite the presence of a federal assault law, . . . we note that federal assault prohibition is less comprehensive than federal murder statute").  Additionally, considering the "kind of wrongful behavior covered" by the state and federal statutes, it is clear there exists a gap in federal law concerning the issue of child abuse, and therefore, a state statute is needed to fill that void. *Id*. at 165.  In *Lewis*, the Louisiana murder statute provided a harsher punishment for murder where a defendant acted with specific intent to kill or inflict great bodily harm upon a child.  The government argued the state law did not cover the same conduct because it served as a child protection statute. *Id*. at 169.  While the Supreme Court agreed that this argued in favor of assimilation, it ultimately concluded that assimilation was not proper because the detailed nature of the federal murder statute evidenced an intent by Congress to preclude the application of state murder statutes on federal enclaves: "Congress intended its statute to cover a particular field—namely, 'unlawful killing of a human being with malice aforethought'—as an integrated whole." *Id*.  In the case at hand, the Court has found no evidence that Congress intended to cover the field of child abuse or that all acts of child abuse should fall within the exclusive purview of the federal murder statute.

Additionally, in contrast to the murder statute in *Lewis*, the New Mexico child abuse statute is not exclusively a murder statute—indeed, this is only a small portion of the conduct covered by the law.  Thus, while it may partially overlap with the federal murder statute, the state statute represents a much more comprehensive set of provisions specifically designed to

protect children living in New Mexico against many different forms of abuse.  In addition to child abuse resulting in death, the New Mexico statute covers abuse resulting in great bodily harm and also conduct that does not result in harm, providing a range of penalties based on the age of the child, the degree of harm to the child, and the *mens rea* of the defendant.

Furthermore, unlike the federal murder statute, which focuses on a broad range of conduct that may be charged as murder—including arson, kidnapping, treason, espionage, sabotage, child abuse, sexual abuse, burglary, robbery, assault, torture, killings that result from a reckless and wanton disregard for human life that is extreme in nature, and willful, deliberate, malicious, or premeditated killings—the New Mexico statute seeks to punish a very specific form of conduct: child abuse.  This focus "upon a narrower (and different) range of conduct . . . argues in favor of assimilation." *Id*. at 169; *see also United States v. Key*, 599 F.3d 469, 479 (5th Cir. 2010).  For instance, the act of intentionally torturing a child resulting in death is clearly covered by both statutes, and if this were the extent of the conduct criminalized under the New Mexico statute, assimilation would not be proper; however, the statute also criminalizes acts such as intentionally or negligently permitting a child to be exposed to inclement weather. This behavior is not covered by the federal murder statute.  The New Mexico statute was enacted to broadly and comprehensively punish a specific form of behavior: child abuse.  Thus, even though the federal statute will at times cover the same conduct as the state law, the Court concludes there is a gap in federal law to be filled.

Lastly, in *Lewis*, the Supreme Court noted that the assimilation of the Louisiana murder statute would create the perverse result of "treat[ing] those living on federal enclaves differently from those living elsewhere." 523 U.S. at 171.  In the case at hand, this is not a concern.  If Defendant had been tried in state court, she could have been charged with both murder and child

36

abuse under New Mexico law. *See State v. Reed*, 120 P.3d 447 (N.M. 2005); *State v. Pierce*, 792 P.2d 408, 417–18 (N.M. 1990) ("When the facts underlying both offenses are different and they are shown to have occurred at different times, there is no impediment precluding a defendant from being convicted of both first-degree murder, of child abuse resulting in death or great bodily harm, and of child abuse not resulting in death or great bodily harm."); *State v. Gutierrez*, 541 P.2d 628, (N.M. 1975) ("The offense of murder and the offense of child abuse resulting in the child's death are not the same."). Accordingly, the need to ensure the equal treatment of those living on and off federal enclaves, also favors assimilation.

Finally, the Court notes that in her motion for reconsideration, Ms. Christie only requests the Court vacate counts 3 and 5 of the Second Superseding Indictment as being improperly assimilated, but at no point does she argue that count 2 should not have been assimilated. In essence, Defendant is arguing for a partial assimilation of the New Mexico child abuse statute; yet, she cites no authority in favor of this proposition, and after an extensive search, the Court was unable to locate any authority supporting this position. Thus, while there is clearly some overlap between the statutes, as the jury ultimately found Defendant guilty of child abuse resulting in death and federal second-degree murder for the same conduct, this does not mean that the New Mexico child abuse statute cannot be assimilated. Indeed, *Lewis* clearly contemplates overlap; that is why it developed a two part test. 523 U.S. at 164–65. If there is no federal enactment that punishes the conduct, that is the end of the matter, and the state law can be assimilated; however, where there is overlap or partial coverage by federal law, then the trial court must go on to the second part of the test and ask whether Congress intended to preempt the field and to punish the conduct to the exclusion of state law. *Id*. In the case of child abuse, the clear answer is, "no." Defendant's argument concerning her multiple homicide convictions

under counts 1, 3, and 5 is ultimately a multiplicity issue, and that is how the Court should address any potential error.  The Court therefore denies Defendant's motion for reconsideration of the assimilation of the New Mexico child abuse statute, as there is no need to correct clear error or prevent manifest injustice.

### B.    Multiplicity and Double Jeopardy

Defendant next argues that her convictions on counts 1, 3, and 5 were multiplicitous and violate the Double Jeopardy Clause of the United State Constitution by allowing multiple punishments for the same criminal behavior—the murder of Brandi Wulf—and requests that the Court vacate two of her three convictions. (Doc. 341 at 8.)  Pre-trial, the Court was not certain of the government's ultimate theory of the case or what evidence the government would offer with regard to the periods of abuse charged in the Second Superseding Indictment.  Now that all the evidence is in, the Court can consider whether it supports multiple punishments.  Furthermore, if the imposition of multiple punishments for counts 1, 3, and 5 violates the Double Jeopardy Clause of the United States Constitution, then reconsideration of the Court's earlier ruling is necessary to prevent manifest injustice. *See United States v. Nickl*, 427 F.3d 1286, 1301 (10th Cir. 2005) ("The government may submit multiplicitous charges to the jury, but if a defendant is convicted of both charges, the district court must vacate one of the convictions.").

### 1.    Two Periods of Abuse

Counts 1, 3, and 5 of the Second Superseding Indictment charged that Defendant's conduct from on or about January 17, 2006 and continuing to on or about January 26, 2006 caused the death of her daughter, Brandi, a three-year-old toddler.  Counts 2 and 4 charged that Defendant's conduct from on or about January 2005 and continuing to on or about January 26, 2006 caused Brandi to be placed in a situation that endangered her life and health, and to be

tortured, cruelly confined, and cruelly punished.  At trial, the government described two distinct periods of abuse which occurred during the year before Brandi's death. (Tr. 2170, 2176.)  While these periods were punctuated by individual acts of abuse or neglect, the government described them as separate periods that related to separate crimes charged in the indictment.  The government did not link the individual crimes to any particular event that occurred during the two time periods charged; rather, the government argued that each period as a whole satisfied the elements for multiple crimes. (Tr. 2170–77.)

The first period of abuse began in January 2005 and ran through January 2006; it comprised the year before Brandi's death, prior to her father's deployment for temporary duty on January 17, 2010.  The government presented two theories for negligent and intentional child abuse not resulting in death during this period: (1) Defendant failed to provide adequate nutrition, causing Brandi to become malnourished and physically weakened; and (2) Defendant failed to take Brandi to the doctor for the entire year, preventing medical professionals from providing care for Brandi. (Tr. 2170–76.)  The government did not argue that this first period of abuse caused Brandi's death; instead, its theory was that Defendant's neglect endangered her life or health and left her physically weakened. (Tr. 2175.)  In this weakened state, Brandi was more susceptible to the additional hardships that resulted when she was left in her mother's care, at which point, her condition quickly went from bad to critical, as she was too weak to seek out water or nourishment on her own like a normal, healthy three-year-old. (Tr. 2177–78.)

The week of January 17–26, 2006 comprised the second period of abuse, which lasted nine days and resulted in Brandi's death on January 26, 2006.  The government presented expert testimony that during this period, Brandi would have become progressively more tired, lethargic, dizzy, listless, and disoriented as her dehydration worsened; eventually, her body functions

would have begun to shut down and she would have been unable to move, lapsing in and out of consciousness; finally, too weak from the continued malnourishment and dehydration to seek out water, she would have gone into shock, and died. (Tr. 988–991.)  The government argued that Defendant's actions during this time period constituted negligent child abuse resulting in death, intentional child abuse resulting in death, and second-degree murder: "[D]efendant's conduct during those nine days fits all three of these charges, intentionally placing her daughter in that situation that killed her, recklessly disregarding that situation that killed her, acting with callous and wanton disregard for human life during that nine-day period." (Tr. 2177.)

The government also presented a third, specific act of abuse that occurred on January 25–26, 2006.  The government argued that, knowing something was wrong with Brandi, Defendant placed her in her room for a period of fourteen to sixteen hours without food or water until approximately 2:00 p.m. the following day.  The government presented expert testimony indicating that when Defendant put Brandi down to bed, the signs of dehydration would have been obvious to a normal, reasonable person: she would have had dark circles around her eyes, and she would have been lethargic and probably too weak to move. (Tr. 421, 988, 991.)  The government asserted that locking Brandi in her room for fourteen to sixteen hours straight in this state satisfied the requisite *mens rea* for second-degree murder:

> Because in that nine days when Brandi didn't get enough food, when she didn't get enough water, and when she was put in that room—take a look at that room—when she was put up in that room in a vulnerable state, in a malnourished state, in a weakened, fragile state, she's the size of a 15-month-old, when she was put up in that room for 14 to 16 hours straight, that's callous and wanton disregard for human life.  That's second-degree murder.

(Tr. 2177.)  Thus, counts 1, 3, and 5 of the Second Superseding Indictment charged three separate homicide offenses for the period of January 17–26, 2006, with the government arguing

that Defendant acted with the requisite *mens rea* to satisfy each of the three counts at different points during the nine days.

Unlike most child abuse cases where the abuse consists of a single, discreet act resulting in a demonstrable injury, the abuse in the case at hand was not defined by a particular occurrence; instead, the abuse consisted of a pattern of neglect that continued over a period of one year, which was proved through circumstantial evidence and expert testimony regarding the observable, long-term physical effects of the abuse.  In such a case, a homicide conviction for each, individual act of neglect or abuse is improper because it was the defendant's cumulative conduct that ultimately caused Brandi's death, not any single occurrence: denying Brandi a single meal or sippy cup is not sufficient to prove second-degree murder or intentional or negligent child abuse resulting in death, as one such act standing alone could not be the proximate cause of Brandi's death. *See United States v. Swallow*, 109 F.3d 656, 659 (10th Cir. 1997) ("Proximate cause of death is an essential component of . . . murder.")  Indeed, Dr. Kellogg, one of the government's expert witnesses, testified that even if Defendant had suddenly withheld all fluids, it would have taken Brandi several days to die. (Tr. 990.) Accordingly, Defendant's acts or omissions are sufficient to support a conviction under counts 1, 3, and 5, only if they are considered part of a continuing period of abuse.

