# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

|  |  |  |
|---|---|---|
| _____ | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:07-cr-00614-RB** |
| | ) | |
| **REBECCA CHRISTIE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

> Can a mother forget the baby at her breast
>> and have no compassion on the child she has borne?
> Though she may forget,
>> I will not forget you!

> Isaiah 49:15 (New International Version, 1984).

Brandi Wulf died at the age of three years, seven months, and twenty-six days.  The cause of death, in the words of one expert witness at trial, was the "most severe case" of dehydration in a child she had ever seen.  The jury found that this twenty-three pound little girl died as the result of the extreme, callous neglect of her mother, Defendant Rebecca Christie.  Ms. Christie, not happy with the reality that included responsibility for her infant daughter, had escaped into the alternate, virtual reality of a video game, World of Warcraft, where she was a decorated, but childless, warrior.

It falls to me to impose a sentence that is "sufficient but not greater than necessary" (the parsimony principle) to address the sentencing factors contained in 18 U.S.C. § 3553.  Having fully considered the facts of the case, the Guidelines range, the 18 U.S.C. § 3553(a) sentencing factors,

and otherwise being fully informed, I sentence Defendant to a term of 300 months' incarceration.

## I.  PROCEDURAL BACKGROUND

Defendant Rebecca Christie was tried before this Court from October 26, 2009 through November 11, 2009.  The jury found Defendant guilty on Counts 1, 2, 3, and 5 of the Second Superseding Indictment and not guilty on Count 4. (Doc. 316.)  Post trial, Defendant filed Motions for Reconsideration, Judgment of Acquittal, or in the Alternative, for New Trial. (Docs. 341 & 359.) In a Memorandum Opinion and Order dated November 3, 2010, the Court granted in part and denied in part Defendant's Motion for Reconsideration, denied Defendant's Motion for Judgement of Acquittal, and denied Defendant's Motion for a New Trial. (Doc. 379.)  Pursuant to that Memorandum Opinion and Order, the Court then filed an Order vacating Counts 3 and 5 of the Second Superseding Indictment on December 6, 2010. (Doc. 383.)

Defendant therefore comes before the Court on the two remaining counts of second-degree murder (Count 1) and negligent child abuse not resulting in death (Count 2).  An initial sentencing hearing was held on May 12, 2011 to consider Defendant's objections to the Pre-Sentence Report (PSR) and to hear from the government and Defendant with regard to any mitigating or aggravating factors the Court might consider pursuant to 18 U.S.C. § 3553(a).  A final sentencing hearing was then held on May 23, 2011 to pronounce sentence.  This Memorandum Opinion and Order sets forth the basis for the sentence imposed.

## II.  FACTUAL SUMMARY

The following is a brief summary of information the Court found relevant in its pronouncement of sentence.  The facts were gleaned from the trial evidence, the PSR, the Mitigation Evaluation submitted by Defendant, and other relevant information that was brought to the Court's attention.  Consideration of such information is part of a longstanding policy by U.S. Courts to

2

consider the full breadth of information available to arrive at a sentence that fits the individual in both kind and extent. *Pepper v. United States*, 131 S. Ct. 1229, 1239–40 (2011). In this unique case, where the Court cannot look to similar cases to guide its deliberations, an evaluation of such information is all the more critical.

Although Defendant's early upbringing was fairly typical, at the age of sixteen she was sexually abused by a close family friend, Donald Hickey. Mr. Hickey was the best friend of Defendant's father at the time, and after the incident, Mr. Hickey and Defendant's father became estranged. Defendant asserts that she felt responsible for destroying this relationship, and that this caused her relationship with her father to suffer. Following the incident, Defendant's attention to her school work declined. At the age of seventeen, she became pregnant with her first child, Mia.

Mia's father, Robert, did not accept responsibility for the child. Defendant was left to raise the child by herself, with the help of her parents. In 2001, shortly after Mia's birth, Defendant was involved in a serious car accident. She injured her back during the accident and was confined to bed for a lengthy period of time. Shortly thereafter, her father attempted suicide. Later, Defendant left home with her child to live with friends and eventually ended up in a homeless shelter. Defendant's father went to the shelter and convinced her to return home.

Still eager to move out of her parents' home, Defendant met Co-Defendant Derek Wulf online through Match.com. Derek was a divorced airman with one daughter. Defendant moved in with Derek on Eglin Air Force Base in Florida, leaving Mia at home with her parents. Defendant married Derek on February 14, 2002. Derek was verbally and physically abusive to her throughout the marriage. While living with Derek, Defendant became pregnant with Brandi Wulf, her second child, born on June 19, 2002. Defendant had a difficult pregnancy. Medical records from this time indicate that Defendant was diagnosed with depression and anxiety disorders.

In December 2002, Defendant moved with Derek and Brandi, away from Florida and her family support, to Holloman Air Force Base in Alamogordo, New Mexico. Defendant asserts that Derek continued to be physically and verbally abusive, that she was very unhappy at this time of her life, and that she continued to suffer from anxiety and depression. Derek was the primary caretaker for Brandi during this time: he was responsible for the child's medical care, for making doctors appointments, and performing most of the household chores such as cooking, cleaning, and grocery shopping.

Brandi was a special needs child. Brandi demonstrated short stature and poor growth early on. At birth, Brandi was above the 50th percentile on her growth charts, but by two years of age, she had fallen to the bottom of the growth charts (below the 5th percentile), and between twenty-one and twenty-seven months, she gained little or no weight. Brandi had digestive problems which frequently manifested themselves in severe diarrhea and bloating. Brandi was seen by specialists in 2004 and 2005, and several possible theories were considered for her health problems, but a final diagnosis was never made. In November 2004, Brandi was switched from milk to PediaSure, a special nutritional beverage, which alleviated the abdominal bloating, diminished the diarrhea, and increased her weight gain and growth. At the time of Brandi's death, however, not a single bottle of PediaSure was found in Defendant's house.