2.    *One Victim, One Homicide*

Defendant argues that, in the case of homicide, where there is a single victim, there can be only one homicide conviction and one punishment. (Doc. 341 at 9–10, 26–27, 34–35.)  This proposition is clearly supported by New Mexico case law where the defendant's actions are unitary—i.e., part of a single act or episode. *Reed*, 120 P.3d at 462; *State v. Santillanes*, 27 P.3d 456, 459 (N.M. 2001) ("convictions for both vehicular homicide and child abuse resulting in

41

death . . . constituted a double jeopardy violation"); *State v. Mann*, 11 P.3d 564, 570 (N.M. Ct. App. 2000).  It would appear, however, that the New Mexico Supreme Court reached a contrary result where the defendant's actions were non-unitary; thus, when a defendant's unlawful acts "are shown to have occurred at different times, there is no impediment precluding a defendant from being convicted of both [] murder, of child abuse resulting in death or great bodily harm, and of child abuse not resulting in death or great bodily harm." *Pierce*, 792 P.2d at 418.  In *Pierce*, the New Mexico Supreme Court vacated several of the defendant's convictions because the prosecution had charged multiple counts of child abuse based on distinct injuries, rather than "charg[ing] or offer[ing] proof that the acts of child abuse arose as separate and distinct episodes." *Id*.  The court found the "[d]ivision of the act of child abuse into multiple offenses based solely upon proof of multiple injuries [was] contrary to legislative intent in enacting Section 30-6-1[D], and violate[d] double jeopardy limitations." *Id*.

The New Mexico Supreme Court has developed a two-part test to determine whether the Double Jeopardy Clause prohibits multiple punishments.  The court must ask (1) "whether the conduct underlying the offenses is unitary," and (2) "whether the legislature intended to create separately punishable offenses." *Swafford v. State*, 810 P.2d 1223, 1233 (N.M. 1991).  "Only if the first part of the test is answered in the affirmative, and the second in the negative, will the double jeopardy clause prohibit multiple punishment in the same trial." *Id*.  In the cases where multiple homicide convictions were found to violate double jeopardy, the defendants' actions were unitary; whereas, in *Pierce*, there was evidence of multiple injuries and acts of abuse occurring over a period of many days and weeks.  In *Reed*, for example, the defendant shot the victim. 120 P.3d at 450–51.  Similarly, in *Santillanes*, 27 P.3d at 459, the defendant was driving

drunk and killed five people in a single car accident; and in *Mann*, 11 P.3d at 568, the defendant impaled his son in the chest with a screwdriver.  These were all unitary acts.

Double jeopardy does not, however, prohibit multiple convictions for murder and child abuse in the same trial where the prosecution has offered proof of distinct acts or episodes of abuse as the predicate for each count. *See Pierce*, 792 P.2d at 417–18; *State v. Gonzales*, 824 P.2d 1023, 1025–26 (N.M. 1992); *Swafford*, 810 P.2d at 1233.  In the case at hand, counts 2 and 4 charged child abuse not resulting in death during the year-long period preceding Brandi's death; this period clearly represented a different episode of abuse than charged in counts 1, 3, and 5.  Accordingly, the Court concludes that Defendant's conviction for count 2 is not multiplicitous.  Multiple punishments under counts 1, 3, and 5, however, may be multiplicitous as the government presented Defendant's conduct during the nine-day period as a single episode of abuse satisfying the elements of all three charges. (Tr. 2177.)

Conduct is non-unitary where "the defendant commits two discrete acts violative of the same statutory offense, but separated by sufficient indicia of distinctness." *Swafford*, 810 P.2d at 1233.  While individual acts of abuse that occurred during the nine-day period may be "separated by indicia of distinctness," they were not violative of the same statutory offense. *See State v. Cooper*, 949 P.2d 660, 671 (N.M. 1997) (finding that "initial act of battery was distinguishable and separated by an intervening event from the acts that resulted in [victim's] death").  Taken by itself, the act of locking Brandi in her room for fourteen to sixteen hours may have constituted child abuse not resulting in death, and could have been charged as such; but, by itself, it did not constitute child abuse resulting in death.  According to the government's expert, Dr. Kellogg, it would have taken at least a few days for Brandi to become as dehydrated as she was at death; consequently, while being placed in her room contributed to her death, by itself, it

43

did not cause her death. (Tr. 990.)  The Court therefore concludes that Defendant's convictions on counts 1, 3, and 5 were based on a single episode of abuse and may only result in multiple punishments for the same offense if Congress and the New Mexico Legislature so intended.

To determine whether multiple punishments violate double jeopardy, the Court must look at whether Congress and/or the New Mexico Legislature intended multiple sentences under the statutes charged. *See Whalen v. United States*, 445 U.S. 684, 688–89 (U.S. 1980); *United States v. Morehead*, 959 F.2d 1489, 1506 (10th Cir. 1992) ("Where multiple counts for which a defendant is convicted cover the same criminal behavior, our review is limited to whether Congress intended multiple convictions and sentences under the statutes."); *Swafford*, 810 P.2d at 1233 ("the sole limitation on multiple punishments is legislative intent").  With regard to counts 3 and 5, whether the New Mexico Legislature authorized multiple punishments for the same criminal conduct is an issue for the State's courts. *Whalen*, 445 U.S. at 687 (concluding that issue of statutory interpretation with regard to double jeopardy should be left to state courts); *Missouri v. Hunter*, 459 U.S. 359, 368 (1983); *Garner v. Louisiana*, 368 U.S. 157, 167–69 (1961); *Birr v. Shillinger*, 894 F.2d 1160, 1161 (10th Cir.1990) ("[i]n assessing whether a state legislature intended to prescribe cumulative punishments for a single criminal incident, we are bound by a state court's determination of the legislature's intent").  Having reviewed the New Mexico case law, the Court concludes that the New Mexico Legislature did not intend for multiple punishments under section 30-6-1 or the State's murder statute, for a single death resulting from a single episode of child abuse. *See Reed*, 120 P.3d at 462; *Santillanes*, 27 P.3d at 468 n. 3; *Mann*, 11 P.3d at 570 ("we hold that Defendant cannot be punished for both intentional child abuse resulting in death and second-degree murder").

The New Mexico Legislature intended section 30-6-1 to serve as an alternative means to criminalize abusive conduct resulting in the death of a child that might otherwise be charged under the State's murder statute.   The law was intended to provide "greater protection to children," who are "more vulnerable than adults," and who "are under the care and responsibility of adults." *Santillanes*, 27 P.3d at 466.  As the federal murder statute criminalizes essentially the same conduct as the New Mexico murder statute (*compare* 18 U.S.C. § 1111 *with* N.M. STAT. ANN. § 30-2-1), the Court concludes that the fact the Second Superseding Indictment charged second-degree murder under federal law does not impact the New Mexico Legislature's intent with regard to multiple homicide punishments.

3.     *Blockburger*

In addition to the state child abuse charges, the Second Superseding Indictment charged a violation of the federal murder statute, 18 U.S.C. § 1111.   Accordingly, the Court must also consider Congress' intent with regard to multiple punishments.   Congress did not express an intent with regard to multiple punishments in section 1111, and where Congress has not clearly expressed an intent to impose multiple punishments, courts apply the Blockburger test to determine Congressional intent. *United States v. Pearson*, 203 F.3d 1243, 1267–68 (10th Cir. 2000) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).  The Blockburger test is essentially a tool of statutory construction. *Garrett v. United States*, 471 U.S. 773, 778–79 (1985); *Hunter*, 459 U.S. at 366–68; *Morehead*, 959 F.2d at 1506.  Under Blockburger, courts must determine "whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment." *United States v. Dixon*, 509 U.S.  688, 696 (1993).  Applying the test to the case at hand, the Court concludes that federal second-degree murder and negligent and intentional child abuse resulting in death under

45

New Mexico law are not the same offenses.  First, second-degree murder requires that the defendant act with malice aforethought, "a reckless and wanton disregard for human life that is extreme in nature." *United States v. Wood*, 207 F.3d 1222, 1229 (10th Cir. 2000).  Neither intentional child abuse nor negligent child abuse require a showing of malice aforethought. Second, the New Mexico child abuse statute requires that the victim be under the age of eighteen, while the federal murder statute applies to the killing of any human being.  Thus, each statute requires proof of an element the other does not.  Accordingly, at least under the Blockburger test, double jeopardy does not prohibit multiple punishments.  This is, of course, contrary to the New Mexico Legislature's intent with regard to the State's child abuse statute.

### 4.    *Lesser-Included Homicide Offenses*

Another possible way to look at the homicide offenses charged in the case at hand are as lesser-included offenses of each other; federal courts have consistently held that multiple punishments for lesser-included offenses are not authorized by Congress. *See, e.g.*, *Brown v. Ohio*, 432 U.S. 161, 169 (1977) ("Fifth Amendment forbids . . . cumulative punishment for greater and lesser included offenses" (internal citation omitted)).  For example, in cases involving first-degree felony murder under 18 U.S.C. § 1111, where the government has obtained convictions for both murder and the underlying felony, the imposition of multiple punishments violates double jeopardy. *Whalen*, 445 U.S. at 694; *Lewis*, 523 U.S. at 177.  The underlying felony is considered a lesser-included offense because conviction of the greater offense, murder, requires proof of all the elements of the lesser-included felony. *Id.*.0  In other words, because "proof of rape is a necessary element of proof of felony murder" perpetrated during the course of a rape, the rape is considered a lesser-included offense, and a court cannot impose multiple sentences. *Whalen*, 445 U.S. at 693–94.  Similarly, in the case at hand,

Defendant argues that the child abuse offenses are lesser-included offenses of second-degree murder. (Doc. 341 at 9.)

To determine whether one offense is a lesser-included offense, the court must determine whether the "elements of the lesser offense are a subset of the elements of the charged offense." *Schmuck v. United States*, 489 U.S. 705, 716 (1989).  Thus, "[w]here the lesser offense requires an element not required for the greater offense," it is not considered a lesser-included offense. *Id.* Furthermore, "[t]o be necessarily included in the greater offense the lesser must be such that it is impossible to commit the greater without first having committed the lesser." *Id.* at 719 (internal quotations omitted).

For example, second-degree murder and involuntary manslaughter are considered lesser-included offenses of first-degree murder. *Wood*, 207 F.3d at 1226–29.  However, second-degree murder is not a lesser-included offense of first-degree felony murder.  *United States v. Chanthadara*, 230 F.3d 1237, 1257–59 (10th Cir. 2000).   The distinction between these offenses—first-degree murder, felony murder, second-degree murder, and involuntary manslaughter—is the requisite *mens rea* required for each offense. *Wood*, 207 F.3d at 1228. First-degree and second-degree murder both require malice aforethought.  First-degree murder, however, requires an additional showing that the murder was a "willful, deliberate, malicious, and premeditated killing." 18 U.S.C. § 1111.  Thus, first-degree murder requires an additional *mens rea* element beyond just malice aforethought; whereas, the malice element for second-degree murder, which is a general intent crime, can be shown through reckless or wanton behavior which is not willful or deliberate. *Wood*, 207 F.3d at 1228.  Under first-degree felony murder, however, the prosecution only needs to show the commission of the underlying felony to prove the *mens rea* element. *Chanthadara*, 230 F.3d at 1258.  Because proving the underlying

felony does not require a showing of an intent to kill, an intent to do serious bodily harm, or a depraved heart (but rather the *mens rea* of the underlying felony), the lesser offense requires proof of an element the greater does not, and therefore, second-degree murder is not a lesser-included offense of first-degree felony murder.