Brandi did not see a doctor in the year before her death. The Defendants had been instructed to follow up with a gastroenterology clinic in February 2005, but never made an appointment, and the clinic never contacted them to schedule an appointment. Brandi gained only one-and-a-half pounds during the year before she died. Based on her growth charts, she should have gained between three and five pounds during this period. At the time of death, Brandi weighed only twenty-three pounds, the average weight for an eighteen-month-old child.

In the months preceding Brandi's death, Defendant spent the majority of her day on the computer playing the video game World of Warcraft. World of Warcraft is a massively multi-player online role-playing game (MMORPG) with millions of users worldwide. The game is considered highly addictive, causing players to exchange their reality for that of the game, where they make friends, gain confidence, and achieve the kind of satisfaction not to be had in the real world. Defendant frequently participated in four to six hour "raids" in which her team would raid villages or other sites in the game and capture money, weapons, and other items. In the month prior to Brandi's death, Defendant was on the computer nearly continuously from around 2:00 p.m. to 3:00 a.m. each day.

Defendant was responsible for caring for Brandi during the day when her husband Derek was at work; yet, when Derek would come home from work at lunch or in the evening, he would find Defendant on the computer, not caring for the child. Defendant generally failed to provide even the most basic care for her daughter—food, water, and a clean diaper. Derek would leave home around 7:00 a.m., and usually return by 4:30 p.m. When he arrived home, Derek would often find Brandi's water cup empty and her diaper overflowing with diarrhea. When Derek would come home for lunch one or two days a week, Defendant would tell him that Brandi was upstairs taking a nap after being fed; yet, based on the trial testimony, it is likely that Defendant still had not let Brandi out of her room. Defendant indicated that Brandi's routine was to go to bed between 10:00 p.m. and 1:00 a.m. and to wake up between noon and 2:00 p.m. Defendant would often leave Brandi in her room without food or water for periods up to sixteen hours.

Given these circumstances, Derek, exhausted, sought and received a voluntary temporary deployment (TDY) to Langley, Virginia, abandoning his daughter completely to the care of Defendant. Derek's deployment began on January 17, 2006. The TDY was scheduled to last for

5

thirty days.  Nine days after Derek left, Brandi was dead.  On January 26, 2011, Defendant went upstairs to check on Brandi at approximately 2:00 p.m.  She found her limp and unconscious and called 911.  Brandi was pronounced dead at the hospital in Alamogordo later that day.  It is clear that Brandi died as a result of Defendant's extreme neglect.

When the paramedics arrived at Defendant's home at 2:23 p.m., Brandi was non-responsive and did not have a pulse or respiration.  Her lips were blue, dry, cracked, and scaly.  Brandi's eyes, open and glassy, were sunken into their sockets, had dark rings around them, and did not blink or move.  Her skin was bluish-gray in color.  She was cool and clammy to the touch.  Her mouth was completely dry, and each tooth had a black ring around it near the gumline.  One of the medical technicians on scene that day, who had spent four months in Afghanistan, stated that she had never seen anything like it.  Brandi was immediately transported to the Gerald Champion Regional Medical Center where the hospital staff worked for about an hour to revive her.  At approximately 4:00 p.m., the emergency room doctor on duty pronounced her dead.

After Brandi's death, Defendant and Derek Wulf divorced, and Defendant moved back to Florida to live with her parents.  Defendant then became romantically involved with Michael Christie, a single father raising two young sons.  Defendant met Mr. Christie while playing World of Warcraft.  Defendant eventually married Mr. Christie.  They had a girl named Brianna, who was born with Pallister Killian syndrome, a chromosomal abnormality which causes severe disability.  Following Brianna's birth, Defendant had a tubal ligation, which prevents her from having any more children.

Since the jury's pronouncement of its verdict on November 11, 2009, Defendant has been incarcerated at Otero County Prison Facility (OCPF).  Defendant has taken many of the courses offered at OCPF, including anger management and substance abuse, and she is helping to tutor other

inmates who are preparing for their GEDs.  She also crochets blankets which are given to prison visitors as gifts.  When she gets into the Bureau of Prisons, Defendant hopes to continue her education and obtain a college degree.

## III.   LEGAL STANDARD

A district court's determination of a defendant's sentence must be both procedurally and substantively reasonable. *United States v. Friedman*, 554 F.3d 1301, 1307 (10th Cir. 2009). Substantial deference is granted to the sentencing judge, and reversal is only warranted where the court "renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Munoz-Nava*, 524 F.3d 1137, 1146 (10th Cir. 2008) (internal quotations omitted). Procedural reasonableness focuses on whether the judge properly calculated the Sentencing Guidelines range, considered the sentencing factors in 18 U.S.C. § 3553(a), and adequately explained the sentence imposed. *Friedman*, 554 F.3d at 1307; *United States v. Tom*, 327 Fed. App'x 93, 95 (10th Cir. 2009) (unpublished).  "Review for substantive reasonableness focuses on 'whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a).' " *Friedman*, 554 F.3d at 1307 (quoting *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1215 (10th Cir. 2008)).