"The distinction between involuntary manslaughter and second-degree murder is that the former does not require malice aforethought." *Wood*, 207 F.3d at 1229.   Nonetheless, involuntary manslaughter is still considered a lesser-included offense of second-degree murder. Involuntary manslaughter requires the commission of an act which might produce death "without due caution and circumspection." 18 U.S.C. § 1112.   Accordingly, the "substantive distinction" between the two crimes "is the severity of the reckless and wanton behavior: Second-degree murder involves reckless and wanton disregard for human life that is extreme in nature, while involuntary manslaughter involves reckless and wanton disregard that is not extreme in nature." *Wood*, 207 F.3d at 1229.  Consequently, by committing the greater offense of second-degree murder, one necessarily commits the lesser offense of involuntary manslaughter.

Applying this reasoning to the case at hand, one might argue that negligent child abuse resulting in death is a lesser-included offense of second-degree murder, as the charge of negligent child abuse requires proof of lesser degree of recklessness than second-degree murder. To prove negligent child abuse, the government must show "criminal negligence"—that the defendant "acted with a reckless disregard for the safety or health of the child"—essentially the same *mens rea* as required for involuntary manslaughter.   Accordingly, the difference in *mens rea* required to prove second-degree murder and negligent child abuse resulting in death is primarily one of degree.   However, there is another important distinction between the two crimes: child abuse resulting in death requires that the government prove the victim was under

48

the age of eighteen.  Consequently, negligent and intentional child abuse resulting in death require proof of an element that the offense of second-degree murder does not, and they are therefore not lesser-included offenses. *Schmuck*, 489 U.S. at 716.

5.     *Conflicting State and Federal Intent*

To summarize, the Court has determined that when child abuse resulting in death is charged in the same indictment with murder, the New Mexico Legislature did not intend multiple punishments when the charged conduct stems from a single episode of abuse; however, under the Blockburger test, imposing multiple punishments for federal second-degree murder and child abuse resulting in death does not violate Congressional intent.  To resolve this conflict, the Court turns to the ACA, which is the federal statute that permits the government to charge state crimes in federal court.  "The purpose of the [ACA] is to provide a method of punishing a crime committed on government reservations in the way and to the extent that it would have been punishable if committed within the surrounding jurisdiction." *United States v. Sain*, 795 F.2d 888, 890 (10th Cir. 1986); *see also Lewis*, 523 U.S. at 171 (rejecting the assimilation of state law where it would "treat those living on federal enclaves differently from those living elsewhere").  Accordingly, the Court must respect the New Mexico courts' interpretation of their own statutes with regard to multiple punishments for state crimes assimilated under the ACA. *Whalen*, 445 U.S. at 687; *Hunter*, 459 U.S. at 368; *Garner*, 368 U.S. at 167–69; *Shillinger*, 894 F.2d at 1161 ("[i]n assessing whether a state legislature intended to prescribe cumulative punishments for a single criminal incident, we are bound by a state court's determination of the legislature's intent").  The Court therefore concludes that, in the case at hand, the imposition of multiple punishments for counts 1, 3, and 5 violates double jeopardy, and two of the three convictions must be vacated.

6.      *Vacating the Lesser Offenses*

When multiple punishments have been imposed for a single offense in violation of the Double Jeopardy Clause, the court must vacate the convictions for the lesser offenses. *Ball v. United States*, 470 U.S. 856, 864–65 (1985) ("Having concluded that Congress did not intend petitioner's conduct to be punishable under both [statutes], the only remedy consistent with the Congressional intent is for the District Court, where the sentencing responsibility resides, to exercise its discretion to vacate one of the underlying convictions."); *Nickl*, 427 F.3d at 1301 ("The government may submit multiplicitous charges to the jury, but if a defendant is convicted of both charges, the district court must vacate one of the convictions."); *State v. Schoonmaker*, 176 P.3d 1105, 1119 (N.M. 2008) ("double jeopardy requires . . . that the conviction of the lesser offense, not merely the sentence, is vacated"); *Santillanes*, 27 P.3d at 468 ("concurrent sentencing does not adequately remedy the imposition of impermissible multiple punishments for a single offense; double jeopardy requires that the lesser offense merge into the greater offense such that the conviction of the lesser offense, not merely the sentence, is vacated").  In her motion, Defendant asserts that intentional child abuse resulting in death and negligent child abuse resulting in death are the lesser offenses and should therefore be vacated (Doc. 341 at 9–10); however, Defendant offers no authority to support this proposition.

In its review of the case law, one of the most commonly applied metrics for determining the lesser offense to be vacated is comparing the penalties ascribed to each crime. *See Ohio v. Johnson*, 467 U.S. 493, 499 (1984) (concluding that double jeopardy's protection against multiple punishments "is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature"); *United States v. Avery*, 128 F.3d 966, 972 (6th Cir. 1997) (vacating conspiracy conviction as it carried the lesser base offense under the sentencing

50

guidelines); *Santillanes*, 27 P.3d at 469 ("We believe that the degree of felony under Section 30-1-7 is an appropriate measure of legislative intent regarding which of the two offenses is a greater offense.").

Courts have also commonly vacated the lesser-included offense. *See, e.g.*, *United States v. Fischer*, 205 F.3d 967, 970 n. 2 (7th Cir. 2000); *United States v. Boyd*, 131 F.3d 951, 954–55 (11th Cir. 1997) ("The proper remedy for convictions on both greater and lesser included offenses is to vacate the conviction and the sentence of the lesser included offense."); *United States v. Freyre-Lazaro*, 3 F.3d 1496, 1507 (11th Cir. 1993).  Although the Court determined that child abuse resulting in death is not a lesser-included offense of second-degree murder, the lesser *mens rea* for child abuse might be a factor for the Court to consider. *See Wood*, 207 F.3d at 1226–29; *but see Santillanes*, 27 P.3d at 470 ("the lesser *mens rea* for child abuse resulting in death does not indicate that the Legislature views the crime as a lesser offense").

Finally, the Court notes that the purpose of the ACA is to fill gaps in federal law. *Sain*, 795 F.2d at 890.  In the case at hand, however, there is arguably no longer a need for the assimilation of state law, as the federal murder statute proved sufficient to punish Defendant's conduct.  Thus, the assimilation of state law to adequately address Defendant's behavior may not ultimately be necessary, as the jury found that Defendant's conduct satisfied the elements of federal second-degree murder.  Consequently, vacating the child abuse counts arguably conforms with Congress' intent under the ACA.

In the end, the government's theory of the case was that a single episode of abuse resulted in Brandi's death, and that Defendant's conduct during this period satisfied the elements for counts 1, 3, and 5.  The jury found Defendant guilty on all three counts; therefore, "double jeopardy requires that the lesser offense merge into the greater offense such that the conviction

51

of the lesser offense, not merely the sentence, is vacated." *Santillanes*, 27 P.3d at 468; *see also*

*Pierce*, 792 P.2d at 419 ("Where offenses merge, defendant can be charged with each offense,

but the double jeopardy clause precludes entry of multiple sentences on such conviction, thereby

punishing defendant more than once for the same offense." (citing *Johnson*, 467 U.S. at 499;

*Ball*, 470 U.S. at 864–65)).   At trial, the Court expressed its concern over the jury returning

multiple convictions based on the same period of abuse; the government conceded that

Defendant could argue post-verdict that the convictions were multiplicitous and ask the Court to

vacate one of the counts. (Tr. 2028.)   This is the situation that the Court now confronts.

Accordingly, to prevent a violation of Defendant's constitutional right to be free from multiple

punishments for the same offense, the Court must vacate two of the homicide counts.  The Court,

however, defers its decision on which counts to vacate to permit the parties an opportunity to

further brief this issue.

## IV.   MOTION FOR JUDGMENT OF ACQUITTAL

Defendant requests that the Court enter a judgment of acquittal on counts 1, 2, 3, and 5 of

the Second Superseding Indictment, as the government failed to present at trial sufficient

evidence to support these convictions.  Under Federal Rule of Criminal Procedure 29, the Court

may "enter a judgment of acquittal of any offense for which the evidence is insufficient to

sustain a conviction."   In deciding such a motion, the relevant question is whether, taking the

evidence, both direct and circumstantial, together with the reasonable inferences to be drawn

therefrom, in the light most favorable to the government, any rational finder of fact could find

the essential elements of the crimes charged beyond a reasonable doubt. *See Jackson v. Virginia*,

443 U.S. 307, 319 (1979); *United States v. Burkley*, 513 F.3d 1183, 1188, 1190 (10th Cir. 2008);

*United States v. Voss*, 82 F.3d 1521, 1524–25 (10th Cir. 1996); *United States v. Brown*, 995 F.2d

1493, 1502 (10th Cir. 1993). It is not the Court's job to weigh conflicting evidence or to consider the credibility of the witnesses; rather, the Court must ask, if believed, would the evidence establish the elements of the crime. *United States v. Farag*, 41 Fed. App'x. 338, 341 (10th Cir. 2002); *United States v. White*, 673 F.2d 299, 301–02 (10th Cir. 1982). "[W]hile the evidence supporting the conviction must be substantial and do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994) (internal citation and quotation marks omitted).

The parties disagree about whether, in reaching its decision, the Court should review the entire record, or only the evidence presented up to the close of the government's case-in-chief when Defendant made her initial Rule 29 motion for judgment of acquittal. Defendant urges the Court to consider all of the evidence in the record in reaching it decision, including Defendant's testimony. (Doc. 359 at 2–3.) The government asserts that because Defendant moved for a judgment of acquittal under Rule 29 at the close of the United States' case-in-chief, and the Court reserved its ruling, under Rule 29(b), the Court's ultimate decision must be based on the evidence at the time the motion was made. (Doc. 354 at 14.) Defendant, however, counters that she moved for a judgment of acquittal post-trial under Rule 29(c), which contains no limitation on the Court's ability to consider the entire record.