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).  The Guidelines range, however, is only a beginning point, and the sentencing judge must also consider the 18 U.S.C. § 3553(a) sentencing factors, making an individualized assessment of each case based on the facts presented. *Id*. at 49–50.  The sentencing judge "may not presume that the Guidelines range is reasonable." *Id*.  Nonetheless, in imposing an out-of-Guidelines sentence, the district court must support any deviation with a statement of reasons based on the facts of the case demonstrating that

7

the "justification is sufficiently compelling to support the degree of the variance." *Id.*  "[A] major

departure should be supported by a more significant justification than a minor one." *Id.*

In the case at hand, the PSR calculates a Guidelines range of 360 months to life and

recommends a sentence of 360 months.  Defendant requests a sentence of ten years, a twenty-year

downward variance from the recommended sentence.  To grant such a substantial variance, there

must be a significant and compelling justification.  In making its determination whether such a

variance is warranted, the Court must consider the following factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant . . . ;
> (5) any pertinent policy statement . . . in effect on the date the defendant is sentenced;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  These factors must guide the Court's sentencing determination, which must

be "sufficient, but not greater than necessary, to comply with the purposes set forth [above]." *Id.*

## IV.    ANALYSIS

### A.    Calculation of the Sentencing Guidelines Range

The Court adopts the PSR's finding of a base offense level of 38, calculated pursuant to

U.S.S.G. § 2A1.2(a).

Next, the Court adopts the PSR's finding of a two-level upward adjustment for a vulnerable

victim imposed pursuant to U.S.S.G. § 3A1.1(b)(1).  In the case at hand, the victim, Brandi Wulf, was three years old, particularly small for her age, unable to open doors for herself to access food or water, and completely dependent upon her mother's care.  Accordingly, the Court concludes that a two-level upward adjustment for a vulnerable victim is appropriate.  Defendant does not object to this two-level upward adjustment.

Additionally, the Court adopts the PSR's finding that a two-level upward adjustment for obstruction of justice is warranted due to false statements made by Defendant to the jury.  Defendant objects to this adjustment, arguing that there is no evidence she committed perjury in her testimony. (Doc. 390 at 9.)  An enhancement for perjury is appropriate if the Court finds Defendant (a) gave false testimony, (b) concerning a material matter, and (c) with the intent to provide false testimony, as opposed to the inaccurate testimony resulting from confusion, mistake, or a faulty memory. *United States v. Sarracino*, 340 F.3d 1148, 1172 (10th Cir. 2003).  A matter is material where, if believed, the false statement "would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, *Commentary, n.6.*

In making a perjury determination, the Court must be careful not to impinge upon the constitutionally protected right of a defendant to testify on his or her own behalf at trial; thus, the mere fact that a defendant is found guilty or that her testimony conflicts with the jury's verdict is insufficient. *Sarracino*, 340 F.3d at 1172.  Rather, "[t]he sentencing court is required to 'carefully review the evidence and make findings independent of the jury verdict which specifically identify the testimony at issue and establish that it, in fact, constitutes perjury.' " *Id*. at 1173 (quoting *United States v. Weller*, 238 F.3d 1215, 1222 (10th Cir. 2001)).  Having carefully considered Defendant's testimony in light of the expert medical testimony and other evidence in the case, the Court finds that Defendant knowingly and intentionally made false statements regarding Brandi's fluid intake,

her activity level, and her physical appearance in the days leading up to her death on January 26, 2006. These statements were material because they went directly to the central issue at trial, whether Brandi died from a lack of fluids and nutrition as a result of her mother's neglect, or whether Brandi suffered from an underlying medical condition that caused her to quickly dehydrate and die due to extreme fluid loss.

Specifically, the Court finds that the following statements were contrary to the overwhelming evidence presented at trial and constitute perjury. With regard to Brandi's energy level, Defendant testified that, although Brandi seemed a little irritable and lethargic the day before her death on January 25, 2006 (Tr. 1540–43, 1584), she had been playing (Tr. 1397, 1424, 1584) and walking. (Tr. 1543, 1585.) Defendant testified that Brandi was running on January 24. (Tr. 1581.) With regard to Brandi's physical appearance, Defendant testified that Brandi had little rings under her eyes and looked tired on January 25, but she did not have the dark, black circles that she had at the time of her death. (Tr. 1587.) Additionally, Defendant testified that Brandi's lips were a little dry, but they were not cracked or otherwise abnormal. (Tr. 1587.) Defendant stated that the last time she saw Brandi before she found her non-responsive and called 911 was around midnight or 1:00 a.m. on January 26, 2006 (Tr. 1539); however, Defendant did not notice anything unusual at this time. With regard to Brandi's fluid output, Defendant testified that Brandi had a few mud pie like stools on January 24 and January 25, but no serious or explosive diarrheas. (Tr. 1544, 1564, 1583.) And with regard to Brandi's fluid intake, Defendant testified that Brandi had four or five PediaSures on both January 24 and January 25 (Tr. 1575, 1583, 1590), and that Brandi drank water on January 25 (Tr. 1590–91). In sum, through her testimony, Defendant attempted to convince the jury that Brandi looked and acted normal in the days before her death and that Defendant had provided her with food and water, suggesting that her death was not the product of Defendant's neglect.

10

During the trial, there was considerable expert testimony concerning how Brandi would have looked and acted in the days prior to her death, and how long it would have taken her to get to such a state of malnutrition and dehydration. Dr. Ross Zumwalt, who performed the autopsy on Brandi, testified that the sole cause of her death was dehydration and malnutrition. (Tr. 385.) In order for someone to get this dehydrated, it would have taken several days. (Tr. 381.) During this period, there would have been clear signs and symptoms of dehydration: Brandi would have been less active and listless, her eyes would have appeared sunken, her skin would have been wrinkled, and she would have looked very dry. (Tr. 381.)