Defendant first moved for a judgment of acquittal on all counts at the close of the government's evidence. (Tr. 1090.) The Court reserved ruling on that motion. (Tr. 1116.) At the close of all evidence, Defendant renewed her Rule 29 motion for judgment of acquittal "as it stood before, when the Court took it under advisement." (Tr. 2001.) The Court then denied Defendant's Rule 29 motion for judgment of acquittal. (Tr. 2012–18.) In reaching its decision

on that motion, the Court looked only at the evidence as it stood at the time the Court reserved its ruling.  At the end of trial, on November 11, 2009, the jury found Defendant guilty on counts 1, 2, 3, and 5 of the Second Superseding Indictment and not guilty on count 4. Under Federal Rule of Criminal Procedure 29(c)(1), "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."  Accordingly, the time to file a motion for judgment of acquittal was set to expire on November 19, 2009; however, Defendant moved for an extension of time pursuant to Federal Rules of Criminal Procedure 29(c), 33, and 45(d). (Doc. 318.)  The Court granted this motion (Doc. 320), and on January 4, 2010, Defendant filed her motion for a judgment of acquittal pursuant to Rule 29(c).  Defendant did not indicate that she was merely renewing her previous motion; rather, she presented a motion that was substantively different from her original motion and which included evidence and arguments that were not in her motion brought at the close of the government's case-in-chief.

The government is correct that when a trial court reserves ruling on a Rule 29 motion for judgment of acquittal that is brought by defendant at the close of the government's evidence, the court must base its decision on the evidence as it stood at the time the ruling was reserved. FED. R. CRIM. P. 29(b); *United States v. Truong*, 425 F.3d 1282, 1288 (10th Cir. 2005).  With respect to Defendant's initial motion for a judgment of acquittal, the Court did just that, restricting its decision on the evidence as it stood at the time the ruling was reserved. (Tr. 2012–18.) Following that decision, however, Defendant brought a new motion for judgment of acquittal after the entry of a guilty verdict, and as a result, the Court is not limited to only that evidence adduced during the prosecution's case-in-chief in making its decision.  In *Truong*, the Tenth Circuit concluded that "[t]he procedural posture of this case limits our consideration of the

54

evidence to that presented in the government's case in chief" because "Mr. Truong moved for a judgment of acquittal under Rule 29 at the close of the prosecution's case and the trial court reserved its ruling." 425 F.3d at 1288. But this limitation does not apply when a defendant moves for a judgment of acquittal anew after a guilty verdict; based on the language of the statute and the lack of any case law to the contrary, the Court concludes that Rule 29 permits the trial court to consider the entire record.

### A.     Count 1:  Second-Degree Murder

Count 1 charged Defendant with second-degree murder in violation of 18 U.S.C. § 1111(a), which requires a finding of malice aforethought. Accordingly, the government had to present "evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm." *Wood*, 207 F.3d at 1228 (internal quotations and citations omitted). "This element is [] established if the government shows the defendant 'knew that [her] conduct posed a serious risk of death or harm to [herself] or others, but did not care.' " *United States v. Leonard*, 439 F.3d 648, 651 (10th Cir. 2006) (quoting *United States v. Tan*, 254 F.3d 1204, 1207 (10th Cir.2001)). Defendant argues that the government produced insufficient evidence to prove that Ms. Christie acted with malice aforethought in causing Brandi's death. (Doc. 341 at 11–19.)

To support this argument, Defendant points to her testimony that she gave Brandi food and water on January 25, 2006 (Tr. 1403–09, 1427), that she bathed Brandi the night of January 25, 2006 (Tr. 1424), and that she did not notice any change in Brandi's appearance that alarmed her until the day of Brandi's death. (Tr. 1397.) Accordingly, Defendant argues that there was no evidence presented at trial from which a rational jury could infer that Ms. Christie

was aware that Brandi was not receiving sufficient water, or, that she was in a dangerously weakened state when Ms. Christie put her to bed on January 25, 2006. (Doc. 341 at 13.) Defendant cites to several cases where caretakers who failed to seek medical treatment for their sick children had their convictions reversed because the medical risks were unknown to them, and therefore, they could not be found to have acted with the requisite *mens rea*. *See Martineau v. Angelone*, 25 F.3d 734 (9th Cir. 1994) (reversing conviction for manslaughter where defendant attempted to provide CPR to child before calling 911 because defendant could not be held criminally liable where medical risks were not known or readily apparent); *Fabritz v. Traurig*, 583 F.2d 697, 700 (4th Cir. 1978) (concluding that caretaker must possess "a consciousness of criminality" or knowledge of the "fatal nature of the child's illness"); *United States v. Robertson*, 37 M.J. 432 (U.S. Ct. Mil. App. 1993) (reversing father's negligent homicide conviction because father did not appreciate the magnitude of the boy's symptoms); *cf. People v. Sealy*, 356 N.W.2d 614 (Mich. Ct. App. 1984) (upholding conviction where parent failed to seek medical attention for two-week-old baby who died of pneumonia complicated by dehydration after the baby had been sick for a week and had several episodes in which she stopped breathing and was resuscitated).  In the case at hand, however, there was substantial evidence from which a rational jury could have inferred that Defendant "was aware of a serious risk of death or serious bodily harm." *Wood*, 207 F.3d at 1228.

The government presented the expert testimony of Doctors Zumwalt, Kellogg, and Cooper, who indicated that on January 25, there would have been clear signs of dehydration, and it would have been obvious to a normal person that something was wrong. (Tr. 381, 987–91, 2084–94.)  At this point, Defendant placed Brandi in her room for fourteen to sixteen hours with no food or water. (Tr. 429–34, 456–59, 691–93, 1524; Gov't Ex. 202 at 22.)   Additionally,

expert medical testimony (Tr. 370–71, 378–81, 385, 982–83, 986–91, 2090) and photos of Brandi taken at the hospital and the autopsy (Gov't Exs. 2, 6, 7, 10, 13, 39, 40, 42) showed that she was extremely dehydrated.  The jury could infer from this evidence that Brandi did not deteriorate to this extreme overnight. *See United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995) ("the jury may draw reasonable inferences from . . . evidence"); *cf. Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 521 (10th Cir. 1987) ("A jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility."). Based on expert testimony that it would have taken Brandi at least several days to get to this state (Tr. 381, 990), this was a reasonable inference for the jury to make. *Truong*, 425 F.3d at 1288 ("An inference is reasonable 'if the conclusion flows from logical and probabilistic reasoning.' " (quoting *Jones*, 44 F.3d at 865)).

Furthermore, the government presented evidence that Defendant spent the majority of her day on her computer, including the days and hours leading up to Brandi's death, thus indicating that Defendant's neglect was not inadvertent, but that she knowingly and wantonly ignored her parental duties. (Tr. 913–15.)  Accordingly, considering both the direct and circumstantial evidence presented by the government, the Court concludes that the jury was warranted in finding Defendant knew that something was seriously wrong with Brandi on January 25, 2006, but instead of summoning medical assistance, she placed her in her bedroom for fourteen to sixteen hours without food or water and without checking on her condition during the evening, and that this behavior was reckless and wanton, and a gross deviation from the normal standard of care, thereby constituting malice aforethought.

In the alternative, Defendant argues that if Brandi was actually in such an extreme state of dehydration on the evening of January 25, 2006, that she could not talk or move, then she was

already dying at the time Defendant put her into the bedroom, and placing her in the bedroom without food or water did not represent a reckless and wanton disregard for Brandi's life that was extreme in nature because Brandi would not have been able to eat or drink anything that was placed in the room with her. (Doc. 341 at 18.)  This argument, however, ignores the fact that, by itself, the act of placing a child who is near death and very obviously in a precarious medical condition in a room by herself with no way to monitor her condition represents a reckless and wanton disregard for the child's life and a gross deviation from the normal standard of care. (Tr. 691–92, 993, 2104.)  Dr. Kellogg testified that healthy children Brandi's age need fluid and nutrition minimally every nine to ten hours (Tr. 993), and a sick or dehydrated child needs even more frequent fluids and nutrition.   Accordingly, a rational jury could find that leaving a dehydrated child unattended for such an extended period of time was an extreme and callous act presenting a serious risk of bodily harm or death, and the Court therefore rejects Defendant's argument that the government produced insufficient evidence to prove Ms. Christie acted with malice aforethought.

### B.      Count 2: Negligent Child Abuse Not Resulting in Death

Defendant next argues there was insufficient evidence for a rational trier of fact to find beyond a reasonable doubt the elements of negligent child abuse not resulting in death. (Doc. 341 at 24–25.)  To find Defendant guilty of count 2, the jury had to find that, from on or about January 2005 to January 26, 2006, (1) Defendant caused or permitted Brandi to be placed in a situation that endangered her life or health, or tortured, cruelly confined, or cruelly punished, and (2) Defendant acted with reckless disregard and without justification. (Doc. 312, Instruction No. 20.)  The government argued that Ms. Christie committed negligent child abuse by failing to provide adequate nutrition and hydration for Brandi and by not taking her to the doctor during

the entire year.  Defendant counters that, by the government's own evidence (Tr. 2099), Brandi was healthy during Christmas 2005, and therefore, there was no evidence of child abuse prior to Derek's departure for temporary deployment on  January 17, 2006.

Defendant misconstrues the government's evidence.  The government did not argue that Brandi was completely healthy at Christmas 2005; to the contrary, the government presented evidence that Defendant suffered from chronic malnutrition.  With regard to Christmas 2005, the government only argued that, at that time, the evidence indicated Brandi's diarrhea had resolved and she no longer suffered from explosive and frequent diarrhea that could potentially cause her to rapidly dehydrate and die within a matter of hours.  The government's rebuttal witness, Dr. Cooper, testified that excessive diarrhea resulting from a gastrointestinal disease or inborn error in metabolism did not cause Brandi's death, but rather, her death was caused by dehydration resulting from an inadequate intake of fluids. (Tr. 2098–99.)  In other words, it was Dr. Cooper's opinion that the evidence, including Defendant's own testimony, did not support the theory that Brandi's extreme dehydration was caused by excessive fluid loss. (Tr. 2093–95.) In addition to finding no evidence of a disease or genetic abnormality that could have caused such copious diarrhea, there was no vomit or stools discovered on Brandi, in her diaper, or on her bedding the morning of January 26, 2006, and Brandi's autopsy did not reveal that Brandi was "stooling out." (Tr. 2095.)   Accordingly, in Dr. Cooper's opinion, the more logical explanation for Brandi's extreme dehydration was that she was not taking in sufficient fluids to stay hydrated.  This rebuttal evidence, however, did nothing to disprove the government's assertion that Defendant negligently abused Brandi in the year before her death.

For the year-long period leading up to Brandi's death, the government presented evidence that Defendant caused or permitted Brandi to be placed in a situation that endangered

59

her life or health, or tortured, cruelly confined, or cruelly punished.  Dr. Kellogg testified that Brandi's malnutrition dated back to a period of many weeks or months, as evidenced by the micro and macro-vesicular changes in her liver. (Tr. 993.)   Thus, if Brandi was not suffering from some underlying disease, her malnutrition must have been caused by a lack of adequate nutritional intake, which points to a failure by her primary caretaker to provide adequate nourishment.  Additionally, the government presented evidence that Defendant failed to take Brandi to the doctor during the entire year before her death. (Tr. 608, 690.)   Considering Brandi's medical history, this demonstrated negligence by her caretakers that endangered her life or health.  There was also evidence that Defendant was not providing Brandi with PediaSure, as prescribed by Dr. Noël; once again, presenting a potential danger to Brandi's health. (Tr. 224.)