Dr. Nancy Kellogg, a professor of pediatrics and Chief of the Child Abuse Division in the Department of Pediatrics at the University of Texas Medical School in San Antonio, who had extensive experience in child dehydration and had testified as an expert in 10–15 child abuse cases dealing with parents depriving their children of fluids, stated that in all her years of experience, she had never come across a child that was so severely dehydrated. Based on similar cases, Dr. Kellogg testified that if fluid and nutrition had been suddenly stopped, it would have taken a period of several days for a child to become so dehydrated and malnourished. (Tr. 990.) During this period, the child would have first become very thirsty and would have sought out water as a survival instinct. (Tr. 990.) If, however, the child were unable to obtain food or water, the dehydration symptoms would become worse, and her brain functions would be affected, causing confusion, a loss of coordination and speech, weakness, lethargy, and eventually complete immobility. (Tr. 991.) As the child progressed through these stages, it would become harder for her to seek out water or to verbalize her needs, and in the case of a child who was as dehydrated and malnourished as Brandi, she would have probably been too weak to even move on January 25. (Tr. 991.) To the attentive person, it would have been readily apparent that the child was debilitated and in need of immediate

11

medical attention. (Tr. 991.)

Dr. Susan Cooper, a developmental and forensic pediatrician, testified that a normal person would be able to recognize the signs of dehydration in a child based on common sense. (Tr. 2091–92.)  In terms of behavior, first, the child would become thirsty, and if the child could walk or communicate in any way, the child would drink anything she could get her hands on. (Tr. 2084.)  Eventually, if the child did not receive any fluids, she would start to become tired and lethargic, then disoriented, and eventually she would become unresponsive and difficult to arouse. (Tr. 2085.)  In terms of physical signs, the child would stop voiding; in other words, the child's diapers would not be wet. (Tr. 2084–85.)  The urine would also begin to look very concentrated and yellow. (Tr. 2085.)  The child's skin would lose its turgor around the mouth, and her saliva would become sticky. (Tr. 2085.)  Eventually, the child's mouth and lips would become dry and split. (Tr. 2085.)  The child's skin would also start "tenting," i.e., if you picked up the skin between your thumb and forefinger, it would stay in place. (Tr. 2085–86.)  The child's abdomen would also begin to sink because the child would not have any fluid in the bladder and the abdomen. (Tr. 2086.)  If the dehydration became more severe, the child's eyes would begin to sink. (Tr. 2086.)  At the time of her death, Brandi exhibited many of these physical signs of dehydration: Brandi's lips were dry, cracked, and split; her eyes were sunken; her abdomen was flat and sunken; and there was a loss of skin turgor or smoothness. (Tr. 2090.)

When asked what Brandi would have looked like when she was put to bed on January 25, 2006, Dr. Cooper indicated that there were two ways for Brandi to get as dehydrated as she was: either she had an excessive output of fluids—which can dehydrate in a relatively short period of time—or she was not taking in enough fluids to stay hydrated. (Tr. 2087–88.) For Brandi to become as dehydrated as she was due to fluid loss, she would have had to have a fluid output of at least a

quart of fluid, and there was no evidence, based on Defendant's statements, Brandi's diaper from

that evening, or the sheets and blankets that were found in Brandi's room, that she had anywhere

near that level of fluid output. (Tr. 2094.)  Furthermore, the autopsy showed absolutely no indication

of copious diarrhea or that Brandi was "stooling out." (Tr. 2095.)  Without any evidence of copious

output, Brandi must have become dehydrated due to inadequate intake of fluids, which would have

taken a period of several days, during which time the signs of dehydration would have become

progressively more apparent. (Tr. 2093–94.)  Accordingly, on the night of January 25, the physical

and behavioral signs would have been obvious.

       Dr. Todd Cameron Grey, the Chief Medical Examiner for the State of Utah, testified for the

defense; however, when confronted with Defendant's testimony regarding Brandi's condition in the

days leading up to her death, Dr. Grey indicated that, if Brandi only had a few mud pie-like

diarrheas a day, as Defendant indicated, then restriction of fluids or inadequate intake would have

to be considered as a more substantial contributing factor in explaining her dehydration and death.

(Tr. 1693–95.)  Additionally, Dr. Grey admitted that if, as Defendant testified, Brandi had four

PediaSures a day and only a few mud pie like stools a day on January 24–25, 2006, then her level

of dehydration on January 26, 2006 would be inconsistent with this scenario. (Tr. 1697–99.)

       In light of the considerable evidence to the contrary, the Court finds it incomprehensible that

Brandi would not have shown very serious signs of dehydration and malnourishment on the day

before her death, and that these signs would have been quite obvious to any reasonably attentive

caretaker.  Additionally, the Court finds Defendant's description of Brandi's fluid intake and output

inconsistent with the testimony and Brandi's death.  Had Brandi actually consumed four or five

Pediasures and a cup of water the day before she died without any serious diarrhea or other fluid

loss, she would not have been so severely dehydrated at the time of her death.  In sum, Defendant's

testimony simply does not match up with the evidence, and the inaccuracies go beyond mere confusion, mistake, or a faulty memory. Therefore, the Court concludes that Defendant knowingly and intentionally gave false testimony concerning a material matter and imposes a two-level upward adjustment pursuant to U.S.S.G. § 3C1.1.

The Court therefore finds that the adjusted offense level of 42, as recommended in the PSR, is appropriate. Additionally, the Court adopts the PSR's finding of a Criminal History Category I, with a resulting Guidelines range of 360 months to life. The Court next considers the 18 U.S.C. § 3553(a) Sentencing Factors to determine whether an upward or downward variance is appropriate.