Furthermore, there was evidence Defendant would routinely place Brandi upstairs in her bedroom and close the door, which she was unable to open, for periods of twelve to sixteen hours, endangering Brandi's life or health and presenting evidence of cruel confinement. (Tr. 691–92, 993, 2104.)  Dr. Kellogg stated this would be "entirely inappropriate," and if he heard such a story, he would report the parents because children Brandi's age have higher metabolic needs than adults and should not go more than nine to ten hours without a meal. (Tr. 993.)  Lastly, the government presented evidence Defendant was on her computer nearly continuously from noon to 3:00 a.m. every day, causing her to neglect her parental duties to pursue an obsession with online gaming. (Tr. 828, 866, 913–15.)  Accordingly, there was ample evidence presented at trial to demonstrate a pattern of child abuse during the year-long period.

Defendant, however, construes her behavior as merely "imprudent," arguing that the harm to the child must be substantial and foreseeable, and a reasonable individual would not think Defendant's actions endangered Brandi's life or health. (Doc. 341 at 21–25.)  To prove a

person acted negligently under the New Mexico child abuse statute, there must be evidence the "person knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of the child." N.M. STAT. ANN. § 30-6-1(A)(3). The jury was accordingly instructed by the Court that it must find Defendant knew or should have known her conduct created a substantial and foreseeable risk, she disregarded that risk, and she was wholly indifferent to the consequences of her conduct and to the welfare and safety of Brandi. (Doc. 312, Instruction No. 20.)

The Court concludes that the jury's determination was supported by sufficient evidence of acts or omissions during the year period before Brandi's death that presented a real and significant danger to the her health, and that a rational jury could find these acts represented more than mere imprudence by Defendant, but were of such a nature that a reasonable person would have recognized the danger to the safety and health of the child. The evidence indicated that Defendant regularly placed Brandi in her room, unsupervised, and without any food or water for periods of twelve to sixteen hours; that Defendant failed to take Brandi to the doctor for an entire year, despite a history of potentially serious medical problems; and that Brandi suffered from chronic malnutrition, indicating that Defendant was not providing Brandi with adequate nourishment for a period of weeks or months. Furthermore, Defendant's computer chat logs (Gov't Ex. 206) evidence a desire to escape her reality and ignore the responsibilities of parenthood through online gaming and friends. Consequently, there was ample evidence of negligent child abuse not resulting in death during the year period before Brandi's death.

### C.    Count 3: Negligent Child Abuse Resulting in Death

In count 3, Defendant was charged with negligent child abuse resulting in death for the nine-day period before Brandi's death from January 17–26, 2006. Again, to convict Defendant,

the jury had to find Defendant knew or should have known her conduct created a substantial and foreseeable risk, she disregarded that risk, and she was wholly indifferent to the consequences of her conduct and to the welfare and safety of Brandi. (Doc. 312, Instruction No. 21.)  Defendant argues that her acts during this period did not amount to negligent child abuse because a reasonable person would not view her acts or omissions as having constituted cruel confinement or having placed Brandi's life or health in danger.

Defendant asserts that the act of putting Brandi in her room and shutting the door does not constitute child abuse and that it would not have been prosecuted as such had Brandi not died. (Doc. 341 at 23.)  The Court disagrees.  As previously noted, routinely placing a child of Brandi's age and physical condition in her bedroom and closing the door, which she was unable to open, for periods of twelve to sixteen hours without parental supervision, clearly endangered Brandi's life or health and constituted cruel confinement. (Tr. 691–92, 993, 2104.)  Dr. Kellogg stated that this would be "entirely inappropriate," and that if he heard such a story, he would report the parents. (Tr. 993.)  If Brandi had not died, Defendant's abuse may not have come to light; however, this does not make it any less dangerous or negligent.

Defendant points to the definition of "neglect" contained in the New Mexico child abuse statute, arguing that Defendant's behavior did not rise to this level:

> "neglect" means that a child is without proper parental care and control of subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parents, guardian or custodian or their neglect or refusal, when able to do so, to provide them;

N.M. STAT. ANN. § 30-6-1(A)(2).  There was substantial evidence upon which a rational jury could have found that Brandi was without proper care and control of her subsistence, medical care, or other care or control necessary for the child's well-being: there were micro and macro-

vesicular changes in her liver indicating chronic malnutrition (Tr. 993); she was in an advanced state of dehydration that could have only been reached after a period of several days without receiving proper fluids (Tr. 381, 990); Defendant was not providing Brandi with PediaSure, as prescribed by Dr. Noël (Tr. 224); although Brandi would have been exhibiting clear signs of dehydration, her mother failed to seek medical care until her body had completely shut down (Tr. 105); and when she was in this compromised state, suffering from dehydration and malnutrition, Defendant placed Brandi in a room which she could not get out of for fourteen to sixteen hours, without any food or water, and without the parental care or control necessary for her well-being. (Tr. 429–34, 456–59, 691–93, 1524; Gov't Ex. 202 at 22.)   Additionally, a rational jury could have concluded that the reason for this neglect was the direct result of Defendant's habits or refusal to provide care when able to do so, as the government presented evidence that Defendant was neglecting her parental duties so that she could spend her time on the computer playing World of Warcraft. (Tr. 828, 866, 913–15.)

The Court is not convinced by Defendant's efforts to paint her behavior as merely imprudent.  Defendant relies heavily on *State v. Chavez*, 211 P.3d 891, 904 (N.M. 2009), where the New Mexico Supreme Court concluded that the defendant's "act of placing a child to sleep in a drawer as a temporary solution to a broken bassinet is not the kind of obvious risk contemplated by our Legislature as a felony."  Ms. Christie's behavior, however, was far more egregious and obviously negligent, such that the risk of serious harm to Brandi would have been apparent to a reasonable person.  Consequently, the Court concludes there was ample evidence of negligent child abuse during the nine-day period preceding Brandi's death for a rational jury to find the elements of count 3, negligent child abuse resulting in death, beyond a reasonable doubt.

### D.       Counts 5:  Intentional Child Abuse Resulting in Death

Finally, Defendant argues that the government failed to present sufficient evidence to prove beyond a reasonable doubt that Ms. Christie was guilty of intentional child abuse resulting in death as charged in count 5 of the Second Superseding Indictment. (Doc. 341 at 19–20.)  To prove intentional child abuse, the government had to present evidence that Ms. Christie acted purposely in doing an act that endangered Brandi's life or health or caused her to be cruelly confined. (Doc. 312, Instruction No. 23.)

First, Defendant argues that she did not intentionally deprive Brandi of food and water from January 17 through January 26, 2006. (Doc. 341 at 19.)   However, the government presented considerable circumstantial evidence that Defendant intentionally neglected her duties as a parent, and quite possibly, actually intended to cause Brandi physical harm.  Most notable were Defendant's statements in her online chat sessions that she wanted "out of this hell hole," that she wanted to leave Brandi behind, and that she wanted to get out and live and start over without kids. (Tr. 831–36, Gov't Ex. 206.)   These cryptic statements, some just days before Brandi's death, evince an intent to abandon her daughter and her parental responsibilities.

Additionally, the excessive time Defendant spent on the computer—the government presented evidence there was nearly continuous activity from noon to 3:00 a.m. every day—provided further circumstantial evidence that Defendant may have intentionally caused Brandi to be placed in a situation that endangered her life or health. (Tr. 828, 866, 913–15.) Also, the government presented photographs of the house showing a lack of PediaSure and other food items (Gov't Exs. 57–62, 102–07, 144, 155–56.), the testimony of Dr. Zumwalt that Brandi's stomach and intestines had very little food at the time of the autopsy (Tr. 382), and the testimony of several doctors that she was extremely dehydrated and suffered from chronic

64

malnutrition. (Tr. 370–71, 378–79, 986–94, 2090.)   Thus, even though the government's evidence of intentional child abuse was largely circumstantial, when viewed together, it provides strong evidence that Brandi was suffering an extreme level of abuse that was likely not the result of mere negligence.   Accordingly, based on Defendant's statements, the expert testimony, the autopsy, and Brandi's physical condition at the time of her death, a rational jury could infer that Defendant acted intentionally. *See Jackson*, 443 U.S. at 319; *Jones*, 44 F.3d at 865.

Still, even if this were not sufficient, the government presented additional evidence, in the form of Defendant's own statements, of an intentional act of abuse: on the night before her death, January 25, 2006, Defendant placed Brandi in her room, which she could not get out of, for fourteen to sixteen hours without food or water. (Tr. 429–34, 456–59, 691–93, 1524.) Defendant argues that this should not be considered an intentional act of abuse because the situation was not dangerous, as Brandi had eaten and had liquids the day before and Ms. Christie had food and water available for Brandi when she woke up. (Doc. 341 at 20.)   This assertion, however, was directly contradicted by the government's medical experts, who testified that a child Brandi's age should never be left alone for such an extended period of time, because she could become fluid and nutrition deprived, endangering her life or health. (Tr. 691–92, 993, 2104.)   Consequently, the Court concludes there was ample evidence of intentional child abuse in the nine-day period preceding Brandi's death for a rational jury to find the elements of count 5, intentional child abuse resulting in death, beyond a reasonable doubt.

### E.      Conclusion

Defendant argues that a conviction cannot be sustained by "piling inference on inference." *Jones*, 44 F.3d at 865.  A jury, however, is permitted to make reasonable inferences based on the evidence presented at trial; therefore, when reviewing a Rule 29 motion for

judgment of acquittal, the trial court is required to examine the evidence in the light most favorable to the government and to draw reasonable inferences therefrom. *See Jackson*, 443 U.S. at 319; *Jones*, 44 F.3d at 865.  The Court can only enter a judgment of acquittal when the jury acted unreasonably; for example, engaging "in a degree of speculation and conjecture that renders its finding a guess or mere possibility." *Sunward Corp.*, 811 F.2d at 521.  Here, the Court did not find any indication that the jury engaged in speculation, or acted unreasonably.

Defendant suggests the jury was required to accept Ms. Christie's testimony that Brandi exhibited no signs of dehydration in the day preceding her death, and thus conclude that Defendant could not have acted negligently, intentionally, or with reckless disregard for Brandi's life or health, and that Brandi's death was not foreseeable; however, Defendant's testimony was directly contradicted by the government's medical experts.  The jury is not required to accept all evidence or testimony.  Indeed, part of the jurors' duty is to weigh the evidence and make credibility determinations.  Accordingly, when deciding a Rule 29 motion for judgment of acquittal, the Court must be careful not to infringe upon the jury's fact-finding role: the Court must view the evidence in the light most favorable to the government to determine whether any rational jury could find the elements of the crime charged, not second guess the jury's factual findings. *Burks v. United States*, 437 U.S. 1, 16 (1978); *Voss*, 82 F.3d at 1525.  In sum, having reviewed the trial record, the Court concludes there was sufficient evidence to prove beyond a reasonable doubt the elements of counts 1, 2, 3, and 5 of the Second Superseding Indictment, and Defendant's Rule 29 Motion for a Judgment of Acquittal is therefore denied.