### B.     18 U.S.C. § 3553(a) Sentencing Factors

#### 1.     *Parsimony Principle*

Guiding the Court's deliberations in any sentencing determination is the parsimony principle of § 3553, which requires the Court to impose a sentence that is "sufficient but not greater than necessary to effectuate the purposes of sentencing." *United States v. Martinez-Barragan*, 545 F.3d 894, (10th Cir 2008). For the sentencing judge, the parsimony principle is a troubling concept in every case, but all the more so in a case such as this where the stakes are so high. The notion that there exists a sentence, in any case, that is precisely sufficient, and no more or less so, implies a mathematical certainty beyond the reach of this trial judge. Nevertheless, it falls to the Court to find a just and reasonable sentence. Ultimately, the Court has considered the information presented in light of the sentencing factors, and thus arrived at a sentence that I believe is "sufficient, but not greater than necessary." 18 U.S.C. 3553(a); *see also United States v. Irey*, 612 F.3d 1160, 1196–97 (11th Cir 2010) ("The requirement is not merely that a sentencing court when handing down a sentence be stingy enough to avoid one that is too long, but also that it be generous enough to avoid one that is too short."). What follows is the Court's analysis of those factors.

14

2.      *Defendant's Characteristics and Circumstances of the Offense*

This is not a case of intentional murder, but rather a story of horrendous neglect.  The government's theory at trial was not that Defendant deliberately or intentionally killed Brandi, but that her death was the product of her mother's extreme neglect over a period of many days, making this crime, in some ways, similar to involuntary manslaughter, in that it was prosecuted on a *mens rea* theory of callous and wanton disregard for human life. *See United States v. Wood*, 207 F.3d 1222, 1229 (10th Cir. 2000) (concluding that the "substantive distinction" between the two crimes "is the severity of the reckless and wanton behavior: Second-degree murder involves reckless and wanton disregard for human life that is extreme in nature, while involuntary manslaughter involves reckless and wanton disregard that is not extreme in nature.").  While the government points to intentional acts by Defendant (such as placing Brandi in her room for a period of fourteen to sixteen hours with no water), and statements by Defendant that she wished she could start over without children, for purposes of sentencing, the Court does not find Defendant acted with the intent to kill Brandi, but rather with a callous and wanton disregard for the life of her daughter.

This being the case, the Court must consider that, on the spectrum of behavior that constitutes second-degree murder, the fact that Defendant did not act with the intent to kill argues for placing her crime at the lower end of the Guidelines range.  In a somewhat analogous case, *United States v. Grant*, 2008 WL 2485610 (D. Neb. June 16, 2008), the prosecution pursued both theories of voluntary manslaughter and second-degree murder, with the district court instructing the jury that voluntary manslaughter was a lesser-included offense of second-degree murder. *Id*. at *1. The jury convicted the defendant of second-degree murder, however, in making its sentencing determination, the court found that the evidence presented at trial put the defendant's crime right on the line separating second-degree murder from voluntary manslaughter. *Id*. at *7.  Accordingly,

the district court concluded a sentence at the high end of the Guidelines for voluntary manslaughter and the low end of the Guidelines for second-degree murder would be appropriate. *Id.*

In the case at hand, however, the fact that Defendant's neglect was continuous for at least a period of several days demonstrates an extreme level of recklessness and nudges Defendant's conduct up the scale, away from the involuntary manslaughter line. The trial testimony clearly established that Brandi did not become so malnourished and dehydrated overnight, especially considering the absence of any soiled diapers in the house indicating an extreme evacuation of bodily fluids. Thus, Brandi's death was slow enough that a reasonable, concerned parent would have noticed the signs of dehydration and sought medical attention. Yet, for reasons of anxiety about leaving the house, her total involvement in World of Warcraft, and an extreme callousness toward the well-being of her daughter, Defendant failed to properly care for her daughter or seek medical attention. In sum, while the fact that Brandi's murder was the product of reckless, and not intentional, behavior should be considered as a mitigating factor, the level of recklessness involved in the crime militates against any significant variance.

Defendant points to several other mitigating factors concerning the nature and circumstances of the crime that warrant a downward variance. Similar factors were applied in *United States v. Tom*, 327 Fed. App'x 93 (10th Cir. 2009) (unpublished) to grant a significant downward variance. Specifically, Defendant cites to her youthfulness, her depression and anxiety, the fact that she was left alone to care for the child, her abusive marriage, and her lack of prior criminal history as significant mitigating factors in the case at hand that demonstrate her conduct was aberrational, and not the result of a cold-hearted party girl's desire to be rid of her maternal responsibilities. Having considered the facts of this case, the Court finds that a slight downward variance may be warranted based on the circumstances of the offense, but that a significant variance is clearly not appropriate.

16

In *Tom*, the Tenth Circuit pointed out two significant factors in its conclusion that the district court did not abuse its discretion: (1) Mr. Tom had significant mental deficiencies, and (2) Mr. Tom was only eighteen years old at the time of the offense. *Id*. at 96.  Mr. Tom clearly lacked the intellectual and moral maturity of an adult.  While Ms. Christie was a youthful mother at twenty-three years of age, she did not have the same mental difficulties that Mr. Tom did.  Additionally, Defendant produced evidence that she suffered from depression and anxiety that may have made it difficult for her to leave the house and interact with people in social environments, but there was no evidence, either at trial or in the Mitigation Evaluation that her psychological problems had so debilitated her that she was unable to care for Brandi.  Additionally, in *Tom*, there was evidence that Mr. Tom had not actually killed the infant, but rather only assisted in the crime after the fact by disposing of the body.

While Derek Wulf undoubtedly shares some measure of blame for abandoning his caretaker duties for Brandi, this did not absolve Defendant of her parental duties.  As Brandi's sole caretaker while Derek was away from home, Defendant must shoulder the bulk of the responsibility.  Thus, while Defendant's young age, her struggles with anxiety and depression, her abusive relationship, and her apparent addiction to World of Warcraft do offer some mitigation, they cannot be said to reduce Defendant's moral culpability to the same extent recognized by the Tenth Circuit in *Tom*.