## V.  MOTION FOR A NEW TRIAL

Defendant requests that the Court grant a new trial based on the following errors: (1) the Court's jury instructions were erroneous; (2) Defendant was prejudiced by a multiplicitous

indictment; and (3) the Court erred in admitting irrelevant and unfairly prejudicial evidence. Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  The decision whether or not to grant a new trial lies within the sound discretion of the trial court. *United States v. Robinson*, 39 F.3d 1115, 1116 (10th Cir. 1994); *United States v. Kelly*, 929 F.2d 582, 586 (10th Cir. 1991).

### A.    Jury Instructions

Defendant first argues that the Court should grant a new trial due to errors in the jury instructions.   In determining whether the jury instructions were in error, the Court must "determine whether the instructions state the law which governs and provide the jury with an ample understanding of the issues and standards applicable." *United States v. Zimmerman*, 943 F.2d 1204, 1213 (10th Cir. 1991).  The jury instructions do not have to be faultless, but they must be sufficient to convey to the jury "an understanding of the issues and its duty to determine these issues." *Id*.  Additionally, the Court may grant a new trial where the jury instructions were prejudicial to the defendant. *United States v. Cardall*, 885 F.2d 656, 673 (10th Cir. 1989).

#### 1.    *Threat of Multiple Convictions for the Same Offense*

Defendant argues that the Court should grant a new trial because the instructions allowed the jury to convict Ms. Christie of multiple crimes for Brandi's death. (Doc. 341 at 26.) Defendant points out that in its closing argument, the government stated it had proven the elements for each offense, but failed to differentiate what conduct was attributed to each count; consequently, the jury instructions were faulty, allowing Ms. Christie to be convicted of multiple crimes for one death.  Defendant has identified no case law, however, which precludes the government from charging multiple crimes for the same offense in a single indictment.  Double jeopardy only applies where there are multiple punishments for the same offense. *See Pierce*,

792 P.2d at 418–19 ("Although the state properly may charge in the alternative . . . , where defendant is convicted of one or more offenses which have merged into the greater offense he may be punished for only one.").  The Court has addressed the issue of multiple punishments by concluding that it will vacate two of Defendant's homicide convictions.

Still, Defendant argues that the Court erred by failing to give an instruction tendered by Ms. Christie, which would have required the jury to find that each homicide conviction was supported by separate conduct, and that the Court erred by instructing the jury that "[e]ach count, and the evidence pertaining to it, should be considered separately." (Doc. 341 at 3; Doc. 312, Instruction No. 15.)  Defendant argues that this was an incorrect jury instruction because, in the case at hand, if the jury found the Defendant guilty of one homicide offense, the jury then had to find that the other homicide offenses were supported by separate conduct or acquit. (Doc. 341 at 26–27.)  The Court disagrees.

It was the New Mexico Legislature's intent not to allow multiple punishments for a single homicide arising from a single episode of abuse, but the Court found no limitation on the jury finding that during a single episode of abuse, the defendant acted negligently, intentionally, and with malice aforethought.  Of course, "one cannot commit an intentional act and an unintentional but substantially risky act at the same time," *Schoonmaker*, 176 P.3d at 1118 n. 4; however, where a single episode of abuse is charged, that episode may consist of multiple acts, both intentional and negligent.  In the end, the Court concludes its instructions with regard to the three homicide offenses correctly "state[d] the law which governs and provide[d] the jury with an ample understanding of the issues and standards applicable." *Zimmerman*, 943 F.2d at 1213. Furthermore, as the Court has decided to vacate two of the homicide offenses, Defendant was

not prejudiced by the jury instructions. *Cardall*, 885 F.2d at 673.  Accordingly, it was not error for the Court to instruct the jury on all three homicide offenses.

2.    <em>Unanimity Instruction</em>

Defendant next argues that it was error for the Court not to give the jury a specific unanimity instruction with regard to the child abuse counts because, to convict, the jury was not required to unanimously agree on the specific act or omission that formed the basis for each individual count. (Doc. 341 at 27.)  In other words, Defendant asserts that a general unanimity instruction was needed to make it clear to the jurors that they must unanimously find Defendant caused *or* permitted (one or the other, but not both), Brandi to be placed in a situation that endangered her life and health *or* tortured, cruelly confined, or cruelly punished (again, one or the other, but not both). (Doc. 341 at 29.)  For instance, according to Defendant, the jury should have been required to unanimously find Ms. Christie negligently caused Brandi to be placed in a situation that endangered her life or health to find her guilty of count 2, and if one juror found instead that she *permitted* her to be placed in a situation that endangered her life, or that she caused her to be cruelly confined, then the jury could not convict.  Without such an instruction, Defendant argues that her right to due process was violated. (Doc. 341 at 28.)  The Court does not agree, and instead finds that section 30-6-1(D) merely describes alternative means of finding a required element of child abuse.

The Tenth Circuit has held that a specific unanimity instruction is not required when one of the elements of the offense may be proven through alternative means. *United States v. Powell*, 226 F.3d 1181, 1195 (10th Cir. 2000).  Elements, on the other hand, "must be found unanimously by the jury." *Id*. at 1196.  Therefore, whether a specific unanimity instruction was required hinges upon (1) whether "causing" and "permitting" an act of child abuse are

69

considered elements of the crime, or merely alternative means of proving an element of the crime, and (2) whether "placing a child in a situation which endangers her life or health" and "torturing, cruelly confining, or cruelly punishing" a child are considered elements of the crime or merely different means by which an element of the crime can be proven.

The Court concludes that "causing" and "permitting" an act of child abuse are two different means of committing the same offense. *See Pierce*, 792 P.2d 408, 418 (N.M. 1990) ("statute creates alternative ways of characterizing the same abusive act or episode"). Indeed, the New Mexico child abuse statute does not draw a distinction based upon whether the abuse was "caused" or "permitted" by the Defendant. This is in contrast to the child abuse statute's treatment of "intentional" or "negligent" child abuse. In subsections 30-6-1(F)–(H) & (J), the statute specifically distinguishes between negligent and intentional child abuse, providing enhanced penalties for certain types of child abuse. Additionally, the statute provides a definition for "negligently"; however, the statute makes no such distinction between "caused" or "permitted," and these words are not defined within the statute.

> Section 30-6-1[D][] prohibits two acts—causing or permitting child abuse. In using the term "cause or permit," the legislature intended to provide flexibility. Since abuse will frequently occur in the privacy of the home, charging a defendant with "causing or permitting" may enable the state to prosecute where it is not clear who actually inflicted the abuse, but the evidence shows beyond a reasonable doubt that the defendant either caused the abuse or permitted it to occur.

*State v. Leal*, 723 P.2d 977, 980 (N.M. Ct. App. 1986). As the government properly charged "caused and permitted" in the Second Superseding Indictment (Doc. 181 at 3), it was not error for the Court to instruct the jury that they could find Defendant guilty if she caused or permitted the act of child abuse. *See id.*

Additionally, the Court concludes "placing a child in a situation which endangers her life or health" and "torturing, cruelly confining, or cruelly punishing a child" are also different means of committing an act of child abuse.  In *State v. Davis*, 212 P.3d 438, 440–41 (N.M. Ct. App. 2009), the New Mexico Court of Appeals found that it was error for the trial court to instruct the jury that it could find the defendant guilty if it determined he committed the act of abuse "negligently *or* intentionally"; the court did not find, however, that it was error for the judge to instruct the jury that it could find the defendant guilty if proven that he "caused the child to be placed in a situation that may endanger his life or health," *or* that he "cruelly punished the child," even though the trial court instructed in this manner.  Thus, the Court concludes that section 30-6-1(D) provides for several different ways one can commit child abuse, but these different "means" of violating the law are not distinct "elements" of the crime; therefore, it was not error for the Court to instruct the jury concerning the alternative ways in which the requisite act of child abuse could have been committed. *See Leal*, 723 P.2d at 980.

Where a statute provides for different ways of committing an element of the crime, "a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." *Richardson v. United States*, 526 U.S. 813, 817 (1999). For example, in count 2, the jury may have considered not taking Brandi to the doctor for an entire year endangered her life; or, the jury may have found that not providing adequate nutrition during the year endangered her life.  In the end, however, the exact means by which the element was satisfied is irrelevant. *See Schad v. Arizona*, 501 U.S. 624, 631–32 (1991); *Richardson*, 526 U.S. at 817 ("a disagreement about means . . . would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element . . .");

71

*United States v. Powell*, 226 F.3d 1181, 1196 (10th Cir. 2000).  Accordingly, the Court finds that it was not error to refuse Defendant's unanimity instruction.

### 3.     *Mens Rea for Intentional Child Abuse Resulting in Death*

The Court instructed the jury that to find Defendant guilty of intentional child abuse resulting in death, it had to find the following:

1.    The defendant caused or permitted Brandi Wulf to be:
   (a)    placed in a situation which endangered her life or health; or
   (b)    tortured, cruelly confined, or cruelly punished.

2.    The *defendant acted intentionally and without justification*.  A person acts intentionally when the person *purposely* does an act.  Whether the defendant acted intentionally may be inferred from all the surrounding circumstances, such as defendant's actions, or failure to act, conduct, and statements.
   . . .

(Doc. 312, Instruction No. 23, emphasis added.)   This instruction came directly from New Mexico UJI Section 14-610.  Defendant argues, however, that Instruction No. 23 warrants a new trial because it allowed the jury to convict Ms. Christie without finding she intended to place Brandi in a situation that could endanger her life or health, or that she intended to torture, cruelly confine, or cruelly punish Brandi. (Doc. 341 at 30.)   In other words, Defendant asserts that the Court should have additionally required the jury to find Defendant knew her actions caused or permitted Brandi to be placed in a situation that endangered her life or health or to be tortured, cruelly confined or cruelly punished, that Defendant's actions constituted a substantial or foreseeable risk of harm, or that her actions were "inherently harmful." (Doc. 341 at 32–33.) Defendant thus claims that her Requested Jury Instruction H was improperly rejected by the court, and that without the requested instruction, the jury was allowed to convict Defendant if she intended to do an act, even though Defendant may not have intended to harm Brandi or the

act may not have been inherently harmful. (Doc. 341 at 33.)  Additionally, Defendant argues that the lack of a requirement of foreseeability or that the act be inherently harmful allowed the jury to convict Defendant for intentional child abuse based on a lesser *mens rea* than negligent child abuse. (Doc. 341 at 33.)

Defendant's requested instruction stated that a person acts intentionally when she has a "conscious object to engage in a harmful act or to cause the harmful consequence." (Doc. 300 at 3.)  This language was taken from *State v. Schoonmaker*, 105 P.3d 302, 311 (N.M. 2004) ("The child abuse statute punishes defendants for committing a voluntary act that is likely to result in serious harm to the child, such as violently shaking a baby, when it is his or her intent, purpose, or conscious object to engage in a harmful act (shake the baby) or to cause the harmful consequence."), *rev'd on other grounds*, 176 P.3d 1105 (2008).  Child abuse, however, is a general intent crime; therefore, the statute does not require proof that Defendant intended to achieve a specific consequence, to cause harm to the child. *Id*. at 310.  Instead, Defendant must only have intended to do an act which the statute declares to be unlawful—i.e., she must have intentionally caused or permitted Brandi to be placed in a situation which endangered her life or health; or, she must have intentionally caused or permitted Brandi to be tortured, cruelly confined, or cruelly punished. *State v. Brown*, 931 P.2d 69, 74 (N.M. 1996) ("A general intent crime . . . requires only a conscious wrongdoing, or the purposeful doing of an act that the law declares to be a crime." (internal quotations omitted)).  There is no requirement, however, that Defendant intended to harm the child.  Thus, while "intentional child abuse may still include instances where defendant has a specific intent to harm the child," *Schoonmaker*, 105 P.3d at 310 n. 1, the Court was not required to instruct the jury that Defendant must have intended to harm Brandi or to bring about a specific harmful consequence in order to convict.