Finally, the Court notes that before the death of her daughter and her convictions for murder and child abuse, Defendant had lived a completely law-abiding life.  Defendant has no criminal history, no history of drug or alcohol abuse, and she has never been incarcerated.  The Court may therefore consider a downward variance based on Defendant's history of physical and sexual abuse, her psychological problems, her lack of a history of drug or alcohol abuse, and her lack of any criminal history.  While these factors do not excuse her conduct, they do mitigate her culpability to

17

some extent.

On the other side of the coin, the Court must consider those factors that favor a more severe sentence. Clearly the victim's young age, her vulnerability, Defendant's relationship to the victim, and the manner of death all militate in favor of a more severe sentence. The government has argued that, while the Adam Walsh Act, 18 U.S.C. § 3559(f), does not apply in this case (it did not become effective until July 27, 2006, six months after the crime), it does express a general Congressional intent to impose harsh sentences on those who murder juvenile victims. (Doc. 392 at 5.) The Adam Walsh Act, however, only applies to a "crime of violence," which is defined as "an offense that has an element the use, attempted use, or threatened use of physical force against the person." 18 U.S.C. § 16. Citing to *United States v. Waupoose*, 627 F. Supp. 2d 930, 935 (E.D. Wis. 2008), the government argues that "[s]econd degree murder clearly fits within this definition." In *Waupoose*, the defendant was charged with first-degree murder for causing the death of an eight-week-old infant as part of a pattern and practice of physical abuse of the child. *Id*. at 932. The defendant then pled to second-degree murder to avoid a mandatory life sentence. *Id*. Prior to sentencing, however, the government discovered the mandatory life sentence provision of 18 U.S.C. § 3559(f). *Id*. The district court ultimately concluded that the Act applied, and that it was required to impose a life sentence. *Id*. at 935–36.

Notwithstanding the district court's conclusion in *Waupoose*, it is not clear the Act should apply in every case of second-degree murder. Section 3559(f) states that the mandatory minimum only applies in crimes of violence against a person under the age of eighteen. In the case at hand, however, there was no evidence of any physical abuse or violence against Brandi. In determining whether specific behavior represents a crime of violence, "the Supreme Court has instructed sentencing courts to take 'a formal categorical approach, looking only to the statutory definitions

18

of the prior offenses, and not to the particular facts underlying those convictions.' " *United States v. Perez-Vargas*, 414 F.3d 1282, 1284 (10th Cir. 2005).  However, where a "statute is ambiguous, or broad enough to encompass both violent and nonviolent crimes, a court can look beyond the statute . . . ." *United States v. Dwyer*, 245 F.3d 1168, 1171 (10th Cir. 2001).  Although murder generally requires some sort of violent act against a person or property, and the statute provides several examples—sexual abuse, child abuse, robbery, assault, torture, arson, sabotage—it can also be perpetrated in a nonviolent manner. 18 U.S.C. § 1111.  For instance, murder can be accomplished through poisoning or through a "reckless and wanton disregard for human life that is extreme in nature." *Wood*, 207 F.3d at 1229.  Therefore, not all murder necessarily qualifies as a crime of violence because it can be accomplished without the use of, threatened use of, or substantial risk of physical force against a person or property. 18 U.S.C. § 16.  In such a case, the Court is required to look beyond the statute to determine whether the facts of the case constitute a crime of violence.

Here, the government's theory at trial was not that Defendant physically abused Brandi, but rather that she died as a result of extreme neglect over a nine-day period.  Nowhere in the record is there any indication that Brandi suffered from physical abuse.  As far as the Court is aware, Defendant's crime was entirely non-violent, and therefore, the mandatory minimum of Section 3559(f) would not apply in the case at hand.  As the Adam Walsh Act covers only *violent* crimes against children, the Court does not believe it demonstrates a clear Congressional intent to impose a thirty year minimum sentence in all second-degree murder cases involving child victims.

Still, the Court does take note of the fact that Congress and the Sentencing Commission have clearly expressed an intent to protect vulnerable victims and child victims, regardless of whether or not the crime involved any physical violence.  For instance, under U.S.S.G. § 3A1.1(b)(1), Defendant received a two-level upward adjustment for a vulnerable victim.  The PSR accordingly

19

indicates that a two-level upward adjustment was warranted because Brandi was only three years old, she was particularly small for her age, and she was dependent on her mother for her care.

Finally, the Court finds that Defendant's relationship to the victim, and the manner of death militate in favor of a harsh sentence. For at least part of each day, Defendant kept Brandi at her feet while she played World of Warcraft; yet, she was oblivious as the signs of her daughter's dehydration and impending death became more and more obvious. Defendant was so engrossed in an alternative reality that she was unable to provide the most basic care to her daughter, who slowly withered, suffering what must have been a slow and agonizing death. One shudders to imagine how Brandi felt, when the one person on whom she should have been able to count, the person who gave her life, failed to recognize her suffering and failed to fulfill her most basic needs.

Defendant requests a significant downward variance based on the nature and circumstances of the offense, arguing that her psychological problems, her youthfulness, her emotional immaturity, the difficulties of her marriage, her dependence on her abusive husband, and Brandi's fragile medical condition created an unfortunate but aberrational confluence of events that led to Brandi's death. Defendant paints herself as the victim in this case, but the Court cannot forget the true victim. Brandi was only three years old at the time of her death and depended exclusively on her mother, and this mother-daughter bond was forsaken in an abhorrent manner. Having thus balanced the mitigating and aggravating factors in this case, if anything, they weigh in favor of a harsher sentence.