73

Still, Defendant insists that the Court should have minimally instructed the jury that to find Defendant guilty of intentional child abuse, it had to find the act inherently harmful, or the risk of harm to Brandi was substantial and foreseeable. (Doc. 341 at 32–33.)  Defendant argues that by criminalizing "a broad range of apparently innocent conduct," *Staples v. United States*, 511 U.S. 600, 610 (1994), the child abuse statute essentially dispenses with the *mens rea* requirement and allows conviction without a finding that the danger to the child was foreseeable. *Chavez*, 211 P.2d at 896–98.  There is, however, no requirement in the New Mexico child abuse statute that the act be inherently harmful, only that Defendant purposefully acted in an unlawful manner as defined by subsection 30-6-1(D), and the Court disagrees that the statute criminalizes "apparently innocent conduct."  Unlike the unauthorized possession of food stamps, intentionally causing or permitting a child to be placed in a situation that endangers her life or health is not "ostensibly innocuous conduct." *Staples*, 511 U.S. at 611.

At trial, Defendant argued that locking Brandi in her room was an innocent act because Ms. Christie did it to protect her from coming out of her room and falling down the stairs.  As the trier of fact, it was up to the jury to determine whether Ms. Christie acted intentionally to cause or permit Brandi to be placed in a situation that endangered her life or health, or to be tortured, cruelly confined, or cruelly punished.  While Defendant may characterize Ms Christie's act as "innocent," it was up to the jury to determine whether the act was unlawful under subsection 30-6-1(D)—i.e., whether it caused or permitted Brandi to be placed in a situation that endangered her life or health, or to be tortured, cruelly confined, or cruelly punished.  Accordingly, Defendant's assertion that the Court was required to instruct the jury that it must find the act was "inherently harmful," that Ms. Christie knew the act was harmful, and that Defendant intended the harmful consequence, is an incorrect statement of the law.  As a general

74

intent crime, the New Mexico child abuse statute only requires that Defendant purposefully committed an unlawful act as defined by the statute. *See State v. Sheets*, 610 P.2d 760, 770 (1980) (finding that an instruction for a general intent crime "sufficiently cover[ed] conscious wrongdoing in the words 'purposely does an act which the law declares to be a crime' ").

Defendant further asserts that by instructing the jury that they only needed to find Ms. Christie acted intentionally and without justification to convict her of intentional child abuse, while requiring the jury to find Defendant disregarded a substantial and foreseeable risk to convict her of negligent child abuse, this allowed the jury to convict Ms. Christie of a lesser *mens rea* under intentional child abuse than under negligent child abuse. (Doc. 341 at 33.) The Court disagrees. For example, during the year leading up to Brandi's death, from January 2005 through January 2006, the government presented evidence that Defendant failed to provide Brandi with sufficient nutrition and this caused her to become malnourished. To convict Defendant of intentional child abuse for this act or omission, the jury had to find that Ms. Christie intentionally did not provide Brandi with sufficient food and nutrition, causing her life or health to be endangered. To convict Defendant of negligent child abuse, however, the jury only needed to find that Ms. Christie recklessly disregarded Brandi's health—e.g., failing to provide sufficient foods, failing to carefully monitor her caloric intake, or failing to follow up on and seek medical attention for Brandi's digestive problems. Indeed, the jury understood the difference between the two standards, finding Defendant guilty of negligent child abuse during the year before her death, but not guilty of intentional child abuse during the same period.

Finally, Defendant argues in her Supplement to her Motion for a New Trial (Doc. 372 at 2) that Instruction No. 23 was erroneous because it was based on New Mexico UJI Sections 14-602 and 14-610, which have not been revised since the passage of the 2005

75

amendments to Section 30-6-1. *See Garcia v. State*, No. 31,328, 2010 WL 2560432, at *3 n. 2 (May 13, 2010).  In *Garcia*, the New Mexico Supreme Court concluded that these amendments "designate[d] an entirely different level of noncapital offense—one that results in life in prison . . . .  This new designation and sentence applies only to the crime of intentional child abuse when it results in the death of a child under 12 years old." *Id*. at *3.  The court noted, however, that the pleadings did not include the child's age or state that she was under twelve years old. *Id*.  This is not the situation in the case at hand, as the Second Superseding Indictment clearly indicated that Brandi was under the age of twelve, putting Defendant on notice that she faced a greater penalty under count 5.  Notwithstanding, Defendant intimates that the 2005 amendments changed the mental state required for intentional child abuse resulting in death. The Court disagrees.  Instead, the amendments created different offenses and imposed different penalties based on the defendant's *mens rea* and the age of the child. *Id*. at *2–3.  The definitions of the different mental states under the statute, however, did not change.  Accordingly, the Court finds that Instruction 23 was not erroneous.

### B.    Multiplicity of Indictment

Defendant argues that a new trial is warranted because the Second Superseding Indictment was multiplicitous, improperly suggesting to the jury that the criminal activity was more serious than it really was. (Doc. 341 at 33.)  In Section III-B, above, the Court determined that while a defendant may be charged with multiple counts of murder, negligent child abuse resulting in death, and intentional child abuse resulting in death, the New Mexico legislature did not intend that the defendant receive multiple punishments where the government does not charge or offer proof that the acts represented distinct episodes of abuse. *Pierce*, 792 P.2d at 417–18; *Schoonmaker*, 176 P.3d at 1119.  As the government did not distinguish between the

76

individual acts of abuse supporting the crimes charged in counts 1, 3, and 5, the Court concluded that they were part of the same episode of abuse, even though there was evidence of multiple acts of abuse that occurred during the time period charged.  In contrast, counts 2 and 4 of the Second Superseding Indictment charged a distinct episode of abuse occurring between January 2005 and January 26, 2006.  Accordingly, Defendant's conviction under count 2 did not result in the imposition of multiple punishments.

While multiplicity of the indictment is a similar inquiry to multiplicity under double jeopardy, the concerns are not identical.  The Double Jeopardy Clause protects against the imposition of "multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969).  Multiplicity of the indictment protects against potential prejudice to the defendant that may occur where the indictment charges multiple counts for the same criminal behavior, as this may create the impression of greater criminal activity than actually occurred and divert the jury's attention away from a careful analysis of the facts of the case. *United States v. Johnson*, 130 F.3d 1420, 1426 (10th Cir. 1997).  In the end, the "decision of whether to require the prosecution to elect between multiplicitous counts before trial is within the discretion of the trial court." *Id.*

In its Memorandum Opinion and Order regarding Defendants' Motion to Dismiss Due to Multiplicity (Doc. 252), the Court concluded that the Second Superseding Indictment was not multiplicitous, as each count represented a different crime or period of abuse.  There is no specific rule precluding the government from charging federal second-degree murder and negligent and intentional child abuse under New Mexico law for different acts, or as alternative offenses for the same act or episode of abuse, as they clearly represent separate crimes and may be charged as such. *See Garcia*, 2010 WL 2560432, at * 4 ("negligent and intentional child

77

abuse resulting in death are separate crimes, neither subsumed within nor lesser included offenses as the other"); *Pierce*, 792 P.2d at 417–18 ("When the facts underlying both offenses are different and they are shown to have occurred at different times, there is no impediment preluding a defendant from being convicted of both [] murder, of child abuse resulting in death or great bodily harm, and of child abuse not resulting in death or great bodily harm."). Pre-trial, the Court did not know what evidence would be introduced to support the crimes charged or the government's ultimate theory of the case; accordingly, the government was permitted to offer proof of multiple acts supporting the crimes charged or to argue in the alternative. The Court does not believe that this resulted in prejudice to Defendant; therefore, it concludes there was no error.

### C.      Admission of Autopsy Photographs

Defendant argues the admission of Brandi's autopsy photographs was unfairly prejudicial and constituted error. The Court disagrees. Pre-trial, the government presented some fifty-two different photographs of Brandi taken at the hospital and during the autopsy. (Doc. 248 at 9.) Defendant specifically objected to the admission of these photographs as cumulative and prejudicial under Federal Rules of Evidence 401–403, arguing that the emergency room photographs were sufficient to show Brandi's physical state at the time of death. (Doc. 208.) In its Memorandum Opinion and Order regarding Defendant's Motion in Limine to Exclude Autopsy Photographs, the Court determined that, having taken precautions to limit the cumulativeness and potential for prejudice of the photographs,[1] it would admit a limited number of autopsy photos at trial. (Doc. 267 at 4.)   In the end, the Court admitted nine of the original

---

1.  The government agreed to exclude several of the photos, to have its experts explain to the jury the changes that would have occurred to the body between the time of death and the autopsy, and that Defendant could cross-examine their experts with regard to any changes to the body.

fifty-two photographs, including three autopsy photographs. (Gov't Exs. 39, 40, & 42)   The Court found the three autopsy photographs probative of Brandi's dehydration and malnutrition at the time of her death and relevant to Dr. Zumwalt's testimony concerning the autopsy.

Under Federal Rule of Evidence 403, a court may exclude relevant evidence where it is needlessly cumulative or its probative value is substantially outweighed by its potential for prejudice; however, "gruesomeness alone does not make the photographs inadmissible." *United States v. Naranjo*, 710 F.2d 1465, 1468 (10th Cir. 1983).   Additionally, the Court notes that it must give the government considerable discretion in what evidence it chooses to present, as "the prosecution is entitled to prove its case by evidence of its own choice." *Old Chief v. United States*, 519 U.S. 172, 186 (1997).   In *Old Chief*, the Supreme Court concluded that a defendant could not stipulate away the admission of unfavorable evidence; similarly, this Court does not believe that Defendant should be able to avoid "the full evidentiary force of the case as the Government chooses to present it" by arguing that one photograph is potentially more prejudicial than another. *Id.* at 187.   In the Court's opinion, both the emergency room and the autopsy photos were ghastly, and therefore, prejudicial to Defendant; however, to the extent that the autopsy photos may have been more prejudicial due to bruising, discoloration, or other changes to the body, the government was careful to have its witnesses explain these changes.   Ultimately, for a photograph to be excluded under Rule 403, its probative value must be "substantially outweighed by the prejudice that will result." *United States v. Sides*, 994 F.2d 1554, 1562 (10th Cir. 1991).   The Court does not believe the photographs met this standard.