### 3. *Sentencing Disparities for Second-Degree Murder*

Under 18 U.S.C. § 3553(a)(6), the sentencing judge should attempt "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Pointing to several second-degree murder cases where the defendants were sentenced to

much lesser sentences than those recommended in the PSR—*Grant*, *Tom*, and *United States v. Deegan*, 605 F.3d 625 (8th Cir. 2010)—Defendant asserts that a sentence higher than ten years for Ms. Christie would create an unwarranted disparity with other similarly situated defendants. (Doc. 391 at 19.)  Nonetheless, second-degree murder encompasses a broad range of conduct from extreme recklessness resulting in death to intentional and deliberate murder.  The case law reflects that broad range of sentences.  This does not mean, however, that all of the defendants were found guilty of similar conduct.  In considering whether the recommended sentence of 360 months' imprisonment in the case at hand would result in an unwarranted sentencing disparity, the Court must therefore look at the facts of the individual cases to determine each defendants' conduct and consider how Ms. Christie's behavior compares.

In *Grant*, 2008 WL 2485610 at *8, the district court varied downward from a recommended sentence of 292–365 months, to impose a sentence of 180 months.  This downward variance was based on a number of factors.  First, the court considered the history of abuse that the defendant had suffered at the hands of her husband, which helped provoke the murder, putting the crime on the borderline between second-degree murder and involuntary manslaughter.  *Id*. at *7.  The district court also considered as mitigating factors that Ms. Grant had been sexually abused as a child, that she had been exposed to drugs and alcohol at a young age, that both her parents were violent alcoholics, that she had become pregnant at the age of thirteen, that she had been in abusive relationships all of her life, and that she had serious psychological problems.  Furthermore, the court decided to give less deference to the base offense level for second-degree murder as it was not empirically-grounded in past sentencing practices.

In *Tom*, 327 Fed. App'x at 95, the Tenth Circuit affirmed the district court's decision to vary downward from a recommended sentence of 135–168 months, to impose a sentence of 70 months.

21

The district court decided to vary downward primarily based on defendant's lack of criminal history, his "borderline mental retardation," and his emotional and intellectual immaturity. *Id*. at 96. The court concluded that Mr. Tom's conduct was the product of a "highly unique confluence of circumstances in this case," that was "aberrational," and unlikely to occur again. *Id*. The district court also looked at the fact that Mr. Tom's co-defendant had only received a 44-month sentence and cited to the need to avoid unwarranted disparities between similarly situated defendants. *Id*. at 97. Finally, the court acknowledged that a lengthy incarceration would delay Mr. Tom's access to much-needed rehabilitative programs. *Id*. The Tenth Circuit consequently found the sentencing court's imposition of a 70-month sentence was not unreasonable.

In *Deegan*, 605 F.3d at 629, the district court sentenced the defendant to 121 months' imprisonment, the low end of the Guidelines range of 121–151 months. The range was based on the 1997 Sentencing Guidelines in effect at the time of the offense, applying a two-level upward adjustment for a vulnerable victim, and a three-level decrease for acceptance of responsibility to obtain a total offense level of 32. The major disparity between the calculated range in *Deegan*, and the calculated range in the case at hand appears to be the base offense level, which was 33 under the 1997 Guidelines, compared to 38 in the case at hand, and the three-level downward departure for acceptance of responsibility that Ms. Deegan received. In reaching its decision to sentence at the lower end of the Guidelines range, the district court considered several mitigating factors, including the sexual and physical abuse that the defendant had suffered, but ultimately concluded that a sentence within the advisory range of 121–151 months was necessary to "ensure that justice is done" and acknowledge the fact that an innocent life had been lost. *Id*. at 630. The Tenth Circuit accordingly concluded that the sentence was procedurally and substantively reasonable.

While these cases do present some factual similarities, they can also be distinguished. In

*Grant*, the defendant's conduct was much closer to the line between manslaughter and murder than in the case at hand.  In *Tom*, the very unusual characteristics of the defendant and the circumstances of the crime warranted a significant downward variance not justified here.  And in *Deegan*, the disparity appears to be the result of changes to the Guidelines range and the departure for acceptance of responsibility, rather than the result of any variance granted by the court.  In sum, these cases can be distinguished on their facts; and therefore, they do not represent "similar conduct" warranting a significant downward variance to avoid unjustified sentencing disparities.

Defendant additionally argues that a downward variance is justified based on  her ex-husband's likely sentence.  Mr. Wulf pled guilty to child abuse not resulting in death, which carries a maximum sentence of three years' imprisonment.  Defendant asserts that because Mr. Wulf was also responsible for the care of their daughter Brandi, he is similarly situated, and sentencing Ms. Christie to anything more than ten years would create an unwarranted sentencing disparity. (Doc. 391 at 18.)  Mr. Wulf does share some of the guilt for Brandi's death, as he was aware of his wife's pattern of neglect for their daughter, but to call him similarly situated is not warranted. Where two parents equally join in physically abusing a child, and the child ultimately dies as a result of these injuries, a great disparity in the sentences imposed would be unjustified.  In the case at hand, however, Ms. Christie was clearly capable of caring for Brandi by herself, including taking her to the doctor if necessary, cooking her food, giving her water, and going to the store to buy provisions.  While Ms. Christie may not have enjoyed doing these activities, she was certainly capable of performing them.  Thus, her conduct can be distinguished and her culpability was clearly greater.

Next, the government argues that a thirty year sentence is necessary to avoid an unwarranted disparity because, since July 27, 2006, every defendant convicted of murdering a child faces a

mandatory minimum of thirty years, if certain factors are met. Again, the government has not shown that these factors were met in the case at hand, as it can be argued that this was not a crime of violence. Accordingly, the § 3559(f) cases are inapposite to the case at hand. The government additionally cites to two second-degree murder cases involving young, vulnerable victims—*United States v. Vallo*, 238 F.3d 1242 (10th Cir. 2001) and *United States v. Phillip*, 948 F.2d 241 (6th Cir. 1991)—as indicative of a need to impose a lengthy sentence to avoid an unwarranted sentencing disparity. Nonetheless, both of these cases involve physical abuse.