Government Exhibit 39 was a photograph of Brandi's face taken during the autopsy. This photograph showed the thinness of Brandi's face, the prominence of her bones, her sunken eyes, the circles around her eyes, and her dry, cracked lips—all of which were relevant to

proving that she was dehydrated and malnourished.  Government Exhibit 40 was a full-body shot of Brandi's front side.  This photo showed Brandi's overall thinness, her protruding ribs, and her dry wrinkled skin, which were indicative of dehydration and malnourishment.  Government Exhibit 42 was a close-up of Brandi's abdomen.  This photo specifically focused on her thinness and the wrinkling of the skin on her abdomen.  Dr. Zumwalt explained that his external exam during the autopsy revealed that the skin did not have the normal tissue turgor that healthy skin would have, and that the wrinkling of the skin in the photo was indicative of Brandi's severe dehydration. (Tr. 370–71.)  Each witness who was presented the photos was asked to explain how they differed from Brandi's appearance on the day she died.  Additionally, Dr. Zumwalt spent considerable time explaining to the jury the effects of livor mortis[2] on the body, and how this can lead to bruising or discoloration of the body. (Tr. 372–76.)

Having explained to the jury the physical changes to the body that occur after death and the differences between the hospital and autopsy photographs, the government minimized any potential for prejudice the photographs might have.  Additionally, Defendant was allowed to develop this topic on cross-examination and to argue to the jury that these photos did not accurately represent Brandi's appearance and physical condition at the time of her death.  The Court determined that this was the proper way to deal with any potential for prejudice the photographs presented, but exclusion of the evidence was not warranted as the photographs were probative of Brandi's severe dehydration and malnutrition and relevant to Dr. Zumwalt's discussion of the autopsy and his observations.  Consequently, the photographs potential for

---

2. *Livor mortis* is the settling of the blood left in the body after death, as opposed to *rigor mortis*, which is the stiffening of the muscles in the body after death.  When a person dies, the blood in the body will settle with gravity.  If a person dies on his back, for example, the blood will settle towards the back, and there will be some reddening of that part of the body. (Tr. 372.)

prejudice due to their disturbing nature did not substantially outweigh their probative value, and therefore, their admittance into evidence did not constitute error.

### D.      Admission of the Screwdriver Evidence at Trial

Defendant argues that the admission of a screwdriver and three photographs of the screwdriver found in a blanket on the floor in Brandi's room was improper as it was irrelevant and unfairly prejudicial. (Doc. 341 at 36.)  The Court found the evidence was relevant to show the condition of Defendant's house and her neglect of Brandi.  The Court did not, however, find the evidence unduly prejudicial; therefore, the relevance of the screwdriver was not substantially outweighed by its potential for prejudice, and its admission was not error.

### E.      Admission of Evidence Mia Was Not Living with Ms. Christie

Defendant argues that admission of testimony from Defendant's mother, Ms. O'Hara, that Defendant's first daughter, Mia, was not living with Ms. Christie was irrelevant and unfairly prejudicial because it was not relevant to whether Ms. Christie intentionally or negligently placed Brandi in a situation that endangered her health or life or cruelly tortured or confined her. (Doc. 341 at 37.)  Defendant argues that the only purpose of this evidence was to make the jurors believe that Ms. Christie was a bad mom.

Defendant, however, did not object to this testimony in a motion in limine or during the government's cross-examination of Ms. O'Hara.  From page 1294 through page 1301 of the transcript, the government questioned Ms. O'Hara, without any objection from Defendant, about the periods during 2004 and 2005 when Mia lived with her in Florida.  Defendant did not object until the government asked, "And how long has it been since you haven't had Mia?" (Tr. 1321.) Due to the charges that had been brought against Defendant in this case, Mia had apparently gone to live with her father and stepmother in Alaska. (Tr. 1325.)  Defendant objected that any

questioning with regard to the ongoing custody battle over Mia should be excluded on relevancy and 403 grounds. (Tr. 1322.)  The government responded that the questioning was important to show the witness' bias. (Tr. 1322.)  The Court ruled that it would allow the government to pursue the issue of bias, but to avoid the ongoing custody battle. (Tr. 1324.)  The government then asked the following series of questions:

> Q: Now, Mia is not living with you at this time, correct?
> A: What time is that?  I'm sorry.
> Q: At this time, right now, she's not living with you?
> A: Oh, no, ma'am.
> Q: Where is she living?
> A: She's in Alaska with her stepmother.
> Q: And you would like to, I'm assuming, have Mia live with you, correct?
> A: I'd love to see Mia anytime, anyplace, as long as I could.
> Q: Which would include living with you, right?
> A: Certainly, anytime.

(Tr. 1325.)  Following this exchange, there were no further questions about Mia's custody.

Interestingly, Defendant did not shy away from this issue on direct examination, but fully explored Ms. O'Hara's involvement with Mia and her role as caretaker.  Defense counsel asked Ms. O'Hara what happened with Mia when Defendant and Derek got married in February 2002, and Ms. O'Hara indicated that she did not let Mia live with them immediately because she was concerned it was not a stable relationship. (Tr. 1243–44.)  Then, Defense counsel inquired about the arrangement they had with Mia in 2003–2004, and Ms. O'Hara indicated that she had convinced Defendant to let her keep Mia from December 2003 until the following summer. (Tr. 1257–58, 1265.)  And finally, Defense counsel inquired about where Mia was living in 2004–2005; Ms. O'Hara stated that she had taken Mia back after Defendant came to visit at Christmas, but that this time, she had kept Mia for the entire summer and then enrolled her in school that Fall. (Tr. 1267–69.)  Ms. O'Hara did not indicate that Defendant was a bad mom;

however, the jury could make this inference, and that was a risk Defendant faced by pursuing this line of questioning.  The Court fails to see how the government's questions about where Mia was living at the time of the trial in 2009 were any more prejudicial than Defendant's questions concerning Mia's living arrangements in 2003–2005.  The Court was careful to instruct the government to avoid the issue of the ongoing custody battle, and indeed, it was never discussed.

As Defendant explored the issue of where Mia was living at length on direct examination, and then failed to object on cross-examination to Ms. O'Hara's testimony that Mia was not living with Ms. Christie, the Court fails to see how Defendant can now claim that the admission of this testimony constitutes error.  In the brief exchange above concerning Mia's whereabouts in 2009, to which Defendant did object, there was no mention of the custody battle or intimation that Mia had been taken away from Defendant due to the criminal charges against her or because she was a bad mom.  Thus, no prejudice resulted to Defendant.  Accordingly, the admission of Ms. O'Hara's testimony that Mia was not living with Defendant was not error.

F.       **Admission of Evidence of Ms. Christie's Computer Use**

Defendant argues that the admission of evidence relating to Ms. Christie's computer usage, on-line gaming activities, and chats with on-line friends during 2005 was wholly irrelevant and prejudicial, and therefore, it should have been excluded under Federal Rules of Evidence 401–403.   Defendant argues that this evidence was irrelevant because the government's theory at trial was that Brandi died of dehydration, not malnutrition, and that she was completely healthy at Christmas 2005, just a month before her death. (Doc. 341 at 38.) However, this incorrectly states the government's theory of the case.  The government presented substantial evidence that Brandi was malnourished, including the testimony of Dr. Kellogg, who has considerable experience with starvation cases and concluded that the autopsy showed

83

specific changes to Brandi's liver caused by an extended period of malnourishment. Additionally, the government offered evidence that the last time Brandi saw a doctor was on January 28, 2005. The government argued that this showed that Brandi had been abused during the year before her death in support of counts 2 and 4. (Tr. 2170–75.) Furthermore, the government argued that because Brandi had been malnourished over an extended period, she would have entered the nine-day period preceding her death in a weakened state, and that this would have made it harder for her to seek out food or water on her own. (Tr. 2178.)

The government's evidence of Defendant's computer usage was relevant to show that Ms. Christie was not spending the time required to care for a three-year-old toddler. The evidence of computer usage indicated that Ms. Christie spent the majority of her time at the computer, and therefore, was not spending time with Brandi. Additionally, the on-line chat sessions were relevant because they showed Defendant's state of mind and her negative feelings about being a mom and having to take care of Brandi. The Court was careful, however, to limit the admission of the chat sessions to those that were relevant to facts at issue in the case. (Tr. 814–25.) Consequently, the Court concludes that the admission of Defendant's computer usage and the online chat sessions was not error.

### G.    Cumulative Error

Finally, Defendant argues that, even if no single incident of error was sufficiently prejudicial to warrant a new trial, cumulatively, the errors cannot be considered harmless. (Doc. 341 at 39.) The Court disagrees. As detailed above, the individual incidents described by Defendant did not constitute error, and therefore, the cumulative error analysis is not applicable. Accordingly, the Court concludes that the trial was fundamentally fair and denies Defendant's motion for a new trial under Federal Rule of Criminal Procedure 33.

## VI.     CONCLUSION

This matter came before the Court on Defendant's motions for reconsideration, judgment of acquittal, and a new trial.  First, the Court considered Defendant's motion for reconsideration. A court may grant a motion for reconsideration where there is a need to correct clear error or prevent manifest injustice.  Having reviewed its pre-trial ruling on the Assimilative Crimes Act in light of the government's ultimate theory of the case, the Court concluded it was not in error. On the issue of multiplicity, however, the Court concluded that it was necessary to vacate two of Defendant's homicide convictions under counts 1, 3, and 5 of the Second Superseding Indictment to prevent multiple punishments for the same offense in violation of the Double Jeopardy Clause of the United States Constitution.  New Mexico law requires that each homicide conviction be based on a different act or episode of abuse, and in the case at hand, the government did not offer proof that each of the three offenses arose as a separate and distinct act or episode.  In the end, the government's theory was that a single, continuing episode of abuse over a nine-day period resulted in Brandi's death, and Defendant's conduct during this period satisfied all three homicide crimes.  Consequently, the Court will vacate two of Defendant's three homicide convictions on counts 1, 3, and 5 and hereby requests additional argument on the question of which convictions should be vacated.

Next, the Court considered whether to enter a judgment of acquittal on counts 1, 2, 3, and 5 of the Second Superseding Indictment for insufficient evidence under Federal Rule of Criminal Procedure 29.  The Court determined that based on the evidence presented at trial, a rational trier of fact could have found beyond a reasonable doubt the essential elements for the crimes charged.  The Court therefore denies Defendant's motion for judgment of acquittal.

Finally, Defendant requested the Court grant a new trial (1) due to erroneous jury instructions, (2) because she was prejudiced by a multiplicitous indictment, (3) because the Court erred in admitting irrelevant and unfairly prejudicial evidence, and (4) due to cumulative error.  The Court concluded that the incidents described by Defendant did not constitute error and that the trial was fundamentally fair; accordingly, the Court denies Defendant's motion for a new trial under Federal Rule of Criminal Procedure 33 as not in the interest of justice.

**WHEREFORE,**

**IT IS HEREBY ORDERED** that Defendant's motion for reconsideration is **GRANTED IN PART AND DENIED IN PART**, Defendant's motion for judgment of acquittal is **DENIED**, and Defendant's motion for a new trial is **DENIED**.

_____
**ROBERT BRACK**
**UNITED STATES DISTRICT JUDGE**