In *Vallo*, 238 F.3d at 1244, the district court imposed a sentence of 210 months for Mr. Chino and 240 months for Ms. Vallo for the murder of Ms. Vallo's sixteen-month-old son who died as the result of subdural hemorrhaging caused by non-accidental head wounds. While the Tenth Circuit did not discuss the sentencing factors or the reasonableness of the sentence in its opinion, the facts of the case indicate that the baby died from extreme physical abuse occurring on the days leading up to his death. In contrast to the case at hand, the death was caused by the infliction of continued, physical abuse, rather than neglect.

In *Phillip*, 948 F.2d at 246, the district court sentenced Mr. Phillip to thirty years' imprisonment for the crime of second-degree murder. The Tenth Circuit discussed the reasonableness of the district court's decision to depart upward from the Guidelines range. *Id.* at 252. The Tenth Circuit concluded that the district court's imposition of a thirty-year sentence, which represented an upward departure of 98 months, or three offense levels, was reasonable. *Id.* at 253–54. The sentencing judge based his decision on the policy statement in U.S.S.G. § 5K2.8, which justifies upward departures in crimes that are unusually heinous, cruel, brutal, or degrading to the victim. *Id.* at 252–54. The defendant had physically abused the victim over a period of months, inflicting an average of two to three beatings per day. *Id.* at 245. "The defendant's own

24

expert witness testified that this was the worst case of child abuse he had ever seen." *Id*. at 253. Again, the murder resulted from the physical abuse of a child victim.

The above case law would certainly seem to justify a sentence in the range of twenty to thirty years. Given the extreme cruelty of the abuse described in *Phillip*, and the significant departure that was imposed to arrive at a sentence of thirty years in that case, a sentence at or beyond thirty years might constitute an unwarranted sentencing disparity.

### 4.    *Need for the Sentence Imposed*

Finally, under 18 U.S.C. § 3553(a)(2), the Court is instructed to consider (A) whether the length of the sentence reflects the seriousness of the offense, will promote respect for the law, will provide a just punishment, (B) will afford adequate deterrence to criminal conduct, (C) will protect the public from further crimes by Defendant, and (D) will promote Defendant's rehabilitation by providing needed educational training, correctional treatment, and medical care.

Defendant argues that a ten year sentence would be more than sufficient deterrence (1) because she has never been incarcerated, and (2) because the death of Brandi and her separation from her other children, Mia and Brianna, have taken a heavy emotional toll.  Following her conviction, Defendant lost custody of her first child, Mia, and she is prohibited from any physical contact with her daughter Brianna.  Defendant argues that these are tremendous punishments in and of themselves.  While the loss of her children has undoubtedly taken a heavy toll on Defendant, the Court does not find that this should weigh heavily in its determination of an adequate sentence.  This is always a consequence for those convicted of child abuse, and it should weigh heavily on Defendant, but it does not justify a downward variance.  Nonetheless, given the fact that Defendant has never been previously incarcerated before her arrest for this crime, the Court finds that a sentence of 300 months' imprisonment would provide sufficient deterrence.  While a thirty year

25

sentence as recommended in the Guidelines may be justified based on the seriousness of the offense, the Court finds such a lengthy period of incarceration would be excessive in this case as Defendant has no criminal history, and a shorter sentence will provide adequate deterrence.

Next, it does not appear that Defendant poses a threat to the general public.  Obviously, she can no longer be trusted as a care giver; but she had a tubal ligation following the birth of her daughter Brianna Christie, preventing her from having any more children, and the imposition of appropriate conditions of supervised release should be able to minimize any potential risk to other children.  Furthermore, as Defendant will be incarcerated for the next 300 months, by the time of her release, her children will have grown to the point they can take care of themselves.

Finally, the Court must consider whether the sentence imposed will facilitate Ms. Christie's rehabilitation, and how the Court can best provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Ms. Christie has stated that she intends to obtain a college degree once she gets into the Bureau of Prisons, and she has already completed several of the courses offered at OCPF.  The Court hopes that she will continue to pursue this goal and the educational opportunities that are available through the Bureau of Prisons.  In regard to Defendant's assertion that she will be unable to receive needed medical care or one-on-one therapy while incarcerated, the Court does not find this persuasive.  The Bureau of Prisons is required to provide inmates with needed medical care, and while Defendant may not have access to one-on-one therapy, she can receive group counseling to help her deal with her psychological problems. Accordingly, the Court finds that its sentence is sufficient in this aspect.

In sum, the Court finds that a sentence of 300 months' imprisonment is needed to effectuate the purposes of sentencing.  While this sentence does represent a harsh penalty, Defendant's conduct was particularly reprehensible, and such a harsh sentence is needed to promote respect for the law.

The Court does not believe that Defendant presents a particular threat to the public—although she should not be placed in a position to care for anyone in the future—and therefore, its sentence is sufficient to provide adequate protection to the public.  Finally, the Court hopes Defendant will take full advantage of the more than adequate opportunities for education, vocational training, medical care, and counseling that will be afforded to her while in the custody of the Bureau of Prisons.

## V.      CONCLUSION

The Court finds a sentence within the recommended Guidelines range of 360 months to life as calculated in the PSR would be inconsistent with the sentencing factors of § 3553 and the Sentencing Reform Act's requirement that the Court impose a sentence sufficient, but not greater than necessary to effectuate the purposes of sentencing.  Therefore, the Court grants a downward variance, and for the reasons set forth above, the Court sentences Defendant Rebecca Christie to 300 months' imprisonment.  In addition to this sentence having been pronounced in open Court and on the record today, a Judgement of Conviction in conformity with this Memorandum Opinion and Order will issue this date.

_____
ROBERT BRACK
UNITED STATES DISTRICT JUDGE

27